Exhibit C is a true and correct copy of relevant excerpts and exhibits from Mrs. Griffin's deposition.

Atkinson-Baker, Inc.
www.depo.com

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4   ROSA AGUILAR, an individual,   )   **CERTIFIED COPY**
                                    )
5                    Plaintiff,     )
                                    )
6           vs.                     )  No. 2:19-CV-02285
                                    )
7   EXPEDITORS INTERNATIONAL OF     )
    WASHINGTON, INC., corporation;)
8   and DOES 1 through 20,          )
    inclusive,                      )
9                                   )
                     Defendants.    )
10  _____)

11

12

13                 DEPOSITION OF

14                  DIANE GRIFFIN

15            LOS ANGELES, CALIFORNIA

16          WEDNESDAY, MARCH 11, 2020

17

18

19
    ATKINSON-BAKER, INC.
20  (800) 288-3376
    www.depo.com
21
    REPORTED BY:  DIXIE LYNCH, CSR NO. 9521
22
    FILE NO. AE02296
23

24

25

Atkinson-Baker, Inc.
www.depo.com

```
1      A    No.
2      Q    All right.
3           You are still employed with Expeditors; right?
4      A    Correct.
5      Q    When did you start working with Expeditors?
6      A    November of 1997.
7      Q    All right.
8           And what's your current position?
9      A    Branch administrative manager.
10     Q    In the time frame between 2015 and 2017, what was
11  your position?
12     A    2015 and 2017?
13     Q    Yeah.
14     A    Branch administrative manager.
15     Q    Okay.
16     A    And I also oversaw the accounting department.
17     Q    Do you no longer oversee the accounting
18  department?
19     A    Correct.
20     Q    Other than no longer overseeing the accounting
21  department, have your job duties changed in any other way?
22     A    No.
23     Q    How come you don't oversee the accounting
24  department anymore?
25     MS. WASSERMAN:  Objection to the extent it calls for
```

Atkinson-Baker, Inc.
www.depo.com

1      A     Holandez.

2      Q     All right.

3            And then did you report to anybody in 2016 and

4    2017?

5      A     Yes, I did.

6      Q     Who did you report to?

7      A     Carlton Ruesch.

8      Q     All right.

9            Do you know who Eric Mooney is?

10     A     Yes, I do.

11     Q     And is Eric Mooney somebody that reported to you

12   or that you reported to?

13     A     Eric Mooney reports to Carlton Ruesch.

14     Q     But are you and Eric, are you at equal levels, or

15   were you at equal levels in 2017?

16     MS. WASSERMAN:  Vague and ambiguous as to the term

17   "equal levels."

18   BY MR. HOPPER:

19     Q     Or were you totally separate from his duties?

20     MS. WASSERMAN:  Again, vague and ambiguous.

21           Can you clarify the question?

22   BY MR. HOPPER:

23     Q     Well, do you understand what I'm trying to ask

24   you?  I'm just trying to ask did you report to Eric or did

25   Eric report to you?  Did you even --

Atkinson-Baker, Inc.
www.depo.com

1    were at the 5757 in 2009 until you moved to the Torrance

2    location.

3        THE WITNESS:  Correct.

4    BY MR. HOPPER:

5        Q    How long have you and Rosa been working together

6    at Expeditors?

7        MS. WASSERMAN:  Vague and ambiguous as to the term

8    "working together."

9    BY MR. HOPPER:

10       Q    At the same office location.

11       A    I can estimate about 18 to 20 years.

12       Q    Had you ever met Rosa before she started working

13   at Expeditors?

14       A    No.

15       Q    All right.

16            She was an accounts payable clerk; right?

17       A    That is correct.

18       Q    And what were her job duties as of 2016 and 2017?

19       MS. WASSERMAN:  Calls for a narrative.

20            You may respond.

21       THE WITNESS:  She paid our transportation vendors.

22   She would reconcile our journal voucher transfers.  She

23   did some other internal accounting duties.  I'm not real

24   in tune with the specifics other than those.  The main one

25   was she paid our transportation vendors.

Atkinson-Baker, Inc.
www.depo.com

1    Q    What was the problem with her computer?

2    A    She -- she would say that things were being

3  deleted from her computer.  She -- her -- her manager went

4  over -- I'm sorry.  Her supervisor went over and sat and

5  observed it to see what was going on, and she would say,

6  "See, that's what has happening," and "That's what's

7  happening."  The supervisor said, "No.  That's fine.

8  Everything is fine there."  So there were just some things

9  that we couldn't put our finger on in terms of her

10  computer functioning.

11    Q    Wasn't it that she was saying she was trying to

12  delete things and it wouldn't let her delete things?

13    A    It was one or the other.  I don't remember

14  without reviewing my notes, but it was a whole thing about

15  deleting and not deleting.

16    Q    Okay.

17         Did she also -- so how did that lead to her

18  missing details when it came to her work product?

19    A    I don't recall offhand.  I believe there's some

20  things in my notes on that.

21    Q    Do you know who complained to you that she was --

22  that her work product was lacking when it came to the

23  details?

24    A    Maria Higa, her supervisor; and Lisa Blandi would

25  also be involved in reporting that to me.

Atkinson-Baker, Inc.
www.depo.com

1    Describe what started happening in 2016 -- March

2  of 2016 with respect to Rosa's attitude or behavior

3  problems that you became aware of.

4    MS. WASSERMAN:  Objection.  Vague and ambiguous, and

5  calls for a narrative.

6    MR. HOPPER:  Well, I will rephrase.

7  BY MR. HOPPER:

8    Q    When did you first become aware that employees

9  had complaints about Rosa's attitude or behavior in 2016?

10    A    That would have been shortly before April 29th as

11  documented in my notes.

12    Q    All right.

13    And how did you become aware?

14    A    Maria Higa began alerting us that Rosa was asking

15  for some changes in her workplace, and she was just having

16  discussions with her.  And then my first direct

17  involvement was April 29th, and I became aware and

18  experienced some of the things Maria had reported to us.

19    Q    What did Maria report?

20    A    That she was saying some strange things.  That

21  she had some concerns about her.  But it was very

22  infrequent.  It wasn't happening daily.  She was doing her

23  daily work still.  But Rosa and Maria had worked together

24  a very long time.  Probably the entire time Rosa was there

25  Maria and she worked together.  So Maria was becoming

1  concerned about her change in behavior, demeanor.

2      Q    What was -- what did Maria report to you that

3  Rosa was saying or doing that was concerning to her?

4      A    I would have to look at my notes to be able to

5  recall that part of it.

6      Q    Okay.

7      A    Because some of those things were documented in

8  those notes.

9      Q    Do you recall -- without looking at your notes,

10 do you recall any of Rosa's behavior that Maria found

11 concerning?

12     A    I don't -- I can't distinguish what happened

13 before my involvement from after.  I remember after my

14 involvement better, so I don't want to speculate on what

15 was before and what was after my involvement.

16     Q    Do you remember what Maria told you Rosa was

17 requesting to be changed in her work space?

18     A    She requested her desk to be moved, and Maria

19 told her that she would be happy -- well, can I say -- her

20 first request months prior to that was if she could change

21 her end time by five minutes -- I believe it was

22 five minutes.  It was a short period of time -- because of

23 our parking lot situation, and Maria said sure.  That's

24 fine.

25          And then the most recent where other things were

Atkinson-Baker, Inc.
www.depo.com

1    observed in terms of her demeanor changing as well.  She

2    seemed to be -- she was requesting a desk change, and

3    Maria said, "Well, I can change your desk if that will

4    help you feel better about being in the department."  She

5    was uncomfortable in the department for some reason.

6    Again, without looking at my notes, I'm having a hard time

7    distinguishing my conversation April 29th from what Maria

8    told us.

9        Q    Well, at any time, did you become aware why Rosa

10   was seeking for her desk to be moved?

11       A    April 29th.

12       Q    Okay.

13            So what did she -- was this a meeting that you

14   had with Rosa?

15       A    Yes.

16       Q    Okay.

17       A    That's a meeting I had with Rosa.

18       Q    Okay.

19       A    And Lisa Blandi was present.

20       Q    Okay.  All right.

21            And what did Rosa tell you?  This was 2016;

22   right?

23       A    Yes.

24       Q    Okay.

25            So what did Rosa tell you during this April 29,

```
 1   2016, meeting?
 2      MS. WASSERMAN:  Calls -- objection.  Calls for a
 3   narrative.
 4          You just want the meeting recalled?
 5      MR. HOPPER:  Sure.
 6   BY MR. HOPPER:
 7      Q    What happened during the meeting?
 8      A    It was a lengthy meeting, so it's a -- and that
 9   was one of the reasons I documented it.  So, yes, I
10   reviewed my notes with my attorneys.  But it was a lengthy
11   meeting, so it's hard to give you a quick summary.
12      Q    Uh-huh.
13      A    The most prominent -- there was a couple
14   prominent things, so it's not going to be everything that
15   happened during that meeting.  One is it was very obvious
16   that Rosa was extremely agitated.  And in the meeting, she
17   stated that she was very nervous and anxious and that this
18   only happens at work.  I remember that very distinctly
19   because Lisa and I were very concerned that there was
20   something in the work environment or could be something in
21   the work environment that was impacting her because of
22   that statement she made.
23      Q    Uh-huh.
24      A    So we asked Rosa what's -- you know, what's going
25   on.  "Can you help us understand what might be going on?"
```

1  And she said something happened, and I believe she said
2  about a month ago.  And we said, "Can you help us
3  understand what happened? because we want to make you
4  comfortable, figure out what went on."  And she said it
5  was too embarrassing.  She couldn't tell us.
6        And we said, "Please, Rosa.  We want to be able
7  to look into this and understand what's going on."  And
8  she stated that everyone's talking about it.  And so we
9  asked, "What is 'it'?"  She said, "What happened."  And
10 I -- Lisa or I -- we were going back and forth.  Mostly I
11 was speaking.
12    Q    Uh-huh.
13    A    I said, "Rosa, what happened or what was involved
14 so we can look into this?"  "No.  I want no one" -- she
15 was very adamant she did not want an investigation.  She
16 said she was going to her doctor that following week --
17 this was a Friday, because I recall the 29th of April.
18 And she stated during that meeting that she was going to
19 her doctor.  And so it became pretty clear based on -- I
20 never had -- I've never had -- before that point seen Rosa
21 that emotional.
22    Q    Uh-huh.
23    A    She was crying, and she was -- she was, as she
24 said, anxious and nervous.  There was a physical
25 observation of that.  So it became very clear that I

1    needed to have an interactive dialogue with her about what

2    her options were, especially since she was going to her

3    doctor so she would be -- she would be armed with that

4    information if she and her doctor got into a discussion

5    about her needing to make a change at work --

6        Q    Uh-huh.

7        A    -- whether it be a leave of absence or an

8    accommodation or in this case I even went into the

9    workers' comp because she stated that it only happened at

10   work.  So I wanted to give her all her options, call them

11   little "A" accommodation options, whether it's a leave, an

12   official accommodation, or a workers' comp.  She could

13   file under workers' comp.

