Exhibit D is a true and correct copy of relevant excerpts and exhibits from Ms. Pettway's deposition.

Atkinson-Baker, Inc.
www.depo.com

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4   ROSA AGUILAR, an individual,        **CERTIFIED COPY**
                                    )
5                    Plaintiff,     )
                                    ) CASE NO.
6   vs.                             ) 2:19-cv-02285
                                    )
7   EXPEDITORS INTERNATIONAL OF      )
    WASHINGTON, INC., a corporation; )
8   and DOES 1 through 20,          )
    inclusive,                      )
9                                   )
                     Defendants.    )
10  _____ )

11

12

13

14

15              DEPOSITION OF

16           MCCRAY S. PETTWAY

17          LOS ANGELES, CALIFORNIA

18         TUESDAY, JUNE 2, 2020

19

20

21  ATKINSON-BAKER, INC.
    (800) 288-3376
22  www.depo.com

23

24  REPORTED BY:  DAMARIS MARTINEZ, CSR NO. 12925

25  JOB NO.:  AE032B5

Atkinson-Baker, Inc.
www.depo.com

1        In 2016, were you aware that Rosa had made

2    complaints against her co-workers?

3        A    I was aware, yes.

4        Q    Okay.  And how did you become aware of that?

5        A    Diane Griffin and Carlton Rusch informed me.

6        Q    Was this during a phone call?

7        A    Yes.

8        Q    All right.  And --

9        A    It was to clarify a business Skype call.  Not a

10   hard line or mobile phone call.

11       Q    Okay.  And what did Diane and Carlton report to

12   you about the complaints that Rosa made?

13            MS. WASSERMAN:  Objection to the extent it

14   calls for a narrative.

15            But can you explain, McCray?

16            THE WITNESS:  They reported that she raised

17   concerns of being harassed and being talked about by

18   other employees.

19   BY MR. HOPPER:

20       Q    Did they let you know any of the specific

21   conduct that Rosa was complaining about?

22       A    At different times they let me know of

23   different things that she was complaining about.

24       Q    Okay.  So, for example, did they inform you

25   that, you know, there was -- that other employees were

1    gossiping about her?

2        A    Yes.

3        Q    And what did they -- I mean, did they report to

4    you the nature of the gossip that Rosa had reported?

5        A    Yes.

6        Q    And what did they tell you?

7        A    That employees in the accounting department

8    were whispering about her or talking about her.

9    Whenever she would approach them, they may stop, or she

10    may be seated at her desk and they would be talking

11    about her or she would overhear them talking about her.

12    But there was not a specific thing that they were

13    reporting that she said that was being spoken about by

14    her co-workers.

15        Q    Okay.  So they didn't tell you that -- did they

16    ever tell you that, you know, she complained that any of

17    her co-workers called her an old lady or anything like

18    that?

19        A    At one point, in one conversation, not an old

20    lady, but that she's older and sensitive is what I

21    recall.

22        Q    And was that the only time that the comments

23    about her being older and sensitive was reported to you?

24        A    I believe so.

25        Q    And were any other comments that implicated

1    Ms. Aguilar's age ever reported to you?

2        A    No.

3        Q    And did Diane and Carlton tell you that Rosa

4    believed that a younger employee had a crush on her?

5        A    At some point they did tell me.  These were not

6    all in one particular conversation or part of one

7    complaint.  It became a series of it.  But at some point

8    they told me that there was a whispering about that

9    there was some employee who was younger that Ms. Rosa

10   Aguilar -- the rumor was that she might like.

11       Q    Okay.  And I know that you're saying that it

12   wasn't just one conversation that you had with Diane and

13   Carlton.

14            But were these conversations all in the 2016

15   time frame?

16       A    Yes.

17       Q    And so Rosa was still employed when these

18   incidents were being reported to you; right?

19       A    I was being informed of them.

20       Q    Right.  Okay.

21            And so she was still employed when you were

22   being informed of these issues; right?

23       A    Yes.

24       Q    And did Diane and Carlton let you know that

25   they had investigated Rosa's complaints at all?

Atkinson-Baker, Inc.
www.depo.com

```
 1        A     Yes.
 2        Q     And did they describe their investigation to
 3   you?
 4        A     What do you mean by describe?
 5        Q     Well, I guess who -- did they tell you who
 6   investigated?
 7        A     Yes.
 8        Q     What did they tell you?
 9        A     That Diane and Carlton were involved with the
10   investigation, and that one of the managers also helped.
11   I believe that manager reported to Diane.
12        Q     You don't remember the name of the other
13   manager?
14        A     Yes.
15        Q     And who was that?
16        A     Lisa Blandi.
17        Q     Did you interview any employees related to any
18   investigation into Rosa's complaints?
19        A     No.  I did not conduct the investigation.
20        Q     Were you informed what role Diane took on in
21   the investigation versus Carlton and Lisa?
22        A     Yes.
23        Q     Okay.  So what's your understanding of the role
24   that Diane played in the investigation?
25        A     That she was the lead investigator.
```

Atkinson-Baker, Inc.
www.depo.com

1    A    I did not.  I put them -- reminded them about

2    their ER contact because I don't handle accommodations,

3    and if that was an accommodation, then that would go to

4    ER at that time.  So we weren't just discussing

5    different options that could be available to her based

6    on her behavior and her concerns about her.

7    Q    All right.  And, I mean, as you're aware,

8    eventually Rosa went and was seeing Dr. Kambam for

9    psychiatric evaluation.  You're aware of that; right?

10   A    Yes.

11   Q    And whose decision was that?

12   A    Carlton Rusch.

13   Q    All right.  And you sought out Dr. Kambam;

14   correct?

15   A    What do you mean by sought out?

16   Q    You established contact with him.  You were the

17   first person from Expeditors to contact Dr. Kambam;

18   right?

19   A    Correct.

20   Q    Okay.  And who referred you to Dr. Kambam?

21   A    I believe it was Dr. Christopher Thompson.  I

22   reached out to our attorney network to get

23   recommendations for different providers who could help

24   to assess.  I also reached to Maria Kalina in employee

25   relations to see if our EAP service could help us.  And

Atkinson-Baker, Inc.
www.depo.com

1   in our office for quite some time.  And I was crushed

2   when she moved.  I mean, I know it's much better for her

3   life with her being up in Sacramento, but I was crushed

4   when she left Los Angeles.

5           MR. HOPPER:  Yeah.  I didn't work with her too

6   much there, but I know that Sylvia (inaudible) used to

7   be with her office had a couple cases against her, and

8   she always spoke very highly of her so...  I can imagine

9   that you guys would miss her.