14       Q    Okay.

15            Did you offer her any information about the

16   employee assistance program?

17       A    Yes, we did.  We always do when we have the

18   interactive process.

19       Q    Can you just describe for me what the EAP is, the

20   employee assistance program?

21       A    The employee assistance program is a program

22   through our health insurance that is confidential.  And we

23   always explain that as I did with Rosa.  That they have

24   counselors available.  They have -- whether it's -- and I

25   usually just say the general.  It goes anywhere from any

Atkinson-Baker, Inc.
www.depo.com

1  life situation someone is dealing with to, you know,

2  needing to find day care for your child.  So I don't zero

3  in on a particular presumption that this is what the

4  person needs.  I give them the range of what the EAP does.

5      Q    Okay.

6           And so when you offered her options with respect

7  to accommodations, leaves, and the EAP, were you doing

8  that because you felt like you had perceived that Rosa may

9  have some kind of medical condition that could impact her

10 ability to work?

11     A    No.

12     Q    Okay.

13          Did you -- well, why did you offer all this to

14 her?

15     A    Because she stated, "I am anxious and nervous.  I

16 am never like this except at work."  Or, "This only

17 happens at work."  She said it when I -- without looking

18 at my notes, I -- but she was very strong about that this

19 only happens at work.

20     Q    Okay.

21          Well, when she said she was anxious, you

22 understand that anxiety can be considered a disability

23 under the accommodation laws; right?

24     MS. WASSERMAN:  Objection.  Calls for a legal

25 conclusion from a lay witness.  Also calls for a medical

Atkinson-Baker, Inc.
www.depo.com

```
 1              But she did present it to you; right?

 2      A    She attempted to.  We did not keep the note.

 3      Q    Okay.

 4           Do you remember what information was contained on

 5   the doctor's note?

 6      A    I did not see it.  Her supervisor did.

 7      Q    Oh.

 8      A    I told her to --

 9      Q    That's Maria Higa?

10      A    Correct.

11      Q    And she didn't tell you any of the information

12   that was on the doctor's note other than it was excusing

13   her absences?

14      A    I don't even know that she told me that.  No.  I

15   don't remember her telling me anything about what was on

16   the note, frankly.

17      Q    All right.

18           After the April 29th meeting, did you conduct any

19   investigation into, you know, what Rosa was saying about

20   not being comfortable at work?

21      A    Yes.

22      Q    And what did you do to investigate that?

23   MS. WASSERMAN:  Calls for a narrative.

24           You can answer.

25   THE WITNESS:  I believe it was Monday.  Well, I know
```

Case 2:19-cv-02285-PSG-JC   Document 19-5   Filed 07/17/20   Page 15 of 56   Page
ID #:429
Atkinson-Baker, Inc.
www.depo.com

```
1   it was Monday.  I believe that was May 2nd.  This is
2   specific to the investigation.  I interviewed other AP
3   clerks in her general area, and those were documented in
4   notes that were provided.
5   BY MR. HOPPER:
6       Q    Which AP clerks did you interview?
7       A    Lua Garcia, Vicky Alvarez, Maria Delgado,
8   Angie Kim.  I believe that was all of them.  I apologize
9   if I'm missing anyone.
10      Q    They are all AP clerks?
11      A    Yes, they are.
12      Q    Some of the names in your notes are redacted.
13  Was that something that you did?
14      A    No.
15      Q    Okay.
16           And did any of these witnesses tell you -- I mean
17  what did -- what did Lua Garcia tell you when you
18  interviewed her about what Rosa was complaining about?
19      MS. WASSERMAN:  Calls for a narrative.  The notes have
20  been provided.  We recognize the notes have been redacted
21  for varying reasons.  We are not instructing the witness
22  not to respond as to who she interviewed and such.  The
23  witness is also advised the notes are probably the best
24  evidence of what exactly transpired.
25           But be that as it may, to the extent you recall
```

Atkinson-Baker, Inc.
www.depo.com

1   who said what without looking at your notes, give us your

2   best shot.

3   BY MR. HOPPER:

4      Q    And I'm sorry.  Were these interviews that you

5   and Lisa conducted together?

6      A    No.

7      Q    Okay.

8           Was this just you?

9      A    Correct.

10     Q    Okay.

11          How come you didn't have a second witness like

12   you had done in previous investigations?

13     A    Investigations that I had witnessed were

14   typically sexual harassment investigations.

15     Q    Okay.

16          Any other reason why you didn't have a witness?

17     A    I don't recall.

18     Q    Okay.

19          All right.  So what did Lua Garcia tell you when

20   you interviewed her?  This was on May 2nd.

21     A    Yes.

22     Q    So what did Lua Garcia tell you?

23     A    Lua was very concerned about a change in Rosa's

24   behavior and demeanor.  She was -- she felt close to Rosa

25   and had worked with her I think around 10 or 11 years.

Atkinson-Baker, Inc.
www.depo.com

1   younger gentleman had a crush on her in the office?

2       A    No.

3       Q    Did any of those witnesses let you know that Rosa

4   believed that people were treating her differently because

5   of her age?

6       A    No.

7       Q    Did Rosa ever make those complaints to you, that

8   she felt she was being treated differently because of her

9   age?

10      A    No.

11      Q    Did Rosa tell you that she was concerned because

12  there was a rumor about a younger guy in the office having

13  a crush on her?

14      A    No.

15      Q    Did you ever come to find out what "it" was where

16  she was saying you know about it?  People are talking

17  about her?  Did you ever come to find out --

18      A    Yes.

19      Q    -- what people were saying?

20      A    No.

21      MS. WASSERMAN:  Misstates the testimony.

22  BY MR. HOPPER:

23      Q    Or what Rosa thought people were saying?

24      A    Yes.

25      Q    Okay.

Atkinson-Baker, Inc.
www.depo.com

1          What did you find out?

2      A    That she believed a younger gentleman in the

3   office had a crush on her.  Was attracted to her is what

4   we were told.

5      Q    Do you know who the gentleman was?

6      A    Yes.

7      Q    Who was it?

8      A    Robert Clements.

9      Q    When did Rosa tell you that?

10      A    She did not.

11      Q    Oh, how did you find out about that?

12      A    Maria Higa.

13      Q    Did you ask Rosa if that was true?

14      A    I don't recall.

15      Q    So Maria Higa told you that that was -- that Rosa

16   reported to her that she believed a younger gentleman

17   named Robert Clements had a crush on her or was attracted

18   to her.

19      A    Yes.

20      Q    Did she tell you anything else about that?

21      A    "She" meaning?

22      Q    Maria.

23      A    She said that Rosa thought that it could be child

24   abuse or harassment.

25      MS. WASSERMAN:  I'm sorry.  Could you read the

Atkinson-Baker, Inc.
www.depo.com

1        A    I don't recall.

2        Q    Okay.

3             So that's what Rosa -- according to Maria, this

4    issue with Robert is what she believed people were talking

5    about; right?

6        A    Correct.

7        Q    Did you find out about any other topics that Rosa

8    thought were coming up in discussions with her coworkers

9    that were the subject of her complaints?

10       MS. WASSERMAN:   Vague and ambiguous.

11   BY MR. HOPPER:

12       Q    So did Rosa tell you that she thought people were

13   talking about her with respect to anything else other than

14   Robert Clements?

15       A    She did not.

16       Q    Okay.

17            Did you conduct any other interviews besides the

18   interviews of Lua, Vicky, Maria, and Angie?

19       A    We conducted a second series of interviews at a

20   later date.

21       Q    With all those individuals?

22       A    No.

23       Q    All right.

24            Who was interviewed in the second round?

25       A    Keith Puckett.  Without looking at my notes, I

Atkinson-Baker, Inc.
www.depo.com

1    don't recall the rest of them.

2        Q    Do you know how many interviews you conducted in

3    the second round?

4        MS. WASSERMAN:  If you can approximate.

5        THE WITNESS:  Yeah.  I just remembered another name.

6    Ricardo Moto and approximately two to three other people.

7    BY MR. HOPPER:

8        Q    Were these people that you interviewed in the

9    second round all in the accounting department?

10       A    No.

11       Q    What department were they in?

12       A    Keith was our security, regional security

13   manager.  Robert and Jackie were both in the network

14   management group known as NMC.

15       Q    So you interviewed Robert Clements.

16       A    We did not.

17       Q    Oh, because --

18       A    I said "Ricardo Moto."

19       Q    Oh, I thought you said Robert was in NMC.

20       A    He was in the NMC.

21       Q    Oh, I was just asking about people you

22   interviewed during the second round.

23       A    I know.  I didn't --

24       MS. WASSERMAN:  You said "Robert."  Did you mean to

25   say "Ricardo"?

1    Q    What is Adrian's last name?

2    A    Allen, A-l-l-e-n.

3    Q    What department did Adrian work in in 2016?

4    A    Accounting.

5    Q    And what about Kenya?  What department was she in

6    in 2016?

7    A    Accounts receivable.

8    Q    All right.

9         Did you understand Rosa was asking for a transfer

10   to the other side of the building at some point?

11   A    Yes.

12   Q    All right.

13        Was there any reason why the company couldn't

14   have transferred Rosa to the other side of the building?