10          MS. WASSERMAN:  At least she stayed in the

11   Littler family, even if it's Sacramento, not Los

12   Angeles.

13          MR. HOPPER:  Right.  Right.

14   BY MR. HOPPER:

15      Q    Okay.  So -- all right.  Let me go through some

16   of these e-mails related to Dr. Kambam.

17          I'm going to just start with Exhibit 50 'cause

18   I know we've had a couple depos and I don't want to

19   accidentally cross off any exhibit numbers.  So we'll

20   attach this one as Exhibit 50.

21          (Whereupon Exhibit No. 50 was marked for

22          identification by the reporter and is

23          attached hereto.)

24   BY MR. HOPPER:

25      Q    All right.  This is an e-mail from August 17,

Atkinson-Baker, Inc.
www.depo.com

```
 1    2016 and it's an e-mail you sent to Dr. Kambam and --

 2            Well, is this a true and correct copy of an

 3    e-mail that you sent to the doctor?

 4       A   Can you make it bigger?  Even though I have my

 5    glasses on, I am not able to see that.  Thank you.

 6       Q   Yeah.  Sure.  And, actually, I think I have --

 7    I think I put both -- yeah.  Okay.  So this is actually

 8    a couple different e-mails.  It's the first e-mail you

 9    sent where you identify Simerdip Khangura as the

10    referral source.

11            Is that a true and correct copy of an e-mail

12    that you sent, the third page?

13       A   Yes, it is.

14       Q   Okay.  And then here's the message where you

15    recalled it.

16            That's a true and correct copy of an e-mail you

17    sent as well; right?

18       A   Yes, it is.

19       Q   Okay.  And then this is finally the one with

20    Dr. Christopher Thompson identified as the referral

21    source.

22            And this is a true and correct copy of an

23    e-mail you sent to Dr. Kambam; right?

24       A   Yes.

25       Q   Okay.  And -- so you said, "I'm in need of a
```

Atkinson-Baker, Inc.
www.depo.com

1      Q    All right.  And when you had a call with

2   Dr. Kambam, did you discuss his evaluation of Rosa at

3   all?

4      A    I don't remember what we discussed.  Our

5   typical touch point, it was -- it was about what is

6   missing or outstanding or how soon the report will be

7   completed.  So I imagine that probably was the gist of

8   the conversation.

9      Q    All right.  Did you have any conversations with

10  Dr. Kambam to discuss the actual content of his report

11  from October 2016?

12         MS. WASSERMAN:  Vague and ambiguous as to --

13  vague as to when as the date.

14         MR. HOPPER:  Yeah.  I'm just --

15  BY MR. HOPPER:

16     Q    Any conversations that you had with Dr. Kambam

17  after he prepared his October 2016 report in which you

18  discussed his actual findings in that report.

19         MS. WASSERMAN:  After the report.  Okay.  Thank

20  you.

21         THE WITNESS:  I did have a conversation with

22  Dr. Kambam after receiving the report in October of

23  2016, just to make sure, understood some of the terms,

24  but there were medical terms, and his recommendations,

25  and making sure I understood those.

1    BY MR. HOPPER:

2       Q    Okay.  And what did you understand his

3    recommendations to be as of October 2016?

4       A    I understood that Rosa was not at that time fit

5    to report to work and that he had gathered information

6    from a host of her doctors and it was unfortunate

7    that -- his term, that her condition was not caught.

8    But he was able to determine that she had a medical

9    condition; that it impacted her in the workplace.  I

10   believe he used the term -- I don't know if it was

11   circumscribed or something like that, and I didn't

12   understand what that meant in the way which he was

13   describing it; that it was circumscribed to work, that

14   her conditions were triggered at work.

15      Q    Okay.  So when -- right now when you said "her

16   conditions were triggered to work" or "triggered by

17   work," that's what -- that's how Dr. Kambam explained

18   what he meant by "circumscribed to work"?

19      A    That was my understanding for what he explained

20   to me.  My takeaway from it, that things at work were

21   triggering her behavior that were of concern.  I don't

22   recall the specific words that he used but taking away

23   from my layperson's understanding was that the workplace

24   triggered her behavior.

25      Q    Did he -- just in the phone conversations that

Atkinson-Baker, Inc.
www.depo.com

```
 1      A    Okay.

 2      Q    Okay?

 3      A    Thank you.

 4      Q    Okay.  Are these true and correct copies of

 5   e-mails that you exchanged with Dr. Kambam?

 6      A    Yes.

 7      Q    All right.  And so let's see.  At the bottom

 8   you say, "Dr. Kambam, Rosa Aguilar has contacted her

 9   manager and asked to return to work."

10           Who reported this to you?

11      A    Diane and Carlton, I believe.  I'm not sure if

12   it was both of them or just one, but it would have come

13   from either one of them.

14      Q    All right.  And "She claims" -- you go on to

15   say:

16           "She claims that she is fit for duty.

17      We would like for her to undergo a follow-up

18      review with you to determine if she is fit

19      for duty."

20           So it was Rosa reaching out to her managers

21   that prompted the second meeting with Dr. Kambam?

22      A    Yes.

23      Q    All right.  Before Rosa reached out to her

24   managers to indicate that she wanted to return to work,

25   were there any plans to have her meet with Dr. Kambam
```

Atkinson-Baker, Inc.
www.depo.com

1    again?

2        A    No.  Not that I'm aware of, no.

3        Q    Okay.  And so then these -- the remainder of

4    the e-mails, this is -- you provided these dates.  It

5    looks like Dr. Kambam gave you some dates in late

6    January 2017, and you forwarded those dates to Kelsea

7    Tisdale or Danner to provide to Rosa; right?

8        A    I'm not sure who I would have provided them to

9    at the time.  It might have been her managers.  I'm not

10   sure.

11       Q    Okay.  All right.  And then you mention -- you

12   say at the top in the January 17th e-mail from 11:40,

13   you say, "Please ignore the previous e-mail."

14            What were you trying to get Dr. Kambam to

15   ignore exactly?

16       A    Getting his availability, I think.  I'm not too

17   sure, but I might have gotten a call to say when Rosa

18   was available, and that we were going to work with her

19   availability versus his.

20       Q    Oh, okay.  Okay.  Gotcha.

21            And did you have any communications with

22   Dr. Kambam between November of 2017 and those e-mails

23   that you sent in late or mid January of 20- -- sorry.

24   Strike that.  I got the wrong year.

25            Did you have any communications with Dr. Kambam

Atkinson-Baker, Inc.
www.depo.com

1   really to step in as kind of an HR surrogate for the

2   purposes of retaining the services of Dr. Kambam.