15   A    That side of the building was overly impacted

16   with employees, many of whom were already sharing a desk.

17   In fact -- many of which were already sharing a desk.

18   Q    Any other reasons?

19   A    No.

20   Q    Okay.

21        So the only reason why Rosa couldn't have been

22   transferred to the other side of the building is that the

23   other side of the building was overly impacted with some

24   employees sharing desks and things like that?

25   A    There actually was concern about supervising her

Atkinson-Baker, Inc.
www.depo.com

```
 1   effectively being over on the other side of the building
 2   and a concern about her communicating with her coworkers.
 3   So it was kind of a twofold level concern.  One was
 4   physical facility, and the other was the department
 5   dynamics.
 6       Q    Okay.
 7            What was the current concern about supervising
 8   Rosa if she was on the other side of the building?
 9       A    She was starting to show erratic behavior and
10   impacting other employees.
11       Q    But she was -- I mean her behavior was erratic
12   even in the accounting department; right?
13       A    But we wouldn't have had supervision to observe
14   and to respond to what was going on.  We felt it would be
15   irresponsible as management to place someone with that --
16   that presenting behavior in a different work area.  But
17   that wasn't even --
18       Q    They didn't have any supervisors on the other
19   side of the building?
20       A    No accounting supervisors.
21       Q    But the employees who worked on the other side of
22   the building did have supervisors; right?
23       A    Correct.
24       Q    Who were the supervisors on the other side of the
25   building?
```

Atkinson-Baker, Inc.
www.depo.com

1      Q    Okay.

2           So how did you work with Kelsea when handling

3    Ms. Aguilar's requests for a transfer or any other

4    accommodations?

5      A    As I believe I explained earlier in the day, we

6    contacted Kelsea, and she arranged to get the ADA

7    paperwork completed.  We provided Kelsea with Rosa's

8    essential job function so that she could do so.  Kelsea

9    returned the ADA paperwork back to us so that we could

10   present it with -- to Rosa so she would have it by the end

11   of the day on April 29th for her doctor's appointment the

12   following Monday, May 2nd.  That was the end of my

13   involvement with Kelsea on the accommodation.  We did not

14   speculate on what accommodation.

15     Q    Okay.

16     A    It wasn't appropriate to do so.

17     Q    So I will represent to you that Kelsea sent

18   letters to Rosa in September regarding possible

19   accommodations.  Do you have any knowledge of that?

20     A    Yes.

21     Q    Okay.

22          What's your --

23     A    Well, let me retract that.  The letters, no.  The

24   accommodation requests, yes.

25     Q    Okay.

Atkinson-Baker, Inc.
www.depo.com

```
 1    request for an accommodation.

 2        Q    All right.

 3             And around this time, Rosa had reported that she

 4    believed people were hacking into her computer or

 5    something along those lines; right?

 6        A    That's correct.

 7        Q    And was there any other conduct that she

 8    believed -- well, sorry.  Strike that.

 9             So her overarching belief was that the company

10    was spying on her; right?

11        MS. WASSERMAN:  Misstates the testimony, and calls for

12    speculation as to what Rosa's belief was.

13    BY MR. HOPPER:

14        Q    Well, is that what she reported?

15        A    There were -- I don't know that those were the

16    exact words, but she felt that she was being watched and

17    people going into her computer.  Yes.

18        Q    Okay.

19        A    I don't know if the word "spying" was used

20    offhand.

21        Q    Fair enough.

22             She believed that she was being monitored

23    somehow; correct?

24        A    Correct.

25        Q    Did you conduct any investigation into whether
```

Atkinson-Baker, Inc.
www.depo.com

1    her computer was being monitored?

2        A    Not to my recollection.

3        Q    Did she believe she was being monitored in -- did

4    she report she believed she was being monitored in any

5    other ways besides on her computer?

6        A    Not to my recollection.

7        Q    Okay.

8             So you had conducted this investigation into

9    Ms. Aguilar's complaints that people were talking about

10   her and that her computer was being monitored.  Did you

11   find any evidence to substantiate what she was complaining

12   of?

13       A    We did not.

14       Q    All right.

15            And did you believe that she had made up any of

16   her allegations or fabricated them?

17       A    No, we did not believe she made them up.

18       Q    Did you believe that they were -- that they were

19   true?  That those things were really happening?

20       A    We did not believe they were happening.

21       Q    All right.

22            So how did you reconcile that?  That you didn't

23   believe she was fabricating allegations but you didn't

24   believe them to be true either?

25       A    Based on observation of her behavior, her erratic

 1  behavior, we were very confused as to what was going on

 2  for her.  So it was kind of a multilayered situation at

 3  that point, and we contacted our legal counsel --

 4       MS. WASSERMAN:  Okay.  Don't discuss what you

 5  discussed with legal counsel.

 6       THE WITNESS:  Should I finish?

 7       MS. WASSERMAN:  Yes, except to the extent that you are

 8  not to divulge what you discussed with your legal counsel.

 9       THE WITNESS:  We contacted our legal counsel for

10  direction.

11  BY MR. HOPPER:

12       Q    Okay.

13            Anything else that you did aside from contacting

14  legal counsel for direction after -- you know, in order to

15  try to reconcile these two things?  That she was -- you

16  didn't believe she was fabricating, but you also didn't

17  believe that they were true allegations?

18       A    Not to my recollection.

19       Q    Did you believe that Ms. Aguilar had any sort of

20  mental or psychiatric conditions that were leading her to

21  have false beliefs about what was going on around the

22  office?

23       MS. WASSERMAN:  Objection to the extent it's calling

24  for a medical or psychiatric opinion from a lay witness.

25  Further, it's irrelevant what this witness may or may not

Atkinson-Baker, Inc.
www.depo.com

1    have believed.

2        THE WITNESS:  I have no medical background.

3    Therefore, I came to no conclusions.

4    BY MR. HOPPER:

5        Q    Okay.

6            Did you have any perceptions that Ms. Aguilar had

7    any sort of mental or psychiatric conditions that were

8    causing her to falsely believe that things were going on

9    around the office?

10        MS. WASSERMAN:  Same objection.  Calling for a medical

11    conclusion or mental health conclusion from a lay witness.

12        THE WITNESS:  I am not a medical professional, so I

13    did not come to any conclusions.

14    BY MR. HOPPER:

15        Q    I understand you may not have come up with any

16    conclusions, but what was your perception?

17        A    I was not perceiving.  I was not perceiving

18    any -- as I stated before, we were very confused --

19        Q    Okay.

20        A    -- and sought counsel -- advice from our counsel.

21        Q    So you didn't perceive that she had any mental or

22    psychiatric conditions that were causing her erratic

23    behavior?

24        MS. WASSERMAN:  Same objection.  Asked and answered.

25            You can answer again.

Atkinson-Baker, Inc.
www.depo.com

1    Q    Do you know if Rosa received discipline from

2    Carlton?

3    MS. WASSERMAN:  Objection to the extent it calls for

4    speculation.

5    THE WITNESS:  With the exception of what's in my

6    notes, no, I do not know of any.

7    BY MR. HOPPER:

8    Q    Well, do you recall what's in your notes that you

9    are referring to?

10    A    There was an email --

11    Q    Okay.

12    A    -- that he issued to her.

13    Q    That was for a verbal warning; correct?

14    A    That's correct.

15    Q    Do you know why he gave her a verbal warning?

16    A    Yes.  I've read the email.

17    Q    Just from your recollection, do you remember why?

18    A    She had been asked -- she had been told, excuse

19    me, not to pull other individuals into the scenario that

20    was part of her complaint.  And she was bringing other

21    employees into it, and it was making an uncomfortable

22    situation for multiple employees.  Her requests and her

23    involving of them.

24    Q    Do you know who the employees were that she had,

25    you know, kind of brought into her complaint issues?

Atkinson-Baker, Inc.
www.depo.com

```
 1      A    Can you be specific?

 2      Q    Yeah.

 3           So this was related to a specific incident;

 4   right, where she had gone and talked to an employee and

 5   asked the employee to tell others to be quiet?

 6      A    Correct.

 7      Q    Who was that employee?

 8      A    Alyssa Crutcher.
```

```
 9      Q    Were you present during the meeting when Carlton

10   gave Rosa a verbal warning?

11      A    Yes.

12      Q    Was anyone else present?

13      A    No.

14      Q    Did Lisa ever take part in any of the interviews

15   that you conducted during your investigations?

16      MS. WASSERMAN:   You said Lisa?

17      MR. HOPPER:  Yeah.

18   BY MR. HOPPER:

19      Q    Lisa Blandi.

20      A    Not that I recall.

21      Q    Okay.

22           Did anybody participate in -- so I know, like, we

23   talked about your first round of interviews.  But in your

24   second round of interviews, was it just you again?

25      A    No.  Carlton was present.
```

Atkinson-Baker, Inc.
www.depo.com

1    Q    And what else?

2    A    She randomly asked an employee in the NMC, a male

3    employee, for his cell phone number.

4    Q    Who was the employee?

5    A    Ricardo Moto.

6    Q    How did you find out about that?

7    A    Ricardo brought it to our attention.

8    Q    Was this during the second round of interviews?

9    A    Yes, it was.

10   Q    Okay.

11        Any other erratic behavior that you became aware

12   of from Rosa?

13   A    Yes.  She burst into a -- the office of a manager

14   who works for our regional entity and proceeded to

15   basically accuse him of being -- participating in getting

16   her fired.  Working towards getting her fired, I should

17   say.

18   Q    Who was the manager?

19   A    Andre.  A-n-d-r-e-i, I believe -- we have two of

20   them.  One of them spells it one way and one spells it the

21   other -- last name Uys, U-y-s as in Sam.

22   Q    Okay.

23        How did you become aware of that?

24   A    Carlton told me.

25   Q    Did you speak with Andre directly about that

1    relations, or corporate payroll.

2        Q    Okay.

3        MR. HOPPER:  And the last document is Exhibit 22.

4            (Deposition Exhibit 22 was marked for

5            identification by the court reporter.)