3           So Kelsea Danner and Diane and Carlton would

4   have been in contact whenever they needed to be, based

5   on the process that's step up in employees relations.

6   So I'm not kept and I was not kept up to date on a daily

7   basis whenever there was contact.

8       Q    Okay.  All right.  So let's go ahead and put

9   the January 25th report on the record.  This is Exhibit

10  18.  We'll attach is as Exhibit 18.

11          (Whereupon Exhibit No. 18 was marked for

12          identification by the reporter and is

13          attached hereto.)

14  BY MR. HOPPER:

15      Q    And you're free to take your time and review

16  the whole report if you'd like.

17          My first question is just going to be to ask if

18  you've reviewed the report before.  Just let me know

19  what you want to do.

20      A    I'd like to read it, please.

21      Q    Okay.

22          THE REPORTER:  Counsel, can we take a

23  five-minute break?

24          MR. HOPPER:  Yeah.  Sure.

25          (A break was taken.)

```
 1   BY MR. HOPPER:
 2       Q    Okay.  Here's the report that's Exhibit 18.  Go
 3   ahead and take a moment to review it.
 4       A    Okay.  You can scroll down.
 5       Q    Sorry.  My mouse was on the other screen.
 6       A    Can you scroll up just a little bit?
 7       Q    (Counsel complies.)
 8       A    Okay.
 9       Q    Okay.  I think that's pretty much it.
10            All right.  Is this a -- this is a report that
11   you reviewed in or around January of 2017; right?
12       A    That's correct.
13       Q    Okay.  And how did Dr. Kambam provide this
14   report to you?
15       A    E-mail.
16       Q    Okay.  And did you discuss with Dr. Kambam this
17   report and its findings on the phone at all?
18       A    Yes.
19       Q    Okay.  When did you have that discussion with
20   Dr. Kambam?
21       A    I'm not sure.  It might have been February,
22   late -- early February.  Because I was out of the
23   country when it came in.  I believe I was in Australia
24   at the time.
25       Q    All right.  And, you know, we had some
```

1   testimony from Kelsea Danner earlier today where she

2   said she discussed the report with you on two separate

3   occasions, one of which Carlton was also on the call.

4          Do you recall those conversations?

5   A    Yes.  I recall that we had conversations, yes.

6   Q    All right.  And did your conversations with

7   Kelsea and Carlton, did they occur before or after your

8   conversation with Dr. Kambam?

9   A    They were after my conversation with Dr.

10  Kambam.

11  Q    Okay.  So when you talked to Dr. Kambam about

12  the January 25th, 2017 report, what was your purpose in

13  having that conversation?

14  A    I wanted to understand what he meant by his

15  assessments and that she was -- that she was probably

16  not going to get better in some instances.  So I just

17  wanted to have some clarity around the lack of insight.

18         He indicated at one point that she was not

19  recognizing that she had a medical condition, and that

20  recognition -- the lack of recognition was contributing

21  to her not continuing treatment.

22         I think it was -- it was of a significant note

23  to him and to me that she had discontinued seeing Dr.

24  Carlson, and she was no longer taking medicine to help

25  with her condition.  It seems to be -- seems to have

1  been at the time a refusal to acknowledge that there was

2  a condition that was impairing her and that could be

3  treated possibly if she would follow the direction of

4  the doctors.

5        And so we talked about that and talked about

6  what some of the terms meant in his report.

7    Q   Do you recall which terms you discussed or

8  what -- you know, which terms you talked about, what

9  they meant specifically?

10    A   I remember etiologies, and I also talked with

11  him of what it meant about lack of insight, just to make

12  sure that I understood terms that seemed common to me or

13  medical to me, that I had the right understanding.   And

14  he was able to provide information to help me understand

15  that her condition was something that needed to be

16  treated and that she was refusing to recognize or had

17  refused to recognize that she needed to be treated.   And

18  that was a big stumbling block for her.

19    Q   Did he -- did you discuss with him his

20  recommendations which are showing right now, the three

21  recommendations?

22    A   Yes, I did.

23    Q   Okay.  And so did you -- did you attempt to

24  discuss how his first recommendation that she seek

25  treatment and take antipsychotic medication, how that

1    could be reconciled with her lack of insight into her

2    condition, as you stated?

3        A    Yes.  We discussed with -- all three, but

4    particular to the first one, that it wasn't just seeing

5    a psychiatrist and antipsychotic medication, but it was

6    also psychotherapy.  And he didn't think that

7    psychotherapy would be helpful in the long run to

8    prevent some of the behaviors that were reported about

9    her.

10        So we talked about that, and that her failure

11    to recognize that she needed the help was problematic

12    for her improving.

13        Q    Okay.  But I guess more what I was wondering is

14    did you ask him, you know, "Okay.  So you're saying that

15    she has a lack of insight into her condition but you're

16    also saying that this is a recommendation that she, you

17    know, seek psychotherapy and see a psychiatrist and get

18    medication."  Did you ask him at all if there was any

19    way -- if there was, I guess, any -- any doubt in his

20    mind that -- well, strike that.

21        Did you ask him if he thought there was any

22    possibility that she would actually follow up or meet

23    the first recommendation in this report?

24        A    I don't know if I'd put it that particular way,

25    but I did ask if he thought -- I think I asked if he

Atkinson-Baker, Inc.
www.depo.com

1    thought that she would get into treatment.  She was

2    emphatic that she did not have a problem in using terms

3    that there's nothing wrong with her and not crazy, and

4    it kind of matched what -- or did match what Carlton and

5    Diane had shared.  So he didn't seem to be encouraged by

6    the assessment that she would seek the treatment.

7        And, in fact, he shared that she was -- my

8    words, not his -- but my interpretation of it is that

9    she was trying to play coy or trying to fool him.  I

10   think he may have said she's trying to present herself

11   better than what she actually is; that her primary

12   occupation was that she needed to make money, and she

13   was trying to almost dupe him into believing that she's

14   really okay.

15       Those are just my terms, kind of a lay person's

16   assessment from the technical things that he provided to

17   me, and that he confirmed to me that my understanding

18   was correct.

19       So basically not only was she not willing to do

20   the things that she needed to do to improve her

21   circumstance medically, but she was also trying to do a

22   work around, kind of on guiding him into thinking that

23   she really was okay.

24       Q    Did Dr. Kambam inform you of -- you know, did

25   he tell you that he instructed or -- yeah.  Let me use a

1  with Rosa and following steps to see if we can

2  accommodate her.