6        MR. HOPPER:  All right.  This is Bates-stamped

7    EXPEDITORS (AGUILAR) 1 through 19.

8        THE WITNESS:  Uh-huh.

9    BY MR. HOPPER:

10        Q    Look through these.  Are these true and correct

11    copies of your notes that you prepared when investigating

12    Rosa Aguilar's claims?

13        A    They are with the exception of I did not redact

14    the notes.

15        Q    Right.

16        A    My notes are not redacted.

17        Q    Right.  Okay.

18            And, you know, we have already gone over your

19    testimony as to who you interviewed and what they said.

20    Is there any reason you can think of why these names

21    should be confidential?

22        MS. WASSERMAN:  Objection to the extent it calls for

23    attorney-client privilege and work product.

24            You can answer from your perspective, but that

25    may not --

Atkinson-Baker, Inc.
www.depo.com

```
1    this.  She had to have done a screenshot or something.
2        MS. WASSERMAN:  Right.  When this document was
3    created --
4        MR. HOPPER:  Right.
5        MS. WASSERMAN:  -- which you haven't even asked when
6    the notes were created.
7        MR. HOPPER:  Fair enough.
8    BY MR. HOPPER:
9        Q    When did you create these notes?
10       A    At the time of the events.
11       MS. WASSERMAN:  Right.
12   BY MR. HOPPER:
13       Q    Okay.
14            And so did you save the files that you were
15   embedding in your Word document?
16       A    No, I did not.
17       Q    Okay.
18            All right.  What is the last page?  There's -- it
19   says "Job Performance Impact - as reported by Maria Higa."
20   Is this something that Maria actually prepared, or did you
21   type this up?
22       A    Maria prepared.
23       Q    How did you come to obtain this, you know, text
24   message that Maria had drafted up?
25       A    We asked her to prepare a document that indicated
```

Atkinson-Baker, Inc.
www.depo.com

1  which areas there was performance deficits in the last

2  period of time since her last review.

3      Q    But did she -- is this something she emailed you?

4      A    I don't recall.

5      Q    Do you know if she provided it to you in a Word

6  document?

7      A    I don't recall.

8      Q    Why did you ask Maria to prepare this?

9      A    Because we were concerned that Rosa's erratic

10  behavior was starting to affect her performance, and that

11  was -- and we wanted to get documentation of what that

12  behavior was.  I mean what that performance -- what the

13  performance deficits were.  Sorry.

14      Q    All right.

15          So Rosa had been told to not return to work as of

16  September 12th; right?

17      A    Can I reference the document?

18      Q    Sure.  I think it's on 17.  It starts on 17 and

19  goes to 18.

20      MS. WASSERMAN:  If you need to review the whole

21  document to get -- answer the question --

22      THE WITNESS:  I need to review -- you said the 12th?

23  BY MR. HOPPER:

24      Q    Yeah.

25      A    I'm going to review from the 12th on.

```
 1        Q    Okay.  That's fine.

 2        A    Can you repeat the question?

 3        Q    Yeah.

 4             Isn't it true that September 12th is the day that

 5   Carlton told Rosa that she shouldn't come back to the

 6   office the next day?

 7        A    That is correct.

 8        Q    All right.

 9             And she did not return to actually perform work

10   after September 12th; right?  I know she came back the

11   next day, but she wasn't performing work that day; right?

12        A    Correct.

13        Q    And she didn't perform any more work after

14   September 12th; right?

15        A    Correct.

16        Q    And part of the reason Carlton asked her to not

17   return was because he wanted her to go see a psychiatrist;

18   right?

19        MS. WASSERMAN:  Objection to the extent it calls for

20   speculation.

21   BY MR. HOPPER:

22        Q    Do you know?

23        A    That is not my understanding of why.

24        Q    Okay.

25             Why did he ask her to not come back?
```

Atkinson-Baker, Inc.
www.depo.com

1      MS. WASSERMAN:  Objection to the extent it calls for

2    speculation.

3          If you know.

4      THE WITNESS:  My understanding is he wanted her to not

5    come back because she is causing -- continued to cause

6    disruption in the workplace and was -- we were getting

7    other complaints from other employees, and we had

8    concerns -- or he had concerns about how she was impacting

9    other employees, and he was waiting for further direction

10    from counsel.

11   BY MR. HOPPER:

12      Q    Do you know if Rosa's medical leave started on

13   September 12th or September 13th?

14      MS. WASSERMAN:  Objection to the extent it calls for

15   speculation.

16      THE WITNESS:  My understanding is it did not.

17   BY MR. HOPPER:

18      Q    Okay.

19          Do you have any understanding as to when her

20   medical leave started?

21      A    Only through counsel.

22      Q    In-house counsel or outside counsel?

23      A    I don't recall.

24      Q    All right.

25          Well, I guess I'm just trying to figure out why

```
1   they are all done the same day.
2        Q    And is that your general practice when you take
3   notes regarding investigations you conduct?
4        A    Yes, it is.
5        Q    You were asked several questions earlier today
6   without being provided a copy of your notes but about
7   conversations that are discussed in detail in your notes.
8   If the discussion of those conversations contained in your
9   typewritten notes is more detailed than testimony that you
10  provided today, which would you believe to be the more
11  complete response?
12       A    My notes.
13       Q    Okay.
14            You made -- there was a comment that counsel
15  asked you about that came up during the course of the
16  investigation that there was an employee who when you
17  spoke with this person during the course of conducting
18  your investigation referred to Ms. Aguilar as an older,
19  sensitive woman.  Do you remember those questions?
20       A    Yes, I do.
21       Q    Can you provide context to that statement that
22  was provided to you?
23       MR. HOPPER:  Objection.  Vague and ambiguous.
24       THE WITNESS:  That comment was made by Lua Garcia.
25  Lua was close to Rosa and often, you know, commented that
```

Atkinson-Baker, Inc.
www.depo.com

1                    REPORTER'S CERTIFICATE

2

3

4       I, DIXIE LYNCH, CSR No. 9521, Certified Shorthand

5   Reporter, certify;

6       That the foregoing proceedings were taken before me at

7   the time and place therein set forth, at which time the

8   witness was put under oath by me;

9       That the testimony of the witness, the questions

10  propounded, and all objections and statements made at the

11  time of the examination were recorded stenographically by

12  me and were thereafter transcribed;

13      That the foregoing is a true and correct transcript of

14  my shorthand notes so taken.

15      I further certify that I am not a relative or employee

16  of any attorney of the parties, nor financially interested

17  in the action.

18      I declare under penalty of perjury under the laws of

19  California that the foregoing is true and correct.

20      Dated this 23rd day of March, 2020.

21      Signature requested.

22

23

24  _____
                DIXIE LYNCH, CSR NO. 9521

25

On April 29, 2016 around 8:00 AM, Rosa Aguilar approached her Supervisor, Maria Higa to tell her that she wanted to be transferred.   Maria told her that she would discuss the matter with Lisa Blandi.   This was the second time Rosa had approached the Supervisor, the first time she spoke to her was end of March and at that time she asked to move to another building.   When the supervisor asked in March why she wanted to be in a different building, she said that people were talking about her.   She specifically pointed out REDACTED and stated that she did not want to sit near her and she felt that "they"(her team members) were talking behind her back.   When the supervisor asked how she knew this, Rosa commented that when "they" are talking she will lean over and give them her "mean face" and then they will go back to work.   When the supervisor pressed further how do you know they are talking about you? Rosa responded "I just have this feeling".

In speaking to her the supervisor immediately offered to change her desk within the department to provide her some distance from REDACTED.   She said no that was not what she wanted and left it at that.   Previously Rosa had complained about the parking at Century to the extent that around the beginning of the year the supervisor modified her schedule so she could leave a little earlier (2 minutes was Rosa's request) to avoid the rush.        The end of March request seemed in part linked to her on going complaints about parking since it was specific to changing buildings.

The person that she referenced REDACTED is a more social individual and at times has been spoken to about excessive talking.   The supervisor was asked to remind the group that socializing needs to be contained to break time, and minimized during work hours.   Although they do legitimately interact frequently in the daily conducting of business.

In addition, it is pertinent to note that before Rosa approached her supervisor at the end of March, REDACTED REDACTED had spoken to Maria Higa to let her know that there seemed like there was something wrong with Rosa. (as explained by REDACTED in her 5/2/16 conversation with Diane)  Rosa and REDACTED have worked together since REDACTED was hired in July of 2005 and generally speaking have always have a congenial relationship.   By REDACTED own admission she is careful in approaching Rosa as she knows that she is an "older sensitive lady" and is aware to be *"delicate".   As REDACTED explained that there relationship has a pattern of her REDACTED occasionally not being as delicate, and at those times Rosa will get mad at her, but it blows over in a day or two at the most.

April 11th – April 22nd Maria Higa was on vacation.   Lisa Blandi made a point to sit in the department instead of her office during this time so she could monitor that the "socializing" was kept to a minimum.

April 29, 10:45 AM – Lisa and Diane met with Rosa to find out what the underlying reason for her request earlier that day was.   She stated she wanted to work in another department.   Diane clearly explained that transfers don't happen this way.   That her skills are in accounting and that we can't just hand her over to another department and say "put Rosa to work".   She stated if that was the case that she then wanted to move to the other side of the building as she could not work in the location she was in any longer.

When asked why she wanted to move,  she stated that everyone was talking about her, that they have spread the word to everybody, and that they talk about it every day.   At this point she began to cry and continued to do so throughout the meeting.   When asked what it was they were talking about she said something embarrassing happened one to two months ago.   When Diane asked what happened she said it was too embarrassing to talk about.   When asked who was talking she again said everyone and

EXPEDITORS (AGUILAR) 000001

EXHIBIT 22
Diane Griffin
3/11/2020
Reported by:
Dixie L Lynch, CSR #9521

now the NMC was talking about her too.  She stated "I am very nervous and anxious"  "this does not happen at home".  When asked what leads her to believe that "they" are talking about her she stated "I just know"  "I have this feeling".  Rosa was visibly shaking and showed an extreme look of tenseness. Rosa stated that she had a doctor's appointment the following Monday or Tuesday.  Diane explained that if she needed to take time off or if in meeting with her doctor they decide that she needed some time off, that there were leave provisions such as the FMLA that we could look into for her.   She immediately said "I can't afford that".  Diane asked Lisa to look up her accrued time, and she had 11 weeks between sick and vacation.  Diane explained how the time is applied during FMLA.   Diane further explained that if Rosa felt that this condition was directly related to the work environment that we could also look at the option of a W/C claim.  Diane explained how this worked.    Diane presented Rosa with the EAP brochure and explained what the EAP benefit entailed.