3      Q    Okay.  Do you know if Kelsea ever had any

4  conversations with Rosa about Dr. Kambam's

5  recommendations?

6      A    I don't know.

7      Q    Okay.  And, I mean, obviously you heard her

8  testimony earlier.  But at the time, you know, in

9  February 2017, did you ever, you know, tell Kelsea that

10  she should do that, that she should advise Rosa of Dr.

11  Kambam's recommendations?

12      A    No, I did not.  And that would not have been a

13  departure of other conversations where we would have had

14  different discussions about different employees.  They

15  know their role.  If they need assistance from a legal

16  standpoint, they'll reach out.  So I didn't interfere

17  with her process.

18      Q    Okay.  All right.  So did you -- did you

19  consider Dr. Kambam's recommendations to indicate that

20  she would be unable to return to work indefinitely?

21      A    I understood that Dr. Kambam's report indicated

22  that there would be issues with her returning to work

23  with (inaudible) to her medical condition and her

24  refusal to have the treatment that was necessary to

25  treat it.  That was my understanding.

Atkinson-Baker, Inc.
www.depo.com

```
 1       Q    Okay.  And that was your understanding based on
 2   what you -- what you knew from the report and what had
 3   been reported to you by Carlton and Diane; right?
 4       A    It was based on the report from Dr. Kambam.
 5   Carlton and Diane are not health care providers, and so
 6   I didn't take direction from them on any medical basis.
 7   I only relied on Dr. Kambam and his report.
 8       Q    Okay.  And did Dr. Kambam, you know, let you
 9   know that from -- you know, from a professional
10   standpoint in his, you know, capacity as a psychiatrist,
11   that there was any reason that these -- that this report
12   shouldn't have been shared with Ms. Aguilar?
13       A    No, he did not.
14       Q    Okay.  Did you discuss with Kelsea the
15   possibility of sharing the report with Rosa?
16       A    No, I did not.
17       Q    Did you expect that Kelsea or somebody in
18   employee relations would share the recommendations made
19   by Dr. Kambam with Rosa?
20       A    I did not have any expectations.  They have
21   their process and they follow it.  I'm aware that they
22   have a process how they collect information from
23   treating health care providers and how they interact
24   with the employees, but I don't know every step that
25   they do because it's different on a case-by-case basis.
```

Atkinson-Baker, Inc.
www.depo.com

1    Q    Okay.  Is there anything else that -- that you

2    discussed with Dr. Kambam during the conversation that

3    you had with him to go over his findings in his

4    January 2017 report?

5    A    Yes.

6    Q    All right.  What else did you discuss with him?

7    A    We also discussed what he meant by a behavioral

8    contract.  I believe -- I can't be a hundred percent

9    certain, but I believe that I let him know we had a

10   handbook that set our expectations on how we are to

11   conduct at work, as well as our code of business

12   conduct.  So I didn't quite understand once he explained

13   what a behavior contract was.

14         And I also shared with him and reminded him

15   really about the instructions that Carlton had given her

16   and that there have been verbal things related to her

17   that she had not followed.  So I wanted to get an

18   understanding of what he meant by behavior contract.

19   Q    Okay.  And did he provide any elaboration on

20   what he meant by behavioral contract after you asked him

21   about that?

22   A    Yes.  And from what I recall, they were

23   consistent with what he had written in his report, so I

24   just wanted to make certain that I understood it.

25   Q    Did you discuss with Dr. Kambam his third

```
 1   recommendation that she could be placed in a different
 2   department or around different personnel?
 3        A    Yes.  He went over all three.  I don't recall
 4   anything specific of note about No. 3, other than the
 5   recommendation that she be placed in a different
 6   department or around different personnel.
 7             I believe -- I can't be a hundred percent
 8   certain, but I believe we had a discussion with her
 9   skill set, that the roles are very specific at different
10   desks, like in customs (inaudible) or import and expert,
11   import/export for air, and it's not a matter of sliding
12   employees.
13             So I think we talked about the difficulty with
14   placing her somewhere else.
15        Q    All right.  And when you discussed the report
16   with Dr. Kambam, I mean, did he make any recommendations
17   or did he conclude that the company wouldn't be able to
18   accommodate her based on what you were informing him of?
19        A    He did not make any such assessment.  He just
20   answered questions that I had regarding the report.
21        Q    And did he ever, you know, state conclusively
22   that -- I know he had concerns about whether Rosa would
23   actually acknowledge that she had a problem and seek
24   treatment and medication and all that.  But did he ever
25   say that, you know, based on his meeting with her and
```

Atkinson-Baker, Inc.
www.depo.com

1   his professional knowledge and everything, that he was

2   certain that she would never take those steps?

3       A    I don't recall him saying certain -- certainty

4   with respect to anything because that will be a bit of

5   predictive analytics so that would have surprised me.

6   So I definitely don't recall anything like that.

7       Q    Okay.  And anything else that you discussed in

8   that conversation with Dr. Kambam that you haven't

9   already testified to?

10      A    No.

11      Q    All right.  And then what -- so you said that

12  was in early February 2017, I think was your best

13  estimate; right?

14      A    I think so.

15      Q    Okay.  And then how long after that did you

16  have a conversation with Kelsea Danner about the report?

17      A    It could have been the same day, the next day.

18  I'm not sure.  It could have been -- I do recall talking

19  to him later evening, but I'm not sure which

20  conversation it was because we tend to not be able to

21  connect until like after 6:00 p.m. when he was finished

22  with his patients or in between patients.  So it might

23  have been the next day that I talked to Kelsea.

24      Q    All right.  And the first conversation that you

25  had with Kelsea, was that just you and Kelsea or was

1    anyone else participating in that discussion?

2        A    We had a discussion with just the two of us.

3        Q    Okay.  And did you -- did you share the report

4    with Kelsea before your conversation with her?

5        A    I think I talked about it and I think she

6    didn't have it yet, is what I think is kind of the

7    chronology of things.  Because I printed off a hard copy

8    and hand delivered to the employee relations department,

9    I think.  Because at that time I don't think it was

10   encrypted.  I think that's the process.

11       Q    When you talked with Kelsea during the first

12   conversation, what did you discuss with respect to

13   Dr. Kambam's report?

14       A    I don't recall specifically what was said, but

15   we discussed what the recommendations were and whether

16   or not we could accommodate and -- from the company's

17   perspective.  And then we talked to Carlton.

18       Q    I'm just focusing on the discussion that you

19   just had with Kelsea and not with Carlton.

20           Did you -- did you or Kelsea, during that

21   conversation, make any determination whether the company

22   could accommodate Rosa?