Diane expressed that we were very concerned that she was not comfortable in her work environment and that we needed to investigate what is behind this.  Rosa was emphatic that she wanted no investigation and would not point fingers.  Diane said if there is something that people are doing to make you uncomfortable and we don't find out what is going on,  this could happen to someone else. She clearly stated "they will not do this to anyone else".    Diane again reiterated if she could just help us understand what happened a month or so ago we would be able to better understand the situation. She again stated "no too embarrassing" she added "I work here 22 years no problems", "I don't understand".  When Diane asked "what don't you understand" Rosa replied "why they have to do this to me".   Again Diane expressed concern and reiterated that if she would share more information it would be helpful for us to understand, she said "No".

I explained to Rosa that moving to the other side of the building was not possible at this time as they are maxed out of space as she may have noticed that two of her colleagues who were purposefully placed there to enhance their job performance had recently returned to sitting within the Accounting Department.  I suggested that we could locate her at a different desk on this same side of the building, and she seemed in agreement with that.

I told her that I would need to review everything with Carlton as ultimately placing her outside of the department within the same building was not my decision.  We spoke for a few more minutes, Lisa expressed that we were concerned and would get back to her on what options were available.

Rosa suddenly go up and went for the door saying "if you can't help me then, OK".  Diane asked her to sit back down, and was very clear that "I did not say we were not going to help you", but moving you to a different desk on this side of the building has to be discussed with Carlton.     She then said "I want to be in another building, not a different desk"   Diane explained that was not what she agreed to as being an acceptable option and as a result it was unfair to say she was not being helped, Diane stated "when I offered you option of another desk on the same side of the building you had agreed, so you have to help us understand what exactly you are asking for?"   Diane stated that she could not make that decision either, but in looking into this option she wanted to know from Rosa "what other buildings were acceptable".  Rosa stated Hawthorne or Carson, and that Hawthorne was 10 minutes from her home.

The conversation ended around 11:20 AM with us advising Rosa that we needed to speak with Carlton and get back to her.  Diane asked Rosa if she wanted to go home for the rest of the day, and she said no she would work. Diane asked if she wanted to go for a walk or get some fresh air before returning to her desk she said no, she would go to the restroom.

EXPEDITORS (AGUILAR) 000002

Spoke to Carlton at 11:40 AM and we consulted with REDACTED, Supervisor CHQ Employee Relations
at 11:50 AM and REDACTED                                    at 12:15.

# REDACTED

April 29th 4:00 PM – Lisa and Diane met with Rosa.

Diane explained that the ADA process and that this was necessary to examine her request to be moved
to a different building.   Diane further explained to Rosa that we needed to look into her concerns
further about the work environment and reminded her that this sort of report is serious to us and as
managers we would not be doing our jobs if we didn't look into her concerns further.

Diane concluded by telling Rosa that her concern about people talking about her and the impact that
was having on her during her work day was one issue and a separate issue from her report that the work
place was having an impact on her health.    Diane further explained that the ADA paperwork if
completed by her doctor was the mechanism to allow us facts to examine whether an accommodation
was being requested for by her physician, including potentially changing her work environment to a
different building.    Diane clearly stated that without a documented need for the accommodation for a
different work site location, that was not going to be an option.    Diane again reiterated if she felt she
needed time off or wanted to file a W/C claim to come directly to her to discuss further.

May 2nd – Rosa has an 8:30 doctor's appointment and reported that she would be in around 11 AM.

Rosa later called and said that she would be back at work on Wednesday, based on her doctor's advice
and would bring the "medical forms".

8:05 AM – Diane began to interview staff members in Rosa's immediate area.

REDACTED

I asked REDACTED if there was something going on within the group as we received a complaint.   She
immediately said you mean "something with Rosa".    She went on to say that something happened
about a month to 6 weeks ago.   Made reference to knowing Rosa since they have worked together for
11 years.  She characterized her as "older, sensitive" and she is aware to be delicate when approaching
her.

As noted above REDACTED admitted that on occasion she has been less than delicate, and when that happens
Rosa gets angry or cross with her, this lasts about a day or two, and then blows over and they are back
to normal.  This has been the usual pattern of their relationship.    But this time it has been very

different, it has lasted for more than a month now, and Rosa won't even speak to say good morning if
REDACTED says good morning.

The incident started when Rosa approached REDACTED one lunch hour about a month ago at REDACTED desk while
she was eating lunch. Rosa told REDACTED that someone was talking about her, she mentioned REDACTED team
(NMC). REDACTED responded, "Rosa why would REDACTED team be talking about you, you don't interact with
them, you sit quiet and do your work?" Rosa responded by saying "Don't be a hypocrite – you know
and you know that there is an email going around talking about me" "and now my husband is going to
find out things about work". REDACTED tried to tell her maybe they were talking about a customer and you
over heard or miss understood, Rosa responded "are you saying I imagine it?"

She asked REDACTED to give her the email and REDACTED said she knew nothing about any email, to which Rosa got
more defensive and accused REDACTED of hiding something.

Since that day Rosa has refused to speak to her, including in conducting business, she emails everything,
which REDACTED finds annoying especially on the last day of the month such as last Friday (4/29). REDACTED
recalled that the week following after this incident she ran into Rosa in the print room and she didn't
acknowledge REDACTED. REDACTED said "Rosita are you still mad at me from last week?" Rosa just ignored her.
REDACTED commented that Rosa was the same age as her mother and she treats Rosa with respect.

I asked REDACTED if she understood the reference that Rosa made to her husband. She said that over the
years Rosa has commented that "I don't understand how my husband knows about things that happen
at work?"

I asked REDACTED if she knew what Rosa means by her "mean face" – she said yes that is the face she gives
when she is unhappy with something or someone, we are all know it. She then reiterated "something
is very different this time", she has never been like this for more than a day or two, we are going on a
month this time, and it is getting old and I am getting tired of it. I told Maria on Friday late in the day I
needed to talk to her this morning so that I could get it out, otherwise my anxiety gets to me. She
mentioned that her therapist told her that she cannot hold in this sort of thing and REDACTED reaffirmed that
as long as I can talk to somebody I am fine. I reminded her that she can come to me as well as Maria or
Lisa if she has concerns or frustrations.

I explained to REDACTED the meaning of retaliation and the seriousness if there is any retaliation. Gave
examples and told her to remain professional in her interactions. I told REDACTED this was under no
circumstance to be a topic of conversation. I let her know if she remembers anything else to please let
me know.


8:30 AM May 2nd –REDACTED

Same lead in question as with REDACTED, and REDACTED immediately started to speak about Rosa.

Issue is with Rosa, she said she never has had a problem with Rosa and they have had a good
relationship.

She said she had a personal incident where Rosa came to her about a month or so ago and asked <sup>REDACTED</sup> "if you know something was going on and people were talking about me would you tell me?"  She asked "why would someone want to talk about you Rosa"

There was a second interaction about two weeks ago, where Rosa confronted <sup>REDACTED</sup> to tell her that she thought <sup>REDACTED</sup> knew something and was covering something up.  <sup>REDACTED</sup> said she can tell Rosa is angry with her, she can see it in her face and see clearly how tense she is.  <sup>REDACTED</sup> expressed frustration and stated "if only she would give specifics, but she won't".

I asked <sup>REDACTED</sup> if she spoke to anyone about this, and she said only <sup>REDACTED</sup> and she spoke after the first incident where Rosa individually approach each of them.

<sup>REDACTED</sup> stated that she did not like getting pulled into this by Rosa, she does not like gossip and that she comes to work to work, not get in the middle of something.   She reiterated that she will "not say who or what" and without details she doesn't understand what Rosa thinks can be done about the supposed situation.   She told Rosa if you have an issue you need to talk Maria or Lisa,  she added that is what I would do.

<sup>REDACTED</sup> now feels that because Rosa feels like <sup>REDACTED</sup> is hiding something Rosa thinks <sup>REDACTED</sup> is betraying her somehow.  Although she does acknowledge <sup>REDACTED</sup> if <sup>REDACTED</sup> says good morning or hello, she will respond in kind.  <sup>REDACTED</sup> is hurt that their normal rapport has broken down and Rosa thinks that she has betrayed her.   She will continue to be pleasant in her limited interactions with her.

Never seen Rosa be bad to anyone and doesn't understand why she would event think that someone was talking about her.

I explained to <sup>REDACTED</sup> the meaning of retaliation and the seriousness if there is any retaliation. Gave examples and told her to remain professional in her interactions.   I told <sup>REDACTED</sup> this was under no circumstance to be a topic of conversation.  I let her know if she remembers anything else to please let me know.


8:59 May 2nd - REDACTED

Same lead in question as with <sup>REDACTED</sup> and <sup>REDACTED</sup>.  <sup>REDACTED</sup> immediately started talking about the workload distribution when it became apparent that <sup>REDACTED</sup> couldn't handle her work.  Said it didn't seem fair that everyone had to pick up her slack.   She had to do the Loss report and she hasn't been getting responses from people which is frustrating.

I asked if she had noticed any change in Rosa and her interactions with the team.  She said Rosa is always quiet.  <sup>REDACTED</sup> told <sup>REDACTED</sup> a few weeks ago that Rosa wasn't speaking to her and that Rosa thought someone was talking about her.  She knew that after <sup>REDACTED</sup> told Rosa that she didn't know anything then Rosa stopped talking to her.

<sup>REDACTED</sup> said the situation does not impact her in any way.

I explained to <sup>REDACTED</sup> the meaning of retaliation and the seriousness if there is any retaliation. Gave examples and told her to remain professional in her interactions.   I told <sup>REDACTED</sup> this was under no

circumstance to be a topic of conversation.  I let her know if she remembers anything else to please let me know.