23       A    No.  We didn't -- Kelsea and I did not make a

24   determination.  That -- I don't -- I'm not a manager for

25   Rosa so I would not have made that decision for her.

Atkinson-Baker, Inc.
www.depo.com

1    Her manager would make it.

2        Q     Right.

3             What about Kelsea and employee relations, did

4    she make any recommendations during that conversation as

5    to whether Rosa could be accommodated?

6        A     I think she needed to talk to Carlton is what I

7    remember because this will be in the district in the

8    particular branch office, and two or three really had to

9    do with Carlton.  That was a managerial decision and not

10   a corporate decision from either the legal department or

11   employee relations.

12       Q     Right.

13            But, you know, we talked about the problems

14   with the first -- the first recommendation.

15            Now, did you take it the same way that Kelsea

16   did, that -- and actually let me just ask you:  Did you

17   ask Dr. Kambam if all three of these recommendations

18   needed to be met in order for Ms. Aguilar to return in a

19   probationary -- or return and be fit for duty?

20       A     We discussed that all of these things were

21   needed.

22       Q     Okay.

23       A     He was particularly concerned -- the emphasis

24   was on, No. 1, because that was the underlying

25   predicate, if you will, for all three to be successful.

Atkinson-Baker, Inc.
www.depo.com

1     Q     That's what Dr. Kambam told you?

2     A     That is my understanding from Dr. Kambam but he

3  was mostly concerned about No. 1.

4     Q     And when you say it's your understanding from

5  Dr. Kambam that if one couldn't -- if she couldn't meet

6  the recommendation in No. 1, that the others would not

7  be successful, what did he say specifically that made

8  you develop that understanding?

9     A     I -- can you read that back because I don't

10  think that's what I said that Dr. Kambam said to me.

11  But I just want to make sure I'm clear.

12     Q     Yeah, yeah.  No.  I don't think I was saying

13  that that's what he said.

14           Correct me if I'm wrong, but I thought it was

15  your understanding, based on what he told you, that the

16  first -- she would have to meet the first recommendation

17  in order for the second two to be successful, to have a

18  chance, you know, for her to return to work, and be fit

19  for duty.

20           Is that not accurate?

21     A     That's not accurate.

22     Q     Okay.  I'm sorry.  What did you understand?

23     A     My understanding that Dr. Kambam -- I'm sorry.

24  Helene was saying something.  I don't want to talk over.

25           MS. WASSERMAN:  No.  No.

Atkinson-Baker, Inc.
www.depo.com

1        THE WITNESS:  Okay.  My understanding from

2    Dr. Kambam was that all three were going to be

3    required -- all three requirements were going to be

4    required for her to be successful at work.  But he was

5    really -- he put the emphasis on No. 1, the first

6    recommendation or requirement.

7    BY MR. HOPPER:

8        Q    Okay.  And what did Dr. Kambam say specifically

9    that made you believe that all three recommendations

10   would need to be met in order for Rosa to be fit for

11   duty?

12       A    And.

13       Q    Where did he say that?

14       A    When we talked about -- you said what did he

15   say?

16            When we talked about and I called him to

17   clarify and get -- and ask questions from him -- or of

18   him, he talked about what was needed.  So in discussing

19   what was needed, he used the word "and."

20       Q    Okay.  And did you -- did you ever ask him for

21   an updated report that clarified that point?

22       A    I did not.

23            MS. WASSERMAN:  Objection.  Misstates the

24   document to the extent that you don't believe is clear.

25            MR. HOPPER:  Well --

Atkinson-Baker, Inc.
www.depo.com

1        MS. WASSERMAN:  You can answer the question.

2        MR. HOPPER:  Yeah, yeah.  I mean -- that's

3    fine.

4    BY MR. HOPPER:

5        Q    Did you ask him -- did you ask him specifically

6    if all three recommendations needed to be met or did you

7    just know reading the document?

8        A    I did ask him about the recommendations and

9    what was needed for Rosa.  And in our discussions, he

10   used the word "and" in connecting those things.  And

11   also in reading his document where he indicated -- and

12   the report, that the following, I took it all to mean

13   conjunctive and not disjunctive, in particular, because

14   he did not say, "I recommend one or two or three of the

15   following."  He said the following -- or he wrote "the

16   following."  And I also when I spoke to him, his use of

17   the word "and."

18       Q    Right.

19            And after reading the report and reading the

20   three recommendations, you still asked him to clarify

21   whether all three recommendations need to be met; right?

22       MS. WASSERMAN:  Misstates the testimony.

23       You can answer.

24       THE WITNESS:  Okay.  My understanding from

25   Dr. Kambam, when I talked with him to get clarity on the

Atkinson-Baker, Inc.
www.depo.com

1   concerns about whether or not Ms. Aguilar would meet the

2   first requirement because of the fact that she wasn't

3   seeing her doctor -- stopped seeing her doctor, stopped

4   seeing -- getting -- taking medication.  So he expressed

5   concerns about 1.  I think we all -- that's the

6   testimony.

7          Are you asking if Dr. Kambam expressed similar

8   concerns about 2 and 3?

9          MR. HOPPER:  Yeah.  I'm just -- not

10   specifically that -- you know, with respect to

11   medication and things like that, obviously.  I'm just --

12   BY MR. HOPPER:

13   Q    Did he say anything to you that led you to

14   believe that he doubted that a behavioral contract would

15   be something that she would go along with, that would be

16   helpful to her?

17   A    He thought that and expressed his thoughts that

18   without her treatment, he wasn't -- he didn't have a

19   high expectancy that she will follow through on a

20   behavioral contract.  She seemed to be driven by the

21   economic situation and that would be the most influence

22   over her behavior.  But from what I recall, it would not

23   be long lived.

24   Q    So was it your understanding -- well, did

25   Dr. Kambam basically convey to you that meeting the

Atkinson-Baker, Inc.
www.depo.com

1    first recommendation was sort of a precursor for a

2    behavioral contract to be successful in this situation?

3        A    Getting the treatment that was recommended for

4    her condition from her doctors, and the fact that she

5    stopped seeing Dr. Carlson, stopped taking her

6    medication, was not aware that she was in need of

7    medical care, that she needed psychotherapy, she needed

8    antipsychotic medication.  The fact that she lacked

9    awareness around that or would not accept it was of

10   significant concern to him, and that would impact

11   everything else, including behaving within the bounds of

12   the workplace conditions at work, including the employee

13   handbook and our code of business conduct and directives

14   from our managers.

15        So if she was not treating, then the

16   expectation was not high that the behaviors would

17   actually dissipate.