9:00 May 2nd – REDACTED

Same lead in question as the others.  REDACTED has no knowledge of issues on the team.  I asked if she had noticed any change in Rosa and her interactions with the team.  She said in general she is careful as to how she approaches Rosa, and always shows her respect.


10:10 May 2nd – Rosa called Maria Higa to let her know that she had seen the doctor and she will not be back to work until Wednesday.   And that she will bring doctors note.


2:00 May 2nd – Circled back around with REDACTED to find out more about her concerns and how the work environment is impacting her.

Spoke with REDACTED about the frustration that she expressed to Maria Higa on Friday (4/29) "I've had it with Rosa's attitude".  REDACTED explained that it was the end of the month and rather than communicating verbally to REDACTED as she usually does on pending end of month action items Rosa was emailing them to her. This is not how they usually interact at month end to resolve issues, and it was not very efficient and became frustrating to REDACTED.  It is easier and more efficient to not only take care of issues quicker but if clarification needs to happen it is better to be communicating verbally.

REDACTED said she remembered one other thing that she forgot to mention when she spoke to me in the morning that day.   After the original incident with Rosa REDACTED had approached one of the NMC members, REDACTED to ask if there were any rumors or emails going around her team about Rosa. REDACTED was surprised by the question and responded to REDACTED with "Rosa?, no".  REDACTED said she did this as she was really baffled by the accusation and wanted to try to help Rosa sort it out.   She is afraid that her mind is "playing tricks on her".  REDACTED stated that she is not being mean or disrespectful and that she likes Rosa, she's a nice lady, but she added "she is really having problems

I asked REDACTED how she was doing.  She repeated what she said earlier in the day that  as long as she can talk to someone she can manager her anxiety,  it is when she holds it in that it becomes a problem.  I reminded her that she can certainly go to Maria, as she tends to, but also Lisa and I are here if she needs to ever talk.

At this point REDACTED confirmed that she was fine that there was no reason to be concerned about her.  She will continue to communicate with one of the three of us if she has concerns.

May 4th – Rosa returned to work with a doctor's note excusing her for two days of work,  we advised her that we did not need documentation for a two day absence.

Side note: REDACTED is on vacation from May 4th returning May 16th.

3:30 May 5th Carlton and Diane meet with Rosa to close the loop on the investigation

Carlton explained that we spoke to the people in her work group to see how the environment was and if we could ascertain if there was gossip going around about Rosa.    He said that when Rosa name would come up, with multiple people, there were descriptions like,  respect, hard worker, quiet and does not make any trouble.    Rosa said that of course they would not tell us they talk about her but she know that they talk about her.   When asked if someone told her they were talking about her she said no,  she just hear.  Carlton mentioned that Lisa sat in the department to see if she could observe anything and that Maria is certainly close to the staff and neither of them have heard anything or witnessed anything. Rosa spoke up and said "Maria knows" (meaning supervisor Maria Higa) "I heard her talking to someone about it".    Carlton asked who was she talking to,  Rosa responded that she will not point fingers, but she knows.

Carlton asked Rosa if she could share with us "what it is everyone is talking about".  And she again said it was too embarrassing.   Carlton asked if this incident that is too embarrassing to talk about happened at work or outside of work.   She said outside of work.   Diane asked "then did you confide in someone at work about this?" and she said no.   So Diane asked if it was not an incident that someone at work witnessed and if you did not tell anyone at work about it, how is it that anyone at work knows about this embarrassing thing?   She just said "they know" and "they talk about it".   It is all over the office and "everybody talk about it".  She said I am pretty sure "REDACTED know, and <sup>REDACTED</sup> knows"

Carlton let Rosa know again that we found nothing to indicate that she is being talked about or that there is any story going around about her.  She said she go to two of the people she trust and they both deny it to her, so of course they deny it to us.   They betrayed her as they know it is happening.    Diane asked if you trusted these people and they told you nothing is being talked about why you would not then trust their answer.   She said she heard them say "if we tell her what is going on she will be more angry, so we should not tell her".    Carlton commented that these people feel shut out by her and perhaps that she feels alienated, but she appears to be shutting them out due to them not admitting to her something was not happening like she thought it to be.    Diane added that her coworkers are concerned about her shutting them out so suddenly.

Carlton finished by letting Rosa know that without her help with further information we are at a bit of an impasse.  He emphasized that we want to have the environment to be a good environment for everyone,  but cannot act on anything as we have found nothing to substantiate that people are talking about her.

Carlton reminded her that an accommodation could be made, and Diane noted the ADA paperwork that was given to her on Friday.  She said "that is for a disability, I don't have a disability, I can do my job."

Carlton reminded Rosa about the EAP and the types of services that they offer.  He asked if she would be more comfortable talking to someone outside the branch about what is going on,  and if she would he would gladly set that up all she needed to do was to let him know.

EXPEDITORS (AGUILAR) 000007

5:20 PM May 6th – Maria Higa came to Diane to let her know that there was more going on with Rosa. Rosa had approached her that morning, but Maria did not want to speak to me until Rosa had left for the day.  The situation is related to "someone in the NMC".  She stated to Maria that "someone" in the NMC likes her that person didn't tell her anything- but that person has an attraction to her. <sup>REDACTED</sup> knows about it and she told the rest of the team.  She said "you know" about it as well.  Maria let her know that in fact she knows nothing of this.  Maria asked "does this person know that they are attracted to you?" and she said yes they know.

She said she heard Maria talking to one of the other team members REDACTED  about it.   Maria again said no Rosa how would I talk about it if I don't know anything.  Rosa stated "I'm not crazy".   She told Maria that her doctor filled out the ADA paperwork, and gave it back to her telling her if she wanted to pursue it she could,  but Rosa stated "I am not disabled.  She told Maria that her doctor told her that she needs to see a psychologist, and  Rosa also stated "I am not crazy".  Maria said seeing a psychologist doesn't mean you are crazy, it might help you to talk to someone.   She told Maria that everyone in the NMC knows about this person being attracted to her,  and even REDACTED  knows, cause she heard him talking about it.

She told Maria that it is REDACTED  that is attracted to her, and she knows he is just a kid. She said they even talk that this could be "child abuse".   ???

She told Maria that she spoke to REDACTED  cause he seem like a nice guy and he speaks Spanish. She asked REDACTED  for his phone number so she could send him text messages.  She told him that she knows something is going on with a member of his team. After she did that she said she sees REDACTED speaking to REDACTED  (his manager) about the situation.   Said something to Maria about "them"texting her at home – but can't get text because it is her home #.

Maria asked "who else did you talk to about this?"  She said "her sister",  She asked "does your husband know about this?"  Rosa said no.

Rosa then said that what is going on with REDACTED could be Sexual Harassment.


8:40 AM May 9th  Diane and Carlton spoke to REDACTED

REDACTED  confirmed that he had an interaction with Rosa on April 25th, below is his account of it.

Rosa lync messaged REDACTED  and asked him for his phone #.   REDACTED  what this was about.  Rosa responded not to be afraid,  she just wanted to talke to him and that it "was personal"   REDACTED gave her his number.  She texted REDACTED in Spanish,  which he said was  hard to understand but she told REDACTED she thought he was a good guy and seemed to come from a good family and wanted him to be careful in what you do around the office, there are rumors"  She said I want to confirm the rumors, and that even her supervisors knows the rumors and these rumors are not going to stop.

REDACTED  responded "What are you talking about"    Since that response there has been no other communication from Rosa.

EXPEDITORS (AGUILAR) 000008

TEXT MESSAGE FROM REDACTED   CELL PHONE WITH ROSA AGUILAR

●●○○○ AT&T  LTE                8:48 AM                26% ▭

❮ Messages  REDACTED              Details

Mon, Apr 25, 5:55 PM

(1/5) Hola no tengas miedo ,no voy a hacer nada ,solo quiero la verdad

(2/5)  . Tu estaras pensando porque me escogio a mi. Porque tienes ca

(3/5) ra y caracter de muchacho bueno y si hablas espa ol y no te da v

(4/5) erguenza vienes de buena familia, ademas eres de la edad como mi

(5/5)  hijo

(2/2) contaron aunque nadie me lo diga.  No van a parar hasta que alguien diga que yo ya se todo.

De que estas ablando?

Did you know that you cant send text messages to the home phone?.  I only have answering machine para mensajes hablados.

EXPEDITORS (AGUILAR) 000009

Log maintained by Lisa Blandi and Maria Higa

05/06/16 – Maria Higa
After talked to me on Friday morning around 8:30am. Her attitude changed.  She looks more opened and relaxed.
Rosa started working to schedule<sup>REDACTED</sup> invoices in Expo Accounting and seems like she was very interested and started to test it.
I saw her interacted with REDACTED, another AP member who takes care of expenses.

05/06/16 – Lisa Blandi
Rosa was excited about the new A/P training that we had this afternoon and she actioned several invoices in the new A/P system to pay.

05/10/16- Lisa Blandi
Spoke with Rosa this morning and she was up-beat.  She was working on <sup>REDACTED</sup> and we discussed paying it from the new A/P system, but we need to figure out more issues before we do this.  She was having issues with expo accounting and opened a ticket with IS.  I asked her to save her work and re-boot her system while she is waiting for IS.