18        Q    Okay.  And -- okay.  All right.  I think that

19   clears it up.

20        All right.  So once you and Kelsea discussed

21   the report with Carlton -- when did that discussion take

22   place?

23        A    It would have been after my discussion with

24   Dr. Kambam.

25        Q    Right.

Atkinson-Baker, Inc.
www.depo.com

1    Dr. Kambam recommended and whether or not it could be

2    accommodated.  That's a typical process, from what I

3    understand.

4        Q    And during this phone call that you had with

5    Carlton and Kelsea, did -- did you -- did anybody

6    discuss, you know, whether these recommendations should

7    be communicated to Rosa?

8        A    No.

9        Q    After receiving the report from Dr. Kambam, are

10   you aware of any efforts by anybody at Expeditors to

11   engage in the interactive process with Rosa?

12       A    Yes.

13       Q    Okay.  And what were those efforts?

14       A    I don't know all the efforts, but I am aware

15   from Kelsea Danner that she engaged in the interactive

16   process where communications with Rosa that began in

17   2016 and continued in 2017.

18       Q    Okay.  I'm focusing specifically on the time

19   frame after the January 2017 report was received.

20            Do you know if after January 25th, 2017, if

21   anybody at the company engaged in the interactive

22   process with Rosa?

23       A    I'm aware that Kelsea Danner was engaged with

24   the interactive process with Rosa.

25       Q    After January 25th, 2017?

1   employee or attorney or counsel of any of the

2   parties, nor am I a relative or employee of such

3   attorney or counsel, nor am I financially interested

4   in the outcome of this action.

5

6       IN WITNESS WHEREOF, I have subscribed my name

7   this _18th_ day of _____June_____, _2020_.

8

9

10   _____

11   DAMARIS MARTINEZ, CSR No. 12925

12

13   Signature was requested.

14

15

16

17

18

19

20

21

22

23

24

25

### Praveen Kambam, M.D., PC

11500 W Olympic Blvd Ste 538, Los Angeles, CA 90064-1672 | Phone: 310-231-8964 | Fax: 310-231-8963

January 25, 2017

McCray S. Pettway
Director, Global Legal Services
Expeditors International of Washington Inc.
1015 Third Ave 12th Floor
Seattle WA 98104

Re: Rosa Aguilar

Dear Ms. Pettway:

At your request, I performed an update to an earlier psychiatric evaluation and review of records to offer an opinion and recommendations as to Rosa Aguilar's psychiatric fitness for duty and ability to fulfill her job-related expectations.

As you know, Ms. Aguilar is a 64-year-old, married, Peruvian-American female who worked as an accounts payable representative at Expeditors International but has not been fit for duty because her psychiatric symptoms were negatively impacting her work functioning in particular and the work milieu in general.

**Qualifications of the Examiner:** I am a licensed physician in the State of California. I am board certified by the American Board of Psychiatry and Neurology in the specialty of psychiatry, the subspecialty of child and adolescent psychiatry, and the subspecialty of forensic psychiatry. I am board certified by the American Board of Addiction Medicine in the specialty of addiction medicine. A copy of my curriculum vitae is available upon request.

**Statement of Non-confidentiality:** Ms. Aguilar was informed of the nature and purpose of evaluation. I explained that what she told me was not confidential and that a written report would be submitted to her employer and her employer's attorneys. I also explained that while I am a psychiatrist, I would not be involved in her treatment and that we did not have a doctor-patient relationship. She stated that she understood and agreed to proceed with the evaluation.

**Sources of Information:**

1. Interview of Rosa Aguilar on 1/18/2017, at 11500 West Olympic Boulevard, Suite 538, Los Angeles, California 90064, lasting for approximately one hour.

2. Fitness for duty report, by Praveen Kambam, M.D., dated 10/13/2016.

**Miscellaneous History Updates:** When asked how she has been spending her time since she has not been working, Ms. Aguilar reported that she primarily stays at home. She will watch a

EXHIBIT 18
Deponent RUESCH
Date 3-3-20 Rptr
WWW.DEPOBOOKPRODUCTS.COM

EXPEDITORS (AGUILAR)-000173

18

significant amount of television but will also go out with her sister and participate in Zumba exercise classes. She noted that her son stayed with her during December 2016.

**Substance Use History Updates:** Ms. Aguilar said that she drinks one cup of coffee per day. She reported no history of nicotine, alcohol, or illicit drug use.

**Medication Updates:** Ms. Aguilar reported that she is not currently taking any medications and is not taking her previously prescribed sleeping medication (temazepam, a benzodiazepine sedative medication).

**Psychiatric History Updates:** Ms. Aguilar reported that she has not seen her primary care physician, Nilsa Laborde, M.D., Ph.D., since her last fitness for duty assessment. Ms. Aguilar said that she was only seeing her therapist, Peter Carlson, because she thought that if she went then "they [Expeditors International] would say it's okay to go back to work." Therefore, she stopped seeing Mr. Carlson in 11/2016.

Ms. Aguilar stated that she has experienced less "racing thoughts" when trying to fall asleep and has been sleeping from midnight to 6:00 am without difficulty.

Ms. Aguilar reported that her mood is generally "fine," but she is feeling anxious because her sick time is running out on 1/21/2017. She has some "hurt" feelings that after 23 years, she was told she could not work.

**Ms. Aguilar's Attitude Towards Work on 1/18/2017:** Ms. Aguilar stated, "I need to work," and she reported feeling anxious that her sick time will be used up on 1/21/2017. She stated that she intends to work for about two to three more years then retire. She said she needs to work for her son and feels a financial pressure to do so. Because of this, she emphasized that she is willing to work in any department but when asked about if she would hypothetically prefer to return to her previous department or work in a different one, she was guarded and stated, "They need to decide which one" and "I don't want to say, if I say something they want to keep me from working. They need to decide." However, at one point she expressed that perhaps "a fresh start" would be preferred. Ms. Aguilar told me that Expeditors International needed to decide if she could work in her department or in another department or not at all so she could look for another job.

**Updates to Ms. Aguilar's Account of Circumstances Leading to the Evaluation and Responses to Hypothetical Questions:** When asked, Ms. Aguilar reported that she does not believe her situation was a "harassment case." She said that she would hear other employees talking but no one did anything directly to her. When asked if she thought that people would talk about her again, she replied, "I guess, but maybe they forget now."