05/10/16 – Maria Higa
Came in and said Good Morning and she turned and replied with Good Morning.
Rosa came to my desk around 8:00am and asked me a question regarding new payable system.  She has inv# 979072 from REDACTED that Lisa rejected, however she was not able to attach invoice.
She question in a good way.  She doesn't seems to be mad or upset. Her attitude was more like want to know to resolve the problem.
8:43am: Overheard Rosa talking with Lisa about<sup>REDACTED</sup>, PNB provisions and when she talks to Lisa sounds good.  Excited asking the question, etc.  She said she can't run<sup>REDACTED</sup> in expo.
9:05am: Someone called Rosa and she answered happy.  The person might congratulate her for Mother's Day because Rosa answered in Spanish: Igualmente (same to you).
It was an internal call, regarding a JV request.
9:15am Rosa came to my desk to ask me about the email Lisa sent for the ACH payment CHQ sent on 05/10/16.  She wants to know how it looks in expo and how to check.  We went to the Payment Register and pulled with GCI#.  Remittance confirmation should be received tomorrow 05/11/16.  Rosa will look for it.
09:45am Rosa approached me and mentioned to me that since she made extra copies for<sup>REDACTED</sup> for OXP she gave it to me so I don't have to make copies.
10:10am I was walking by, Rosa stop me and start talking about the Expo Accounting.  She has been checking REDACTED and see how the records shows.  She is surfing in expo to check how the entry looks like for her vendor account.
10:20am Worked with Rosa to see how the approvers view looks like.  I went into Payment Request and showed Rosa that I need to input the Payment Request date and the branch.  We checked May 10th and there was no records.  Then checked May 11th and there are two vendors.  One of them was her service provider: REDACTED.  She looks interested.
11:30am <sup>REDACTED</sup> mentioned to me that she arranged with Rosa to work with her in the afternoon to go over Expo Payables since she knows that she has been working on it.
11:55am – Rosa complaint about a JV request sent by<sup>REDACTED</sup>

5/13 and 5/16 – Rosa took vacation days

EXPEDITORS (AGUILAR) 000010

05/17/16 – Lisa Blandi
Walked the floor about 8:30 and said good morning to Rosa. She said hello back and seemed in a good mood. Walked by at 10:15 and everyone was quietly working at their desks near Rosa.

Email response to REDACTED on 05/17/16

# REDACTED

REDACTED was back from vacation on Monday 5/16, Rosa was on vacation that day.

The first day that they were both in the office was Tuesday 5/17– REDACTED remained busy at her desk focusing on work. We observed no interaction between the two.

Wednesday May 18th. REDACTED has this day off.

5/17/2016 Midafternoon Rosa approached Maria to have her vacation day changed from this Friday to next Wednesday (5/25). Maria commented that she had a lot of people out that day, it was a normal conversation, where Maria confirmed that she would discuss it with Lisa and get back to her.

EXPEDITORS (AGUILAR) 000011

5/18/16 10:00 AM Rosa approached Maria and asked if she can change her vacation.  Maria said she had spoken to Lisa and it was approved, but it will be difficult with some many key people out that day. Rosa got a bit contentious and said "what difference should it make, same number out on Friday as Wednesday".  Which is true but they are people with different roles/responsibilities.    Rosa sent Maria a confirming email that she was making this change so Maria could approve in writing.

5/18/2016  11:45 AM – Maria was distributing invoices to the AP clerks and stopped by Rosa's desk,  as she turned to walk away Rosa called her back to her desk and said "they are telling the new people about me" "Now the new people <sup>REDACTED</sup> and <sup>REDACTED</sup> are talking about me"  "That is why I just kind of ......(according to Maria,   Rosa then waved her hands on either side of her head by her ears repeatedly, paused and then said )......shut down"

She told Maria "You know what they are talking about – you are talking about it too"   MH responded "Rosa I am not talking about you",  RA responded "I am not crazy".

(Note REDACTED          has not even been in the office this week, on vacation all week and <sup>REDACTED</sup> is not a new employee, she just relocated from the other side of the building and now sits 3 desks and an aisle way away from Rosa)

May 23rd – Carlton and Diane called Rosa to CR's office.    Carlton explained that we had done an extensive investigation regarding her concerns and could find now one that was talking about her and found that she was not the focus of any of the employee's conversation.    Carlton explained that unless she had further concerns or something to add we would be closing out the matter and moving forward. Carlton explained that our expectation was that she as well move forward and continue to do her job, which included cooperating and communicating with her team members in the course of a business day in the conducting of business.    Rosa stated "I always do my job".    Carlton acknowledged this but said she needed to move forward from this.    She confirmed that she had no questions or further concerns.

Thursday June 23 @ 2:00 PM – REDACTED came to Diane to report the following.

Rosa approached her that day and asked if <sup>REDACTED</sup> would tell the NMC group to "stop talking",  which <sup>REDACTED</sup> interpreted as them just being too noisy.    <sup>REDACTED</sup> said that she didn't feel comfortable doing this as it really wasn't her place to talk to another group to quiet down.   She further commented that she found the request even more odd since she and Rosa really don't interact.    I asked <sup>REDACTED</sup> to return to Rosa and let her know that she was not comfortable doing this and that she should talk to Maria (supervisor) or Lisa (manager) as they could then take action with the other group.

The below is the result of her second conversation.

REDACTED **REDACTED**

Hi Diane, do you have a minute?                                     2:10 PM

Diane Griffin

sure                                                               2:10 PM

REDACTED **REDACTED**

So I told her she should escalate it because I                     2:24 PM
didn't feel comfortable, but by what she was
telling me, it seems like she's more worried that
they are talking about her, not that they're loud.

Diane Griffin

ok thanks                                                          2:25 PM

Diane Griffin

ok thanks.                                                         2:25 PM

REDACTED **REDACTED**

No problem. I did ask what makes here think                        2:26 PM
they're talking about her and she kept saying
"Because I hear around." And some variation of
that.

6/24 1:00 pm spoke to REDACTED to get direction on the next step.


Monday 6/27 – 2:15 PM – Carlton called Rosa into his office, Diane Griffin present.

Carlton started by reiterating that we last spoke about a month ago and asked if any further concerns have arisen since that time. Rosa responded "It's OK". Carlton went on to explain that it had come to our attention that she was engaging a coworker in conversation about her "being talked about" and that this was not appropriate. He explained that she cannot continue to make other employees uncomfortable and that any continued concerns she had should have been brought to management as previously discussed. Carlton again reiterated that we did a thorough investigation when the first complaint was brought to our attention and made it clear that without further information we could do no more. Diane went over the incident of her approaching another employee and further explained why her behavior was inappropriate. Carlton again asked Rosa if she had any further information or concerns to share with us, and she again said "It's OK".


EXPEDITORS (AGUILAR) 000013

From: Carlton Ruesch
Sent: Friday, July 08, 2016 3:49 PM
To: Rosa Aguilar <Rosa.Aguilar@expeditors.com>
Subject: Conversation

Hello Rosa

Per the conversation you had with Diane Griffin and I last week I want to reiterate the items that we covered.

Two months ago it came to our attention that you felt that other employees were engaging in conversation that were targeting you.   You would not give us specifics, but despite the vague nature of your complaint we took it seriously and we did an extensive investigation.   At that time nothing was found to substantiate this complaint.   On May 23rd Diane Griffin and I met with you to report our findings.   We asked you if you had any further concerns or something to add we needed to hear about them, otherwise we would be closing out the matter.   I further explained that if you had any concerns in the future that you needed to bring them to someone in management.   You confirmed and said you had no other concerns.

Last week, we again met, as two weeks ago week you asked a fellow employee to intervene with another department in asking them to stop talking about you.   You sited the same group that you suspected in May to be engaging in "talking about you".   This inappropriate request to your coworker made this person uncomfortable.   In our meeting today we once again reminded you that we could not substantiate the behavior that you are reporting, and unless you could provide us new information we are unable to act further on your suspicions.   I reminded you again that you need to go to someone in management if you have concerns of this nature and to not involve other employees.   You confirmed by saying OK.

This will serve as our final verbal warning on this matter.   We need to ensure that the work place is comfortable and professional for all employees. You cannot continue to engage other employees with regards to your suspicions that "everyone is talking about you".   Engaging other employees is causing an uncomfortable work environment which viewed by management as a disruption to the work place and therefore will not be allowed.   Any future concerns that you may have must be expressed to someone in management as they are the only ones that can take action on your concerns.

Failing to comply with this request will result in further disciplinary action.

Carlton Ruesch
District Manager

8/02/16 – Maria Higa came to me and advise that on Friday 7/29/16 Rosa came to her and said "what about me what are we going to do?'  Maria asked what do you mean and Rosa advised her that she heard that she was going to be fired.  Maria responded "Rosa you worry me, I don't know where you would hear this"  Maria continued to express her concern and said if this was going to happen don't you think I would know since you report to me.  Rosa said "they wouldn't tell you. Rosa stated "I am not crazy."  I hear people talking about it.

08/04/16 –REDACTED, Regional Manager, reports to Carlton Ruesch that Rosa burst into his office that same day and accused him of working with CHQ to get her fired.   REDACTED  had no idea who Rosa was and what she was talking about.   He expressed in as much to her at the time of her outburst.   Carlton contacted REDACTED and she will get back to us on the next course of action to take with Rosa.

08/10/2016 (9:20 AM) – Rosa approached Maria with a standard AP question.   Maria advised her go ahead and contact operations, they will get back directly to you. Rosa said "I think you better as I may not be here tomorrow".   Maria ask "where are you going to be" and Rosa said she was sure she was going to get fired.   That everyone knew and she was certain that Maria knew as well and was just pretending not to.

She then told Maria the story about barging into <sup>REDACTED</sup> office and what her suspicions about <sup>REDACTED</sup> are.  She said that she has been shaking for three weeks now and that she know that they (meaning the company) has been watching her including intercepting her computer and her phone line.  She said I am not trying to take any documentation with me,  but when I delete documents that I legitimately don't need any longer,  they don't delete,  rather they save and the screen starts flashing as this is happening.

The next day Maria attempted to observe this happening when Rosa would try to delete, but it worked just fine, despite Rosa still claiming otherwise.


8/11/16  Rosa approached her supervisor Maria again and asked how long her insurance will be effective when she gets fired.  Maria again told Rosa she did not know what she was talking about. Rosa said you will see it is going to happen today.     She told her "I can't do my work, they are not letting me do my work".  There was as system issue in the morning that affected everyone on expo accounting and this was communicated by the Accounting Manager.  However, Rosa appeared to interpret that this issue was someone's way of keeping her from doing her work.  Rosa said they are talking right now about me and firing me, she referred to <sup>REDACTED</sup> as one of them.  She said <sup>REDACTED</sup> wife is "in the back" talking about me (pointing towards<sup>REDACTED</sup> office).   Maria again said no Rosa and she again stated "you will see it is happening today".


Friday 08/12/16, <sup>REDACTED</sup> was concerned and asked Maria Higa about Rosa.  It seems that Rosa came to <sup>REDACTED</sup> while Maria was on vacation around 08/04 or 08/05 to say good bye because Rosa told<sup>REDACTED</sup> that she will be fired.