When asked about her work computer and concerns about monitoring and her emails, Ms. Aguilar reported that she believes that Expeditors International was watching her to "make sure [she] did not mess up on [her] way out." She said that when she asked to transfer because everyone was talking about her, Expeditors International wanted to fire her and was watching her work to make sure she upheld her work responsibilities because "employees will sometimes

EXPEDITORS (AGUILAR)-000174

mess up on their way out." When asked why she would be fired for asking for a transfer, Ms. Aguilar said, "I don't know." She said that she did not think her emails would be watched with "the new system" at work. When asked if she thought she would be monitored if she returned to work, she stated, "I don't know." She added, "I don't care, because I want to work and need to work (for her son)."

When asked what she would do if she thought people were talking about her at work, Ms. Aguilar said, "I will keep quiet and keep my mouth shut... I can try to use the earplugs like Carlson said... I need to work for two or three more years."

**Mental Status Examination on 1/18/2017:** Ms. Aguilar was a woman of medium build who appeared her stated age. She was dressed in casual attire. She had good grooming and hygiene. She had good eye contact. She was cooperative and pleasant, and she appeared to be putting forth good effort in general; however, when asked hypothetical questions about aspects of her fitness for duty and hypothetical forced-choice questions about preferred work environments/departments, she was reluctant to answer and appeared guarded and she was concerned that what she said may be used against her by Expeditors International. She did not display any restlessness, physical slowing, or abnormal movements. She spoke with normal rate, volume, and tone. Her emotional expressions were reactive, and she described her mood as "okay." Her thinking was easily followed and free of disjointed thoughts. She stated she was not experiencing any suicidal or homicidal thoughts, intentions, or plans. She stated that she was not experiencing auditory or visual hallucinations, and she did not appear to be responding to internal stimuli. She expressed fixed, false beliefs of a paranoid nature and of having been persecuted at work (lessened since last assessment). She was somewhat preoccupied with needing to return to work for her son.

Ms. Aguilar was alert and fully oriented. She showed good short-term memory as evidenced by her ability to recall three items after five minutes. On tests of concentration, she was able to spell the word "world" backwards. Her fund of general knowledge was fair. She showed good ability for abstract reasoning in her interpretations of the meanings of three proverbs. When posed a hypothetical safety scenario about what to do if she was in a full movie theater and saw a fire, she showed good judgment. Her insight into her psychiatric symptoms was poor.

**Opinion and Recommendations:** It is my opinion, to a reasonable degree of medical probability, that Ms. Aguilar continues to have a Delusional Disorder, Persecutory Type. She experiences fixed, false beliefs that she was gossiped about and monitored at work. Her beliefs are circumscribed to the work setting and her functioning apart from the impact of the delusions and their ramifications in the work setting is not markedly impaired. The intensity and level of perceived persecution appears to have decreased since last assessment (previously she more intently believed that she was being conspired against, spied on, and harassed). While this change may be partially attributed to Ms. Aguilar being guarded because she thinks that what she says may be used as a reason to not allow her to return to work by Expeditors International and because she is not in a work environment that could be more triggering to her, it is also likely part of the natural ebb and flow in severity of a Delusional Disorder.

EXPEDITORS (AGUILAR)-000175

It is also my opinion, to a reasonable degree of medical probability, that Ms. Aguilar continues to demonstrate a lack of insight into the likely etiologies of her symptoms and need for treatment to ameliorate her symptoms.

Although Ms. Aguilar currently reports that she would be able to return to work and ignore any perceived harassment or monitoring should it occur because she is highly motivated for financial reasons to provide for her son, without treatment there is nothing to ameliorate a likely future increase in severity of her symptoms (as part of the natural ebb and flow of severity of a Delusional Disorder). I should note that it is possible that the symptoms remain in an ebb for a prolonged period of even a year or so, but more likely than not her symptoms will become more severe at some point during the next two to three years (Ms. Aguilar's stated term of intended remaining employment), causing her to fail to interact with other team members in a professional manner at all times and causing her to exhibit behaviors that prevent the workplace from being comfortable and professional for all employees.

If Expeditors International chooses to have Ms. Aguilar return to work in a probationary fashion, I recommend the following to increase the probability that she would be fit for duty:

1.  Regular follow-up with a psychiatrist to include taking antipsychotic medication to reduce delusional symptoms and prevent a worsening in their severity. Referral for psychotherapy may occur based on the psychiatrist's recommendations after she is taking antipsychotic medication but as an initial intervention, psychotherapy is unlikely to be effective as a sole intervention.

2.  Clear, written and oral instructions regarding expectations regarding her behavior that she agrees to (in essence, a behavioral contract). This form of behavioral contract should also include likely consequences of her unwanted behaviors to potentially serve as a deterrent. Although this will likely not change her underlying delusional thinking, it may serve to alter her response to her thinking because she identified wanting to work to financially provide for her son as an overriding concern.

3.  Placement in a different department or around different personnel than her previous department to minimize potential triggering of previous delusional thinking about being harassed.

Please do not hesitate to contact me if I can be of further assistance in this matter.

Sincerely,

Praveen R. Kambam, M.D.

Page 4 of 4

EXPEDITORS (AGUILAR)-000176

## Praveen Kambam

| From: | McCray Pettway <McCray.Pettway@expeditors.com> |
| Sent: | Wednesday, August 17, 2016 6:30 PM |
| To: | drkambam@drkambam.com |
| Subject: | Fitness for Duty Exam - Los Angeles, CA Psychiatrist Needed |

Dear Dr. Kambam,

My name is McCray Pettway and I work for Expeditors International of Washington, Inc. You were referred to me from Dr. Christopher Thompson. I am in need of a fitness for duty assessment of an employee. We have an employee who is behaving in ways thought to be consistent with paranoia/delusions. The employee believes people are talking about her and is constantly making references to people saying negative things about her. She has recently accused another employee of reporting her to corporate to get her fired and she has never engaged with the employee previously. Management has shared that no one is talking about her. Managers are concerned that her behavior is escalating and making others very uncomfortable. The employee on last week reported that she believes she is going to be fired imminently and that she believes the company has hacked her phone, email and computer.

There have been discussions about giving the employee some time off from work if she feels she needs to take the time. The employee shared that she is seeing a psychiatrist. The employee has also been asked if she needed an accommodation and she refused any accommodation.

Please let me know if you are available and able to assist with this matter.

Best regards,

**McCray S. Pettway**
Director, Global Legal Services

| Direct | 206-576-2719 |
| Main | 206-674-3400 |
| Fax | 206-393-5753 |
| Email | mccray.pettway@expeditors.com |



**Global Headquarters, Seattle**
1015 Third Avenue, 12th Floor
Seattle, WA 98104

CONFIDENTIALITY NOTICE: The information transmitted in this e-mail message and attachments may be attorney-client information, including privileged and confidential matter, and is intended only for the use of the individual or entity addressed to above. Any distribution, use or review by unauthorized persons is strictly prohibited. If you have received this transmission in error, please immediately notify the sender and permanently delete this transmission including attachments.