Wednesday, 8/17/16 - The below is recounted by Lisa Blandi, Accounting Operations Manager

Rosa came to my office this morning to have me sign the <sup>REDACTED</sup> ACH and closed my door and sat down. She was very emotional.  Below is what she went over.

- She said<sup>REDACTED</sup> and<sup>REDACTED</sup> are entering her computer (remotely) and spying on her and are investigating and checking on what she is doing. <sup>REDACTED</sup> is working with CHQ to investigate and fire her and there is nothing she or I can do.
- She met with<sup>REDACTED</sup> a couple of weeks ago and told him that they were going to fire her.  She said he told her to speak with me, Diane, Carlton about it.
- They are going to fire her because she knows too much about the finances of EI. She does not understand because I know more about the finances than her.
- Everyone is talking about her being fired and she knows today is her last day.
- Everyone in accounting and<sup>REDACTED</sup> team knows she is going to be fired. She said she hears everything all around and she feels things.
- <sup>REDACTED</sup> team has control of her computer and they are looking and investigating her. She said she deleted files and then they are back again.
- She just wants them to leave her computer alone.

EXPEDITORS (AGUILAR) 000015

- In addition to <sup>REDACTED</sup>, REDACTED, and<sup>REDACTED</sup> team spying on her, <sup>REDACTED</sup> and <sup>REDACTED</sup> also spy on her – they are working together. (Note from D. Griffin - none of these people interact with Rosa either personally or in the course of business)
- <sup>REDACTED</sup> team knows her home phone number and address. His team sticks together and they know everything.
- She notices when she goes to pick up papers from the printer that someone has gone through them.
- People do not say good morning to her and ignore her.
- She needs her job for insurance for her and her son, <sup>REDACTED</sup> for at least another year.
- She is not planning to sue.
- Carlton sent email for a verbal warning a while ago and told her not to talk. She said everyone else is talking and they know everything.
- She said she just worries about her job, not people.
- She wants confirmation she will not be fired.

I told Rosa there is no talk about firing her and that <sup>REDACTED, REDACTED</sup> etc are not spying on her. Reminded her of the conversation she had with Diane and I late last year/early this year about the EAP and taking time off. She said she did not need time off. Rosa has tomorrow through next Monday as planned vacation days and has a planned doctor appointment this Friday.

Spoke with Carlton and he asked me to reiterate that we are not going to fire her and that everyone is concerned and to remind her again of EAP etc. and to tell her it is good she has her doctor's appointment. Carlton also recommended that Rosa leave now and mark the remainder of the day as sick time.

I met with her briefly again after speaking with Carlton. I went over everything above. Recommended her son join her for the doctor appointment. She said she will work until noon and then leave for the day. I'll keep an eye on her.

Note from D. Griffin - Rosa left at noon without further incident. She is on vacation August 18th, 19th and 22nd.

Rosa returned to work as scheduled on Tuesday August 23rd. Carlton and Diane met with Rosa upon her arrival. Carlton assured Rosa that no one was working on getting her fired as she was fearing and communicating to others. And that as long as her work quality remained good and she was "fit for duty" there should be no further concern on this subject. Rosa presented us with a note from a counselor that indicated that she was receiving treatment. She said that she had gotten a lot of rest over the past 5 days and would be seeing the therapist weekly. Carlton told her that this was great and we were glad that she sought out help and support. Carlton further iterated that she should let us know if there was anything else she needed such as time off for appointments etc. He told her to always keep in mind that is she is having a difficult day that she can utilize her sick time or if needed a leave of absence, just let us or her supervisor know what support she needs. Rosa's disposition was very upbeat. She repeated that she needed her insurance for her and her son.

EXPEDITORS (AGUILAR) 000016

Below email from Rosa's Supervisor Maria Higa on 9/8/16

Hi Diane, I would like to give you an update on Rosa's behavior. I've already talked to Lisa about it and she suggest me to send you a quick email.

Since last week she keeps making some comments to me that she is still being watched. Her computer is acting and it's because people are touching/working on it from behind.

She mentioned the following:

- Emails disappears
- Emails that she deleted is showing up again on her screen
- Therefore she is not doing anything with her emails (deleting or moving)
- There was an incident this morning that after I asked her what happened she mentioned to me that she received an email from $^{REDACTED}$@Distribution and her email disappeared and she didn't delete it. I asked $^{REDACTED}$ to send me the email again and it shows that it was sent at 9:07am and I couldn't find this in Rosa's computer.
- Last week we had the incident about the PDC. She wanted some privacy to do this so nobody can look at what she is doing or writing.
- She made comment to me that she is tired of this and she won't do anything.
- Also, this morning I was trying to approve one of Rosa's JOV and it did not have the attachment. I questioned her and she replied that she attached the backup and someone might deleted it. I rejected her JOV for her to attach the backup.


9/12/16 – 2:30 PM – Rosa approaches Maria Higa and tells her "she cannot continue to work in this environment" She asked how long am I going to be on display or something to that affect. Maria asked what do you mean?...Rosa responds that "I hear voices"

She went on to say "I don't know how my work will be cause I can't work like this, July and August it was crazy and I don't' know what I was doing.

Rosa had earlier asked Maria to help her walk through the process of adding a GCI to the system for a Service Provider. Maria worked with her on it, and at the end of the process the message "pending approval" popped up and Rosa stated "see they talk about me, it is pending approval"....she asked Maria why does accounting need to see my work?

Maria after speaking with Diane Griffin, offered to Rosa that perhaps it would be a good day to leave early and get some rest, and stay home tomorrow and rest if she feels she needs to. Rosa responded "what you meant I'm crazy" she did not even look at Maria when speaking to her.

4:00 PM Diane asked Rosa to come to Carlton's office with her to meet. We had CHQ prepare the ADA paperwork since she was indicating that she needed "privacy" to complete her essential job duties, specifically the mandatory training that is completed on line.

Carlton presented this to her, and Rosa said, "no I don't need privacy", I don't want the paper work. We discussed that her behavior was concerning the past couple of weeks and reflected on how relaxed she seemed after visiting the counselor and returning to work on August 23rd. Carlton indicated that perhaps she should reach out to this individual and see if she could get an appointment. Rosa was emphatic that she could not afford to go to this person. Carlton suggested that maybe contacting the

EAP, Rosa said I won't talk to someone on the phone I need to see their face. Diane suggested maybe getting an appointment with her regular doctor at which time Rosa said she referred me to a Psychiatrist but it was too expensive, $200 per appointment.

Rosa was getting increasingly angry as we continued to speak, she reiterated much of what she had previously told Maria, but disputed the fact that she needed privacy. When asked what she needed, she said to have everyone stop talking about her and people to leave her computer alone. Carlton tried to explain that computer issues are a part of daily life, and that computer are machines that break. He explained his own challenges that he had in the previous week with email.

It became clear that Rosa was selectively hearing the conversation, had some opposition to every suggestion that was made, so Carlton instructed Rosa that she was to stay home until she heard further from him, stating that she was not to come to the office the next day and likely she would not hear from him until the end of the week, so just take the rest of the week off.   She said I do nothing wrong why this happen.  Carlton reiterated that she was not being fired.

Senior management advise us to deactivate her access badge upon her departure that day.


09/13/16 – Rosa came to Diane's office looking for her.  She said she wanted the paperwork.  Diane thinking that she meant the ADA paperwork indicated it was still in Carlton's office.  Diane asked Rosa to wait in the Newport room while she rounded up the paperwork.  Carlton and Diane met with Rosa and Carlton indicated that he thought there was an agreement that until she heard from him she would not be returning to work.  Rosa stated that she needed the paperwork but not the same paperwork that we tried to give her the previous day. She needed paperwork stating how long she would be off.

Carlton reiterated that at this point he was not certain and that he was trying to round up the resource needed to present to her.  Rosa got upset and again said I do nothing wrong.  I work here 23 years. We both reiterated that she was not being fired and her benefits were active. After calming Rosa down Diane and Carlton walked her out to the elevator lobby.

## REDACTED

Rosa.

9/16/2016 – 8:12 AM – Carlton contacted Rosa on her cell phone and let her know he was calling as promised to touch base and update her. He asked if it was a good time to talk and she acknowledged it was. He reiterated that she remained on paid status and that she was being paid as if she were here working. He asked that she confirm that she understood, and she did.   He then said that we understood that she had concerns about the payment for an appointment, at which time Rosa informed him that she was able to negotiate with the Psychotherapist to accept the Aetna payment amount and she has since seen him. Carlton said "that is great to hear". He went on to say that "I have another appointment set up for you that I need you to attend". He asked if she was ready with a pen and paper and proceeded to provided her the details of the appointment with Dr. REDACTED for Monday 9/16/16 @2:30 AM. He advised that she will remain off work next week under the same status as this week while we wait to hear from the doctor. He asked if she would like us to arrange transportation, and she acknowledged that she would have her sister take her. Carlton requested her email address and told Rosa if she has any issues or changed her mind about transportation that she was to contact him.

**Job Performance Impact – as reported by Maria Higa, Supervisor on September 14, 2016**

    1.) Fails to interact with other team members in a professional manner, thereby isolating herself and not lending her help and support to others.

    2.) Failing to meet company expectation in completing her mandatory training.

| | | | | |
|---|---|---|---|---|
| Rosa Aguilar | Anti-Competition: Trade Association Do's & Don'ts 2016 | REQ1073 | 2-Sep | PAST DUE |
| Rosa Aguilar | Expeditors Competition and Antitrust 2016: Global Edit | REQ1074 | 2-Sep | PAST DUE |

    3.) Payables to other Expeditors offices have not been kept current, it was discovered this week that she was in arears on 73 items all of which were greater than 30 days old, the oldest being 84 days old.   These are expected to be resolved in 30 days.

    4.) In July she completely forgot a monthly review meeting with supervisor.  This meeting is a standing meeting for the purpose of reviewing the vendors that she is responsible to pay and the status of all payments.   She had to be given an additional week to complete this routine update and reconvene with her supervisor.

    5.) She is completing management reports confirming payment has been made on invoices and upon checking there had been no on payments made on multiple items that she indicated payment submitted.