EXHIBIT

50

**Praveen Kambam**

| | |
|---|---|
| **From:** | McCray Pettway <McCray.Pettway@expeditors.com> |
| **Sent:** | Wednesday, August 17, 2016 6:29 PM |
| **To:** | drkambam@drkambam.com |
| **Subject:** | Recall: Fitness for Duty Exam - Los Angeles, CA Psychiatrist Needed |

McCray Pettway would like to recall the message, "Fitness for Duty Exam - Los Angeles, CA Psychiatrist Needed".

## Praveen Kambam

| | |
|---|---|
| **From:** | McCray Pettway <McCray.Pettway@expeditors.com> |
| **Sent:** | Wednesday, August 17, 2016 6:28 PM |
| **To:** | drkambam@drkambam.com |
| **Subject:** | Fitness for Duty Exam - Los Angeles, CA Psychiatrist Needed |

Dear Dr. Kambam,

My name is McCray Pettway and I work for Expeditors International of Washington, Inc. You were referred to me from Simerdip Khangura at Littler Mendelson. I am in need of a fitness for duty assessment of an employee. We have an employee who is behaving in ways thought to be consistent with paranoia/delusions. The employee believes people are talking about her and is constantly making references to people saying negative things about her. She has recently accused another employee of reporting her to corporate to get her fired and she has never engaged with the employee previously. Management has shared that no one is talking about her. Managers are concerned that her behavior is escalating and making others very uncomfortable. The employee on last week reported that she believes she is going to be fired imminently and that she believes the company has hacked her phone, email and computer.

There have been discussions about giving the employee some time off from work if she feels she needs to take the time. The employee shared that she is seeing a psychiatrist. The employee has also been asked if she needed an accommodation and she refused any accommodation.

Please let me know if you are available and able to assist with this matter.

Best regards,

**McCray S. Pettway**
Director, Global Legal Services

| | |
|---|---|
| **Direct** | 206-576-2719 |
| **Main** | 206-674-3400 |
| **Fax** | 206-393-5753 |
| **Email** | mccray.pettway@expeditors.com |



**Global Headquarters, Seattle**
1015 Third Avenue, 12th Floor
Seattle, WA  98104

CONFIDENTIALITY NOTICE: The information transmitted in this e-mail message and attachments may be attorney-client information, including privileged and confidential matter, and is intended only for the use of the individual or entity addressed to above. Any distribution, use or review by unauthorized persons is strictly prohibited. If you have received this transmission in error, please immediately notify the sender and permanently delete this transmission including attachments.

## Praveen Kambam

**From:** McCray Pettway <McCray.Pettway@expeditors.com>
**Sent:** Tuesday, January 17, 2017 11:40 AM
**To:** Praveen R. Kambam, M.D.
**Subject:** RE: Rosa Aguilar

Thank you.  Please ignore the previous email.

I will confirm the date of when Rosa will come to see you.

**McCray S. Pettway**
Director, Global Legal Services

**Direct** 206-576-2719
**Main** 206-674-3400
**Fax** 206-393-5753
**Email** mccray.pettway@expeditors.com



**Global Headquarters, Seattle**
1015 Third Avenue, 12ᵗʰ Floor
Seattle, WA  98104

CONFIDENTIALITY NOTICE:  The information transmitted in this e-mail message and attachments may be attorney-client information, including privileged and confidential matter, and is intended only for the use of the individual or entity addressed to above.  Any distribution, use or review by unauthorized persons is strictly prohibited.  If you have received this transmission in error, please immediately notify the sender and permanently delete this transmission including attachments.

**From:** Praveen R. Kambam, M.D. [mailto:drkambam@drkambam.com]
**Sent:** Tuesday, January 17, 2017 11:24 AM
**To:** McCray Pettway <McCray.Pettway@expeditors.com>
**Subject:** RE: Rosa Aguilar

The main things I would look for are any new relevant information from work, therapist, and primary care physician.  I would also do a relatively quick interview of her to assess if any change in insight, seeking psychiatric treatment, taking medication, etc. (hopefully under 1 hour).

Here are some upcoming times I could be available: Weds 1/18/2017 after 4 pm; Thurs 1/19/2017 after 5:15pm; Mon 1/23/2017 at 2 or 2:30 pm; Weds 1/25/2017 anytime other than 10:30am to 11am.  Let me know if any of those will work and I can put in the calendar.

**From:** McCray Pettway [mailto:McCray.Pettway@expeditors.com]
**Sent:** Monday, January 9, 2017 6:58 AM
**To:** Praveen R. Kambam, M.D. <drkambam@drkambam.com>
**Subject:** Re: Rosa Aguilar

**EXHIBIT**

tabbies®    59

Thank you.  I know of no new information regarding Rosa's status.  I look forward to getting your available dates and times so we can get this assessment done as expeditiously as possible.  Please also let me know how long it would take

to complete and whether you need an additional release from Rosa to complete your report. Finally, please let me know the cost for the assessment. Thanks.

Sent from my iPhone

On Jan 9, 2017, at 6:51 AM, Praveen R. Kambam, M.D. <drkambam@drkambam.com> wrote:

Okay let me get back to you today with some available times/days.

Has there been any new information that you know of?
On Jan 6, 2017, at 1:38 PM, McCray Pettway <McCray.Pettway@expeditors.com> wrote:

Hi Dr. Kambam,


Rosa Aguilar has contacted her manager and asked to return to work. She claims that she is fit for duty. We would like for her to undergo a follow up review with you for you to determine if she is fit for duty. Kindly let me know some dates you are available to conduct the assessment. I look forward to hearing from you soon.


Best regards,


**McCray S. Pettway**
Director, Global Legal Services


| | |
|---|---|
| **Direct** | 206-576-2719 |
| **Main** | 206-674-3400 |
| **Fax** | 206-393-5753 |
| **Email** | mccray.pettway@expeditors.com |





**Global Headquarters, Seattle**
1015 Third Avenue, 12th Floor
Seattle, WA 98104


CONFIDENTIALITY NOTICE: The information transmitted in this e-mail message and attachments may be attorney-client information, including privileged and confidential matter, and is intended only for the use of the individual or entity addressed to above. Any distribution, use or review by unauthorized persons is strictly prohibited. If you have received this transmission in error, please immediately notify the sender and permanently delete this transmission including attachments.