Exhibit E is a true and correct copy of relevant excerpts and exhibits from Dr. Kambam's deposition.

EXHIBIT

3

**Evaluee Name/DOB:** Rosa Aguilar (DOB 3/9/1952)
**RE:** FFD

**Statement of Informed Consent:**
-not confidential ✓
-not doctor/patient ✓

**Sources of Information:**

(1) Interview at office 9/19/2016, ~2:30PM → 4:30PM
(2) records reviewed 9/14/16

**Relevant Background Information:** 64 yo ♀
Born        Lima, Peru; moved > 30 yrs ago
Raised      ∅ dev delays, ∅ birth complications (planned)
Childhood   "okay", Japanese background
Foster/placement ∅
Abuse       ∅
— ∅ traumas          — lives alone +
— ∅ hobbies            husband in house

**Educational History:**
Degrees     MS grad
Grades      17/20 Peruvian scale = ~ B+
IEP/spec ed ∅ spec ed ∅ discipline
            ∅ failed/repeated grades

**Relationship History:**
Marriage    25 yrs husband, lives in Peru but comes & goes visits several months (5-6); good relationship
Children    21 yo son, attends UC Merced, good relationship
Dom viol    ∅

**Occupational History:**
— Expeditors Int'l (logistics company) = accounts payable X~23 yrs, "I didn't know anything"
      before 4/2016, no reprimands  "I was happy working there"

— before, in Peru, accounting dept of Japanese company

**Military History:** ∅

**Legal History:**
Lawsuits ∅
Arrests as juvenile or adult ∅    ∅

**Violence History:**
Physical confrontations ∅
Weapons ∅   ∅ use in fight ∅ access
Gang/conduct sx ∅

**Medical History:**
① HTN                         — HA's 1st pain week → accupuntre helping
② cholesterol (on/off a)      — NKDA        — ∅ SI, ∅ SX, ∅ TBI, ∅ cardiac
③ Temazepam 15mg QHS PRN sleep x/week (took once)

**Current Medications:**
① Enalapril 2.5mg QPM (HTN)
② Crestor 20mg QHS — (cholesterol)
③ vit C, D; Calcium

**Family Psychiatric History:**
∅ ∅, neuro, SAH, ∅ meds

**Substance Abuse History:**
— caffeine 1-2 cups coffee daily
— ∅ nicotine
— ∅ EtOH
— ∅ drugs

**Psychiatric History:**

1st sx past 3-4 mos, sleep probs, wakes up at night, "racy thoughts" when trying to fall asleep, thins on TV, worries / ruminations re: work & future scared about

Suicide ∅
SIB ∅
Inpatient ∅
Meds temazepam once (PCP Nielsa Laborde)     Peter Carlson therapist 2-3x
      before tornado!                          "I don't need it" work making 80

ROS:                mood: "I'm usually a quiet person" & "I don't like other people gossiping"
∅ GAD              - since 7/2016, sometimes feels sad, low energy, feelings hurt especially since someone
∅ panic              fucked at work harassed, erratic app (but snacky) → passive/active
∅ Social anx       - n stressed & tense" at work, "they would enter computer & watch me"
⊕ special phobia     "they laughing and commenting" → whole accounting dept entered my computer"
∅ MDD                "they were unable what I'm doing & trying to find me 2-3" "emails deleted At back
∅ bipolar                                                                    on computer
∅ PTSD            - "This is a harassment case." "someboy" "20's" "crush on you"
∅ eat dx             people talking about it are to another "what? he's crazy" "what? he's blind"
∅ OCD             - "she told everybody maybe she has a crush on me" "He's shy so he didn't tell her directly
∅ hoard              everyday kill him.
∅ ED              - "legal dept found evid but they deny." Blc I hear people talking. After complained
∅ Tics               "they start watching me, then they enter my computer" "(what?) "maybe I'm delete
                     something important or necessarily." "They & see how I work" "They're watching."
                     So they enter my computer & put me on leave." I need to work. But I
                     can't work with people watching me.

**Mental Status Examination:**                              psychotic:
Build  medium                                               ∅ VH ∅ ISE ∅ TH ∅ spec cues
Cooperativity/malingering  coop, putting faith app effort, pleasant    ∅ thought broadcast, reading
e.c  good                                                   (AH) I can hear other people
dress  business casual                                      talking (i.e. open areas)
PM  WNL                                                      ∅ in elevator if door closed
SP  WNL                                                     "I can feel it" "I know they
AFF  reactive, WL range"                                     are talking about me"
MOOD  " okay, relaxed "                                     [How do you know?] " She's...
TP  early full & logical ∅ diss joined                                  (just at work)
TC  ∅ SI, HI, intent, plan
    ∅ AH/VH| ⊕ paranoid ⊕ persecutory at work setting       ∅ spec person
A&O x3                                                       ∅ physical safety concerns
3 ITEMS  dog safety purple (2/3)                            only at work
WORLD → Dr Rowe
US Pres → Obama
Past 5 US Pres
    fair fund (state) &
            dates

Proverbs — don't cry spilled milk → ✓
don't count chickens → "protected"
marriage covered debt →

Fire — "a cell employee," don't scare people / pun2
Envelope
Insight — poor

### Summary of a Typical Day:

5:40 AM woke                    | (not at work)
Powert LF                       | 7 or 8 AM
leave 6:45 AM                   | breakfast
arch 7:05 AM                    | TV
work at desk                    | clean up
NOON - 1PM — stay at desk, lunch| housetasks
1 → 4:30PM work                 | bed around midnight
then leave                      | sometimes staying
home 5:70 PM
rest a little
eat or cook
TV
bed w/10PM

### Attitude Towards Work:

"I'd like to go work but I'm scared to go back & I will not have my privacy back,
they are going to be watching me,"
[if return + no privacy, can you work] → "IDK, not sure"
[any change imagine or misunderstood?] → "No chance." "B/c I'm giving you spec example"
mind tricks on you
like some people but not people that talk; [are they lying?] Yes, lying
why hate me? I feel sad

### Account of Incident(s) Leading to Evaluation/Responses to Hypothetical Questions:

- eval as part of people harassing at work — see above

- 100% sure

- enter computer
- heard people talking about me
- no need treatment
- "maybe I need to become like"

Dr. Nilsa Laborde    9/26/2016  ~ 20 mins
                                (phone)

- long time pt
- no past ψ notes
- HTN meds = enalapril 15 mg daily
- last several mos, complaints of ∉ strange, peculiar a re: work

        computers evaluating her
        employees harassing her
        withdrew friends at work
- referred Tim Cha (neuro) → imaging, etc → NL w/up
- spoke c̄ one son, 22 yo who worked at same place


Peter Carlson    10/3/2016  ~ 20 mins
                              (phone)

- recently seen for psychotic
- dx: delusional d/o 4/2016
- teased by younger man having romantic
- hearing others talk about her
- people entering computer and slowing down
- learning ∉ to care
- internal earplugs
- maybe some response
- lot of danger, "violate human rights"
- fearing it, poor insight

## Praveen Kambam, M.D., PC

11500 W Olympic Blvd Ste 538, Los Angeles, CA 90064-1672 | Phone: 310-231-8964 | Fax: 310-231-8963

October 13, 2016



EXHIBIT

tabbies

4

McCray S. Pettway
Director, Global Legal Services
Expeditors International of Washington Inc.
1015 Third Ave 12th Floor
Seattle WA 98104

Re: Rosa Aguilar

Dear Ms. Pettway:

At your request, I performed a psychiatric evaluation and review of records to offer an opinion and recommendations as to Rosa Aguilar's psychiatric fitness for duty and ability to fulfill her job-related expectations.

Ms. Aguilar is a 64-year-old, married, Peruvian-American female who is currently on medical leave from her position as an accounts payable representative at Expeditors International for concerns that her psychiatric symptoms may be negatively impacting her work functioning in particular and the work milieu in general.

Although a full psychiatric evaluation (including inquiry into childhood history, educational history, relationship history, social history, occupational history, military history, legal history, violence history, general medical history, family psychiatric history, substance use history, and psychiatric history) of Ms. Aguilar was performed and documented, only information directly relevant to determining her fitness for duty is included here.

**Qualifications of the Examiner:** I am a licensed physician in the State of California. I am board certified by the American Board of Psychiatry and Neurology in the specialty of psychiatry, the subspecialty of child and adolescent psychiatry, and the subspecialty of forensic psychiatry. I am board certified by the American Board of Addiction Medicine in the specialty of addiction medicine. A copy of my curriculum vitae is available upon request.

**Statement of Non-confidentiality:** Ms. Aguilar was informed of the nature and purpose of evaluation. I explained that what she told me was not confidential and that a written report would be submitted to her employer and her employer's attorneys. I also explained that while I am a psychiatrist, I would not be involved in her treatment and that we did not have a doctor-patient relationship. She stated that she understood and agreed to proceed with the evaluation.

**Sources of Information:**

1. Interview of Rosa Aguilar on 9/19/2016, at 11500 West Olympic Boulevard, Suite 538, Los Angeles, California 90064, lasting for approximately two hours.

2. Phone interview of Nilsa Laborde, M.D., Ph.D., on 9/26/2016, lasting for approximately 20 minutes.

3. Phone interview of Peter Carlson, on 10/3/2016, lasting for approximately 20 minutes.

4. Medical records of Ms. Aguilar's neurological evaluation and laboratory testing, provided by Dr. Laborde.

5. List of job related responsibilities for Accounts Payable Representative.

6. Employee Performance Evaluation records/personnel file for Ms. Aguilar.

7. Miscellaneous notes from 4/29/2016 to 9/14/2016 relevant to events leading to Ms. Aguilar's fitness for duty evaluation.

**Educational History:** Ms. Aguilar stated that she graduated high school in Peru, earning "the [United States'] equivalent of B+" grades. She has no history of receiving special education services or failed or repeated grades. She has no history of disciplinary problems during high school.

**Employment History:** Ms. Aguilar told me that she was born in Lima, Peru and moved to the United States more than 30 years ago. While in Peru, she was employed in the accounting department of a Japanese company. After she moved to the United States, she began working at Expeditors International, where she has worked in the accounts payable department for approximately 23 years. Ms. Aguilar told me that prior to 4/2016, she had no major issues at work and felt "happy working [at Expeditors]."

**Family Psychiatric History:** Ms. Aguilar reported that no one in her immediate or extended family has ever been diagnosed with a psychiatric disorder, a neurological disorder, or a substance use disorder, and no one has been treated with psychiatric medications.

**Legal History:** Ms. Aguilar stated that she has never been arrested or charged with any criminal offense, either as a juvenile or an adult. She has never been a plaintiff or defendant in a lawsuit.

**Violence History:** Ms. Aguilar reported no history of becoming physically violent with other individuals. She has never used a weapon in a fight. She has no history of gang affiliation, cruelty to animals, or fire-setting. Ms. Aguilar told me that she does not own or have access to any firearms.

**Substance Use History:** Ms. Aguilar said that she drinks one to two cups of coffee per day. She reported no history of nicotine, alcohol, or illicit drug use.

**Psychiatric History:** When asked about when she first experienced any psychiatric symptoms, Ms. Aguilar told me that for the past three to four months, she has been experiencing sleep difficulties. She has "racing thoughts" when she tries to fall asleep, and she awakens in the

middle of the night and turns on the television because of worries and ruminations about work and her future.

Ms. Aguilar reported that she has no history of psychiatric hospitalizations, self-injurious behaviors, or suicide attempts. She said that she has never taken psychiatric medications but she took one dose of temazepam (benzodiazepine sedative medication) for sleep that was prescribed by her primary care physician, Dr. Laborde. Ms. Aguilar said that she has seen Peter Carlson for psychotherapy about two to three times. She stated, "I don't need it," and told me that she goes because her work is making her go.

I screened Ms. Aguilar using the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* – Fifth Edition (DSM-5) for any history of Generalized Anxiety Disorder. She reported a history of excessive worry at night with associated sleep disturbance for the past three to four months, but she did not report other symptoms of this disorder.

Using the DSM-5, I screened Ms. Aguilar for any history of Panic Disorder, Social Anxiety Disorder, and specific phobias. She did not meet criteria for these disorders.

I screened Ms. Aguilar using the DSM-5 for any history of Major Depressive Disorder and Bipolar Disorder. She did not meet criteria for these disorders.

However, when I asked Ms. Aguilar regarding her mood, she replied, "I'm usually a quiet person and I don't like other people gossiping." When asked to elaborate, she stated that since 7/2016, she sometimes experiences feeling of sadness and hurt feelings because she thinks that someone she trusted has harassed her at work. She sometimes experiences low energy, experiences erratic appetite, and pessimistic thinking as a result. She stated that she felt "stressed and tense" at work because "they would enter my computer and watch me" and "they are laughing and commenting [about me.]" When I asked who she was referring to, she said, "The whole accounting department entered my computer." As evidence, she cited that emails that were already deleted were put back on her computer. She said, "They were watching what I'm doing and trying to fire me two or three times."

Ms. Aguilar then told me, "This is a harassment case." She said it began because "some boy" in his 20s has a "crush" on her and people have been talking about it. She stated, "He told everybody that he has a crush on me." She thinks that he did not tell her directly because he is shy.

Ms. Aguilar reported that the legal department found evidence of her harassment, but they have been denying it. She said that she knows this because she hears people talking. Ms. Aguilar said that after she complained, "They started watching me. Then they enter to my computer." When asked about possible motives, Ms. Aguilar replied, "Maybe I'll delete something important or mess something. They don't see how I work. They're watching. So they enter my computer and put me on leave." She then stated that she needs to work but she cannot work with people watching her.

Using the DSM-5, I screened Ms. Aguilar for any history of a psychotic disorder. She reported
no history of experiencing visual or tactile hallucinations, experiencing ideas of references,
believing that she has special powers, or believing that others are reading her thoughts. She did
state that she could hear other people talking about her (in open areas) but when I pressed her to
explore if this were auditory hallucinations, she gave me a mixed answer stating that while she
could not hear this in an elevator when doors were closed, she could feel it and knew for certain
others were talking about her. As additional evidence, she gave me the example that she hears
people saying, "She's…" When asked, Ms. Aguilar did not endorse that any specific person was
targeting her or beliefs that her physical safety was threatened, and she said that her harassment
is circumscribed to the work setting.

I screened Ms. Aguilar using the DSM-5 for any history of Posttraumatic Stress Disorder
(PTSD). She reported no history of symptoms of this disorder.

I screened Ms. Aguilar using the DSM-5 for any history of any eating disorder. She did not
report symptoms meeting criteria for these disorders.

I screened Ms. Aguilar using the DSM-5 for any history of Obsessive-Compulsive Disorder
(OCD) and tic disorders. She did not endorse symptoms of these disorders.

Using the DSM-5, I screened Ms. Aguilar for any history of Attention-Deficit/Hyperactivity
Disorder (ADHD) and a learning disorder. She did not meet criteria for these disorders.

**Ms. Aguilar's Attitude Towards Work:** When asked, Ms. Aguilar stated that she would like to
work but is "scared to go back" and is worried that she "will not have [her] privacy back" and
that "they are going to be watching me." She reported that she did not know if she could return
to work under those circumstances.

**Ms. Aguilar's Account of Circumstances Leading to the Evaluation and Responses to
Hypothetical Questions:** When asked, Ms. Aguilar stated that she was being evaluated as part
of people harassing her at work. She then referenced the information she told me earlier (above
in psychiatric history). Ms. Aguilar stated that she was "100% sure" that what she reported was
true because she has seen evidence of people entering her computer and has heard people talking
about her. When asked if there is any chance that she could be misperceiving things or her mind
could be playing tricks on her, she replied, "No chance. Because I am giving you specific
examples."

**Mental Status Examination on 9/19/2016:** Ms. Aguilar was a woman of medium build who
appeared her stated age. She was dressed in business casual attire. She had good grooming and
hygiene. She had good eye contact. She was cooperative and pleasant, and she appeared to be
putting forth good effort. She did not display any restlessness, physical slowing, or abnormal
movements. She spoke with normal rate, volume, and tone. Her emotional expressions were
reactive, and she described her mood as "okay, relaxed." Her thinking was easily followed and
free of disjointed thoughts. She stated she was not experiencing any suicidal or homicidal
thoughts, intentions, or plans. She stated that she was not experiencing auditory or visual

hallucinations, and she did not appear to be responding to internal stimuli. She expressed fixed, false beliefs of a paranoid nature and of being persecuted at work.

Ms. Aguilar was alert and fully oriented. She showed adequate short-term memory as evidenced by her ability to recall two of three items after five minutes. On tests of concentration, she was able to spell the word "world" backwards. Her fund of general knowledge was fair. She showed good ability for abstract reasoning in her interpretations of the meanings of three proverbs. When posed a hypothetical safety scenario about what to do if she was in a full movie theater and saw a fire, she showed good judgment. Her insight into her psychiatric symptoms was poor.

**Summary of Employee Performance Evaluation records/personnel file for Ms. Aguilar and Miscellaneous notes from 4/29/2016 to 9/14/2016 relevant to events leading to Ms. Aguilar's fitness for duty evaluation:** Prior to 4/2016, Ms. Aguilar has an uneventful work history at Expeditor's. Since 4/29/2016, Ms. Aguilar has expressed to various employees and supervisors similar themes as she expressed to me (e.g., people are talking about her, people are watching and spying on her, and people are monitoring and tampering with her computer) over several months, despite being told to not express her concerns to other employees and only to management. She has also expressed that "I'm not crazy" on a few occasions.

**Summary of relevant information from medical records of Ms. Aguilar's neurological evaluation and laboratory testing, provided by Dr. Laborde:** Ms. Aguilar was referred by Dr. Laborde to a neurologist, Tim K. Cha, M.D., who completed a neurological consultation on Ms. Aguilar on 9/15/2016 and follow-up on 9/21/2016. Dr. Cha performed a neurological examination, a Self-Administered Gerocognitive Examination (SAGE), reviewed lab work from 5/2/2016, and ordered an MRI of the brain. Ms. Aguilar's neurological workup was normal. Dr. Cha opined that "possible intracranial organic brain syndrome is unlikely for her acute psychosis."

**Summary of relevant information from phone interview of phone interview of Nilsa Laborde, M.D., Ph.D., on 9/26/2016:** Dr. Laborde reported that Ms. Aguilar has been a long-time patient under her care. Ms. Aguilar has no history of taking psychiatric medications. Over the last several months, Dr. Laborde began receiving complaints from Ms. Aguilar concerning her work that Dr. Laborde found "strange and peculiar." For example, Ms. Aguilar complained of computers evaluating her and employees harassing her, and she began withdrawing from friends at work. Dr. Laborde referred Ms. Aguilar to a neurologist, Dr. Cha, who did a full neurological evaluation that was normal.

**Summary of relevant information from phone interview of Peter Carlson, on 10/3/2016:** Mr. Carlson said that he recently began seeing Ms. Aguilar for psychotherapy. He has diagnosed her with a delusional disorder with onset approximately in 4/2016. She complained of being teased because of a younger man having romantic interest in her, hearing others talk about her, and people entering her computer and slowing it down. Mr. Carlson has been trying to help her ignore these perceptions and not care as much using what he called "internal earplugs." He thinks she may have had some response, but Ms. Aguilar demonstrates limited insight into her symptoms and expresses a lot of anger that her human rights are being violated.

**Opinion and Recommendations:** It is my opinion, to a reasonable degree of medical probability, that Ms. Aguilar currently has a Delusional Disorder, Persecutory type. Ms. Aguilar has experienced fixed, false beliefs that she is being conspired against, spied on, and harassed since at least 4/2016 (at least one month). Her beliefs are circumscribed to the work setting and her functioning apart from the impact of the delusions and their ramifications in the work setting is not markedly impaired.

It is further my opinion, to a reasonable degree of medical probability, that Ms. Aguilar's Delusional Disorder, Persectory type causes her to fail to interact with other team members in a professional manner at all times and causes her to exhibit behaviors that prevent the workplace from being comfortable and professional for all employees.

Perhaps even more concerning than Ms. Aguilar's actual symptoms (and subsequent behavior) is her lack of insight into: 1) how her symptoms and behavior may affect her co-workers and the work milieu; 2) the likely etiologies of such behaviors (i.e., mental illness); and 3) the necessity of psychiatric or psychological treatment to ameliorate her symptoms and decrease the likelihood of such behaviors' recurring in the future. This is important because her lack of insight in the aforementioned domains makes it unlikely that she will seek or continue in treatment of her own accord. Based on both their nature and duration (i.e., several months), it is unlikely that Ms. Aguilar's symptoms and behaviors will decrease without ongoing mental health treatment.

Because her lack of fitness is based at least in part on her untreated or undertreated psychiatric symptoms, Ms. Aguilar's symptoms may benefit from a low to moderate dose of an atypical antipsychotic medication. As such, I recommend that she be referred to a psychiatrist for initiation and management of such antipsychotic medication. Unfortunately, Delusional Disorder is typically difficult to treat fully, even with a combination of antipsychotic medication (at appropriate doses) and psychotherapy. Therefore, Ms. Aguilar will likely continue to experience some degree of fixed, false beliefs, although they may be significantly less intense and distressing.

Additionally, because of her lack of insight into her symptoms, Ms. Aguilar may perceive no need for psychiatric medication and refuse to take it. It is my opinion that without antipsychotic medication (and solely psychotherapy), her delusional symptoms are unlikely to improve enough to render her able to return to work.

Please do not hesitate to contact me if I can be of further assistance in these matters.

Sincerely,

Praveen R. Kambam, M.D.

## Praveen Kambam, M.D., PC

11500 W Olympic Blvd Ste 538, Los Angeles, CA  90064-1672  |  Phone: 310-231-8964  |  Fax: 310-231-8963

January 25, 2017

McCray S. Pettway
Director, Global Legal Services
Expeditors International of Washington Inc.
1015 Third Ave 12th Floor
Seattle WA 98104

Re: Rosa Aguilar

Dear Ms. Pettway:

At your request, I performed an update to an earlier psychiatric evaluation and review of records to offer an opinion and recommendations as to Rosa Aguilar's psychiatric fitness for duty and ability to fulfill her job-related expectations.

As you know, Ms. Aguilar is a 64-year-old, married, Peruvian-American female who worked as an accounts payable representative at Expeditors International but has not been fit for duty because her psychiatric symptoms were negatively impacting her work functioning in particular and the work milieu in general.

**Qualifications of the Examiner:** I am a licensed physician in the State of California.  I am board certified by the American Board of Psychiatry and Neurology in the specialty of psychiatry, the subspecialty of child and adolescent psychiatry, and the subspecialty of forensic psychiatry.  I am board certified by the American Board of Addiction Medicine in the specialty of addiction medicine.  A copy of my curriculum vitae is available upon request.

**Statement of Non-confidentiality:** Ms. Aguilar was informed of the nature and purpose of evaluation.  I explained that what she told me was not confidential and that a written report would be submitted to her employer and her employer's attorneys.  I also explained that while I am a psychiatrist, I would not be involved in her treatment and that we did not have a doctor-patient relationship.  She stated that she understood and agreed to proceed with the evaluation.

**Sources of Information:**

1. Interview of Rosa Aguilar on 1/18/2017, at 11500 West Olympic Boulevard, Suite 538, Los Angeles, California  90064, lasting for approximately one hour.

2. Fitness for duty report, by Praveen Kambam, M.D., dated 10/13/2016.

**Miscellaneous History Updates:** When asked how she has been spending her time since she has not been working, Ms. Aguilar reported that she primarily stays at home.  She will watch a

significant amount of television but will also go out with her sister and participate in Zumba exercise classes. She noted that her son stayed with her during December 2016.

**Substance Use History Updates:** Ms. Aguilar said that she drinks one cup of coffee per day. She reported no history of nicotine, alcohol, or illicit drug use.

**Medication Updates:** Ms. Aguilar reported that she is not currently taking any medications and is not taking her previously prescribed sleeping medication (temazepam, a benzodiazepine sedative medication).

**Psychiatric History Updates:** Ms. Aguilar reported that she has not seen her primary care physician, Nilsa Laborde, M.D., Ph.D., since her last fitness for duty assessment. Ms. Aguilar said that she was only seeing her therapist, Peter Carlson, because she thought that if she went then "they [Expeditors International] would say it's okay to go back to work." Therefore, she stopped seeing Mr. Carlson in 11/2016.

Ms. Aguilar stated that she has experienced less "racing thoughts" when trying to fall asleep and has been sleeping from midnight to 6:00 am without difficulty.

Ms. Aguilar reported that her mood is generally "fine," but she is feeling anxious because her sick time is running out on 1/21/2017. She has some "hurt" feelings that after 23 years, she was told she could not work.

**Ms. Aguilar's Attitude Towards Work on 1/18/2017:** Ms. Aguilar stated, "I need to work," and she reported feeling anxious that her sick time will be used up on 1/21/2017. She stated that she intends to work for about two to three more years then retire. She said she needs to work for her son and feels a financial pressure to do so. Because of this, she emphasized that she is willing to work in any department but when asked about if she would hypothetically prefer to return to her previous department or work in a different one, she was guarded and stated, "They need to decide which one" and "I don't want to say, if I say something they want to keep me from working. They need to decide." However, at one point she expressed that perhaps "a fresh start" would be preferred. Ms. Aguilar told me that Expeditors International needed to decide if she could work in her department or in another department or not at all so she could look for another job.

**Updates to Ms. Aguilar's Account of Circumstances Leading to the Evaluation and Responses to Hypothetical Questions:** When asked, Ms. Aguilar reported that she does not believe her situation was a "harassment case." She said that she would hear other employees talking but no one did anything directly to her. When asked if she thought that people would talk about her again, she replied, "I guess, but maybe they forget now."

When asked about her work computer and concerns about monitoring and her emails, Ms. Aguilar reported that she believes that Expeditors International was watching her to "make sure [she] did not mess up on [her] way out." She said that when she asked to transfer because everyone was talking about her, Expeditors International wanted to fire her and was watching her work to make sure she upheld her work responsibilities because "employees will sometimes

mess up on their way out." When asked why she would be fired for asking for a transfer, Ms. Aguilar said, "I don't know." She said that she did not think her emails would be watched with "the new system" at work. When asked if she thought she would be monitored if she returned to work, she stated, "I don't know." She added, "I don't care, because I want to work and need to work (for her son)."

When asked what she would do if she thought people were talking about her at work, Ms. Aguilar said, "I will keep quiet and keep my mouth shut… I can try to use the earplugs like Carlson said… I need to work for two or three more years."

**Mental Status Examination on 1/18/2017:** Ms. Aguilar was a woman of medium build who appeared her stated age. She was dressed in casual attire. She had good grooming and hygiene. She had good eye contact. She was cooperative and pleasant, and she appeared to be putting forth good effort in general; however, when asked hypothetical questions about aspects of her fitness for duty and hypothetical forced-choice questions about preferred work environments/departments, she was reluctant to answer and appeared guarded and she was concerned that what she said may be used against her by Expeditors International. She did not display any restlessness, physical slowing, or abnormal movements. She spoke with normal rate, volume, and tone. Her emotional expressions were reactive, and she described her mood as "okay." Her thinking was easily followed and free of disjointed thoughts. She stated she was not experiencing any suicidal or homicidal thoughts, intentions, or plans. She stated that she was not experiencing auditory or visual hallucinations, and she did not appear to be responding to internal stimuli. She expressed fixed, false beliefs of a paranoid nature and of having been persecuted at work (lessened since last assessment). She was somewhat preoccupied with needing to return to work for her son.

Ms. Aguilar was alert and fully oriented. She showed good short-term memory as evidenced by her ability to recall three items after five minutes. On tests of concentration, she was able to spell the word "world" backwards. Her fund of general knowledge was fair. She showed good ability for abstract reasoning in her interpretations of the meanings of three proverbs. When posed a hypothetical safety scenario about what to do if she was in a full movie theater and saw a fire, she showed good judgment. Her insight into her psychiatric symptoms was poor.

**Opinion and Recommendations:** It is my opinion, to a reasonable degree of medical probability, that Ms. Aguilar continues to have a Delusional Disorder, Persecutory type. She experiences fixed, false beliefs that she was gossiped about and monitored at work. Her beliefs are circumscribed to the work setting and her functioning apart from the impact of the delusions and their ramifications in the work setting is not markedly impaired. The intensity and level of perceived persecution appears to have decreased since last assessment (previously she more intently believed that she was being conspired against, spied on, and harassed). While this change may be partially attributed to Ms. Aguilar being guarded because she thinks that what she says may be used as a reason to not allow her to return to work by Expeditors International and because she is not in a work environment that could be more triggering to her, it is also likely part of the natural ebb and flow in severity of a Delusional Disorder.

It is also my opinion, to a reasonable degree of medical probability, that Ms. Aguilar continues to demonstrate a lack of insight into the likely etiologies of her symptoms and need for treatment to ameliorate her symptoms.

Although Ms. Aguilar currently reports that she would be able to return to work and ignore any perceived harassment or monitoring should it occur because she is highly motivated for financial reasons to provide for her son, without treatment there is nothing to ameliorate a likely future increase in severity of her symptoms (as part of the natural ebb and flow of severity of a Delusional Disorder). I should note that it is possible that the symptoms remain in an ebb for a prolonged period of even a year or so, but more likely than not her symptoms will become more severe at some point during the next two to three years (Ms. Aguilar's stated term of intended remaining employment), causing her to fail to interact with other team members in a professional manner at all times and causing her to exhibit behaviors that prevent the workplace from being comfortable and professional for all employees.

If Expeditors International chooses to have Ms. Aguilar return to work in a probationary fashion, I recommend the following to increase the probability that she would be fit for duty:

1. Regular follow-up with a psychiatrist to include taking antipsychotic medication to reduce delusional symptoms and prevent a worsening in their severity. Referral for psychotherapy may occur based on the psychiatrist's recommendations after she is taking antipsychotic medication but as an initial intervention, psychotherapy is unlikely to be effective as a sole intervention.

2. Clear, written and oral instructions regarding expectations regarding her behavior that she agrees to (in essence, a behavioral contract). This form of behavioral contract should also include likely consequences of her unwanted behaviors to potentially serve as a deterrent. Although this will likely not change her underlying delusional thinking, it may serve to alter her response to her thinking because she identified wanting to work to financially provide for her son as an overriding concern.

3. Placement in a different department or around different personnel than her previous department to minimize potential triggering of previous delusional thinking about being harassed.

Please do not hesitate to contact me if I can be of further assistance in this matter.

Sincerely,

Praveen R. Kambam, M.D.

Atkinson-Baker, Inc.
www.depo.com

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                                    **CERTIFIED COPY**

4

5   ROSA AGUILAR,                        )
                                         )
6                 Plaintiff,             )
                                         ) CASE NO.
7   vs.                                  ) 2:19-cv-02285
                                         )
8   EXPEDITORS INTERNATIONAL OF          )
    WASHINGTON, INC., a corporation;     )
9   and DOES 1 through 20,               )
    inclusive,                           )
10                                       )
                  Defendants.            )
11  _____)

12

13

14

15               DEPOSITION OF

16          PRAVEEN R. KAMBAM, M.D.

17          LOS ANGELES, CALIFORNIA

18           MONDAY, JULY 6, 2020

19

20

21  ATKINSON-BAKER, INC.
    (800) 288-3376
22  www.depo.com

23

24  REPORTED BY:  DAMARIS MARTINEZ, CSR NO. 12925

25  JOB NO.:  AE04595

1  they would not be able to return to work?

2      A    I don't, but this -- I don't have that estimate

3  of numbers.  I was thinking more of the situations.

4      Q    Okay.  Okay.  So I understand in this

5  particular case we're dealing with your -- your

6  diagnosis of Ms. Aguilar was that she had delusional

7  disorder persecutory type; correct?

8      A    Yes.

9      Q    Okay.  And what is -- what is delusional

10 disorder?

11     A    So delusional disorder is in the family of what

12 we call psychotic disorders, and so essentially those

13 are conditions where an individual has a -- what we call

14 a break from reality in a way, and that could be due to

15 symptoms, such as delusions in this case.  And so a

16 delusion is a fixed false belief.

17          And the persecutory type is the primary

18 category of the delusions that one has.  So you may have

19 fixed false beliefs about being harassed or talked about

20 or spied upon, in essence being persecuted.

21     Q    And what are the other types of delusional

22 disorders?

23     A    Well, you know, technically you can have

24 delusions in any category, and then there's an

25 unspecified type.  But other common ones are sometimes

1  for speculation.

2          THE WITNESS:  Well, I was answering in general,

3  in clinical setting.  So are you talking about -- you

4  need to narrow that down.

5          So I would say in general it totally varies

6  based on the diagnosis and the condition, the severity,

7  you know, how long they've been in treatment.  A lot of

8  variables there.

9  BY MR. HOPPER:

10     Q    Okay.  Fair enough.

11         Okay.  In Ms. Aguilar's case, do you have any

12 independent recollection of meeting with her?

13     A    I recall -- probably not as detailed as it

14 would have been years ago, but I recall meeting with

15 her.

16     Q    And do you recall how you came to evaluate her?

17     A    When you say how I came to evaluate her, do you

18 mean --

19     Q    Well, how she was referred to you for the

20 evaluation.

21     A    Yes.  I believe Ms. Pettway -- I can't remember

22 how she contacted me, but I believe she contacted me,

23 either through a phone call or e-mail.

24     Q    Okay.  And do you recall, you know, what

25 Ms. Pettway described as, you know, being the reason for

Atkinson-Baker, Inc.
www.depo.com

1  the fitness-for-duty assessment in Ms. Aguilar's case?

2      A    I don't.  I would probably defer to whatever I

3  have on my report or e-mail.  In general, I just -- I

4  recall that it was related to fitness for duty, that

5  there was some concerns about e-mails or complaints of

6  that nature, that she was being either harassed or

7  something like that at work.  That's the best of my

8  recollection.  But, again, I would defer to whatever I

9  took as notes and e-mails and wrote in my report as more

10  accurate.

11      Q    Did Ms. Pettway have any specific request as it

12  relates to the fitness for duty or she just generally

13  asked for a fitness-for-duty evaluation?

14      A    I -- again, I would have to defer to what I

15  have -- I can't recall that level of detail.

16      Q    Okay.  Do you recall any of the phone calls

17  that you had with Ms. Pettway about Ms. Aguilar?

18      A    I recall we had one after the first evaluation

19  I did.  I don't -- if you look at the billing records,

20  you can find out when.  I don't remember when it was

21  exactly.  I think we debriefed about my findings and

22  recommendations.  Many times I liked to speak with

23  whoever referred, just so they understand what I'm

24  saying in the report.

25      Q    Okay.  Do you recall having any calls with

Atkinson-Baker, Inc.
www.depo.com

```
 1        Q     Right.
 2              So, yeah.  It says "Sources of Information" and
 3    it says "Interview at office 9/19/2016."
 4              So is this your initial -- the notes of your
 5    initial interview with Rosa?
 6        A     Yes.  That's correct.
 7        Q     Okay.  And on this document, did anybody else
 8    fill in any of the information or is this all you?
 9        A     No.  That's my less-than-ideal handwriting.
10        Q     Okay.  And you use these notes to prepare your
11    evaluation report; correct?
12        A     That's correct.
13        Q     Okay.  And then you also conducted -- so it's
14    got some notes here related to Dr. Nilsa Laborde?
15        A     Yes.
16        Q     On June 26.
17              So is this a phone conversation that you had
18    with Dr. Laborde?
19        A     Yes.  I -- so those first few pages you showed,
20    I think those were the interview with Ms. Aguilar.  And
21    best of my recollection, I attempted to contact some --
22    or I attempted to gather some collateral information.
23    And these are notes from the phone calls I had with the
24    other providers.
25        Q     Okay.  Oh, yeah.  Then I see, there's
```

Atkinson-Baker, Inc.
www.depo.com

```
 1   Peter Carlson on here as well, 10/3/2016.
 2          So these are notes of a call that you had with
 3   Mr. Carlson; right?
 4      A    That's correct.
 5      Q    Okay.  Did you talk with any other medical
 6   providers about Rosa Aguilar other than Dr. Laborde and
 7   Peter Carlson?
 8      A    No, I did not.
 9          Just one thing to note is, as I'm seeing on
10   that note there, Tim Cha, neurologist, provided me with
11   copies of that neurological workup, and that was the one
12   thing I was unable to find.  I believe I probably
13   shredded it after this case was closed.
14      Q    Okay.  But any insight you gleaned from the
15   report, the neurology report, that would have been
16   contained in your evaluation report; correct?
17      A    That's correct.  And I think it was largely a
18   normal neurological workup.
19      Q    Okay.  And in addition to speaking with
20   Dr. Laborde and Mr. Carlson, did you also review medical
21   records from their offices in regards to Ms. Aguilar?
22      A    Other than the neurological report that -- that
23   Dr. Laborde sent, I don't believe I did.  Well, the
24   records would be whatever I was provided or that were
25   turned over to you and that I was provided by
```

 1    Expeditors.  I don't believe those were medical records,

 2    though, but I'd have to refer back to that.

 3        Q    Okay.  And do you -- I know the records you're

 4    referring to.

 5            So you reviewed Ms. Aguilar's personnel file as

 6    well, correct, or at least some documents in her

 7    personnel file?

 8        A    Yes.  If you -- here's another thing is, at the

 9    beginning of my report, I typically list out the sources

10    of information of what I reviewed, so I would rely on

11    that more than my memory here.

12        Q    Sure.  Sure.

13            Okay.  Let's go ahead and put that report on.

14    We'll attach it as Exhibit 4.

15            (Whereupon Exhibit No. 4 was marked for

16            identification by the reporter and is

17            attached hereto.)

18    BY MR. HOPPER:

19        Q    Okay.  This is a document dated October 13,

20    2016.  It's a six-page document.

21            Is this a true and correct copy of your first

22    fitness-for-duty evaluation report for Ms. Aguilar?

23        A    From what I can see, yes.

24        Q    Okay.  And I can go through it, if you want to

25    take a moment to review as well, so I can -- just let me

```
 1   would not necessarily start like that and -- just for
 2   the record.
 3         But then to answer your question more directly,
 4   yes, she did not appear to have insight into a mental
 5   health condition.
 6      Q    And it says here in that same paragraph on page
 7   4:
 8         "Ms. Aguilar stated that she was 100 percent
 9   sure that what she reported was true."
10         So this kind of gets into what you were saying
11   earlier that some people think, you know, they might be
12   50 percent sure that something is true, that their
13   delusional beliefs are true.  But in Ms. Aguilar's case,
14   she believed it was a hundred percent?
15      A    That's what she reported this time, during this
16   evaluation, I mean.
17      Q    Okay.  And is that determination, you know, I
18   guess the degree in which the false beliefs are fixed,
19   is that something that's self-reported by the patient or
20   are there some -- any other sort of objective tests that
21   you would perform?
22      A    Well, I think it's an overall assessment.  I
23   think this -- the hundred percent sure aspect is an
24   interview technique to kind of probe what she thinks.
25      Q    Okay.  So what did you do to -- what were all
```

1  the things you did to evaluate Ms. Aguilar for her

2  fitness-for-duty assessment?

3     A    Well, I -- typically I'll conduct an interview

4  or full psychiatric evaluation and including a mental

5  status examination.  Then I will also review collateral

6  records, which are employment records, job description,

7  the behaviors of concern, and sometimes speak with

8  treating doctors to get further collateral information.

9          So in this case I think I did most of those or

10  all those.

11    Q    Okay.  And are there any other sort of -- you

12  know, I'm not that familiar with psychiatry, but are

13  there any other sort of tests or anything like that that

14  you perform as part of your fitness-for-duty evaluation?

15    A    It's case by case.  But some instances, for

16  example, let's say the issue is possible, you know,

17  early dementia or something like that, we may do some

18  sort of neuro cognitive testing or psychological

19  testing.

20    Q    Okay.

21    A    It depends on the case.

22    Q    All right.  But in Ms. Aguilar's case, you

23  didn't perform anything like that; right?

24    A    I did not.

25    Q    Okay.  And what about the sources of

1  information that you consulted, what about that led you

2  to your diagnosis that she had delusional disorder

3  persecutory type?

4       A    Let me make sure I understand the question.

5  What do you mean what about the sources of information?

6       Q    So what led you to your diagnosis that she had

7  delusional disorder, Ms. Aguilar?

8       A    Okay.  Well, it was my determination that she

9  had fixed false beliefs of people persecuting her based

10  on the records, based on what she was reporting, and

11  based on what her treating providers were telling me.

12       Q    And I guess what -- how do you determine, I

13  guess, that her beliefs are in fact false?

14       A    Well, you know, I'm not there so I have to rely

15  somewhat on the records, the collateral records and what

16  other folks are reporting.  And general -- you know, you

17  can look at general probability of the likelihood of

18  things.

19            But, you know, if it's something that's very

20  bizarre, like, you know, "aliens took me," it's possible

21  that's true, but it's not probable.

22       Q    Right.

23            And in Ms. Aguilar's case, I'm just wondering

24  if you recall how you determined that her beliefs were

25  false?

1        A     I don't have an independent recollection of

2   that.  But, again, I would have looked at the collateral

3   information, I would have looked at what the treating

4   providers are reporting, and I probably would have

5   considered the probability of what she was saying.  You

6   know, it's a totality of everything that I'm hearing.

7        Q     Okay.  And you don't have any recollection --

8   independent recollection as you sit here today of what

9   about -- about all of the information made it -- sorry.

10  Strike that.

11             So as you sit here today, you don't have any

12  independent recollection of how you came to the

13  determination that Ms. Aguilar's beliefs were false;

14  correct?

15       A     Well, I have a recollection of -- generally of

16  why I believe she had delusional disorder, I guess.  But

17  in terms of do I have a recollection that's better than

18  the report in terms of the basis of the diagnosis, then

19  no.  Again, I would defer to what I wrote back then.

20       Q     Okay.  So your report would contain all of the

21  information upon which you based your determination that

22  Ms. Aguilar's beliefs were false; correct?

23       A     Yes.  That should contain the -- kind of

24  substance of the data, at least.

25       Q     Okay.  And did you also make the determination

Case 2:19-cv-02285-PSG-JC    Document 19-7    Filed 07/17/20    Page 28 of 61    Page ID #:540
Atkinson-Baker, Inc.
www.depo.com

1    that she didn't have any insight into her condition?

2        A    Or that she had poor insight, I believe.

3        Q    Poor insight.

4            When you say she had poor insight into her

5    condition, does that leave some room that, you know,

6    maybe she had some insight into her condition?

7        A    It's possible.  I don't think it's something

8    that -- poor isn't really a quantifiable thing in

9    psychiatry but -- you know, typically we don't say

10   something is a hundred percent in medicine because

11   there's always I guess a chance of a point one percent

12   or something like that.

13       Q    Do you recall, as you sit here today, that she

14   had any -- that she conveyed anything to you that made

15   it seem like she had some insight into her condition?

16           MS. WASSERMAN:  Vague and ambiguous as to time,

17   Counsel.  Are you talking about the first time, the

18   first evaluation?

19           MR. HOPPER:  Right.  Yeah.  Just focusing on

20   the first evaluation right now.

21           MS. WASSERMAN:  Thank you.

22           THE WITNESS:  Well, I -- you know, she had said

23   that -- I think she was -- the strength in which she was

24   holding onto the idea that all these things were

25   occurring was pretty strong.  And, you know, as we

Atkinson-Baker, Inc.
www.depo.com

1        MS. WASSERMAN:  Counsel, you want to bring up

2   the notes?

3        MR. HOPPER:  Yeah.  Sure.

4        THE WITNESS:  Right.  Internal earplugs.

5   That's what I was referring to.

6        So he said that he was trying -- yeah.  Best of

7   my recollection, he was trying to teach her to have what

8   he called, quote, internal earplugs, meaning "try to

9   ignore these things that are bothering you."  And just

10  don't care about it essentially.

11       And he said he wasn't sure, maybe there was

12  some improvement to that or not.  But he still believed

13  that she had very poor insight.

14  BY MR. HOPPER:

15     Q    So is -- if somebody has poor insight after

16  getting treatment, I mean, is the fact that they still

17  have poor insight into the condition, is that an

18  indicator that the treatment is not effective?

19     A    Well, in this case, we're talking about a

20  delusional disorder, and in my experience, psychotherapy

21  isn't that effective of a treatment, at least alone,

22  because of the nature of the condition.

23     Q    So what forms of treatment do you find to be

24  that -- what forms of treatment are effective in

25  treating delusional disorder of the nature that Ms.

1   Aguilar had?

2       A    Yeah.  Well, typically you'd be looking at

3   antipsychotic medication.  But as I mentioned earlier,

4   there is varied response to that.

5       Q    And do you recall if Ms. Aguilar had ever been

6   prescribed or took antipsychotic medication?

7       A    Best of my recollection was no.

8       Q    "No" to -- "no" to both, that she hadn't been

9   prescribed it either?

10      A    Yes.  That she had not been prescribed it and

11  that she was not currently taking it.

12      Q    Okay.  So in your -- in your view, in order to

13  be effective, the treatment would have to essentially

14  include antipsychotic medication, along with

15  psychotherapy or is psychotherapy not helpful even when

16  you're taking the medication?

17      A    Well, psychotherapy could be helpful when

18  taking the medication, but I think it's -- it would be

19  a -- what's the right word?  Not necessary, but a -- the

20  first line, the primary treatment would need to be an

21  antipsychotic medication because here's the way to think

22  about it:  If somebody has delusion -- a fixed false

23  belief and then you're trying to talk to them and say,

24  "Hey, don't have that belief," it's nothing -- you're

25  going to get nowhere.

1      Q     Okay.  All right.  Go back to the report.

2            All right.  So under "Opinion and

3      Recommendations," you said:

4            "It is my opinion to a reasonable degree

5            of medical probability that Ms. Aguilar

6            currently has a delusional disorder,

7            persecutory type."

8            What is -- is that a term of art to a

9      reasonable degree of medical probability?

10     A     Yes.

11     Q     What does that mean exactly?

12     A     Well, I think it's a legal term of art.  So

13     you're probably better than I -- but my understanding as

14     a psychiatrist and expert witness is that it's more

15     likely than not or kind of a preponderance of the

16     evidence type of standard.

17     Q     All right.  And you also go on to say that:

18           "It is my" -- "It is further my opinion

19           to a reasonable degree of medical probability

20           that Ms. Aguilar's delusional disorder,

21           persecutory type, causes her to fail to

22           interact with other team members in a

23           professional manner at all times, and causes

24           her to exhibit behaviors that prevent the

25           workplace from being comfortable and

Atkinson-Baker, Inc.
www.depo.com

1     professional for all employees."

2          Do you recall exactly what led you to that

3     conclusion that -- that her co-workers were basically

4     uncomfortable with her behavior?

5     A    I don't, unfortunately.  I believe it would be

6     somewhere there in the report in terms of the data.  But

7     I don't have an independent recollection without looking

8     further at the report.

9     Q    Okay.  So -- but it would have been contained

10    in the report, whatever led you to that conclusion that

11    her co-workers were uncomfortable with her behavior;

12    right?

13         MS. WASSERMAN:  Misstates the witness'

14    testimony.

15         THE WITNESS:  It would have been contained in

16    the report or in the records that I reviewed.  I may not

17    have like copied -- transcribed them.

18    BY MR. HOPPER:

19    Q    Okay.  All right.  You also note in -- I guess

20    this is the third paragraph down:

21         "Perhaps even more concerning than Ms.

22         Aguilar's actual symptoms and subsequent

23         behavior is her lack of insight into, No. 1,

24         how her symptoms and behavior may affect her

25         co-workers and the work milieu; No. 2, the

1          likely etiologies of such behaviors, i.e.,

2          mental illness; and No. 3, the necessity of

3          psychiatric or psychological treatment to

4          ameliorate her symptoms and decrease the

5          likelihood of such behaviors recurring in the

6          future.

7               "This is important because her lack of

8          insight and the aforementioned domains makes

9          it unlikely that she will seek or continue in

10         treatment of her own accord."

11              Did Ms. Aguilar -- so I know you're saying it's

12    likely that she wouldn't seek or continue treatment.

13    But did Ms. Aguilar ever actually tell you that she was

14    unwilling to seek or continue treatment?

15    A     I don't recall.  I probably would have asked

16    her about it, if she thought she had needed treatment or

17    maybe she said that spontaneously, but I don't recall.

18    I'd have to look at the report and the notes.

19    Q     You also mention:

20              "Ms. Aguilar's symptoms may benefit from

21         a low-to-moderate dose of an atypical

22         antipsychotic medication."

23              This is the next paragraph down.

24              Do you have any -- I mean, what -- is there a

25    particular medication that you think would have been

Atkinson-Baker, Inc.
www.depo.com

1  beneficial for Ms. Aguilar?

2      A    No.  The family of antipsychotic medications,

3  they are roughly -- well, I guess, let me say this, from

4  a population level, they are roughly equivalent in

5  effectiveness, other than one that's more effective.  So

6  it's primarily trial and error, you know, which ones

7  have not as many side effects for the particular

8  individual.  But just that class of medication is what I

9  would recommend.

10     Q    And by that class, what -- what are you

11 referring to?  What class is that?

12     A    Yeah.  Good question.

13          So the antipsychotic class, the reason I

14 mention atypical, atypical is the, I guess we call them

15 second generation of the medications.  They have less

16 side effects in terms of movement problems, and so

17 that's why I recommended that one.

18     Q    All right.  You go on to say:

19          "As such, I recommend that she be

20     referred to a psychiatrist for initiation and

21     management of such antipsychotic medication."

22          Do you know if Expeditors ever actually

23 referred Ms. Aguilar to a psychiatrist?

24     A    I don't know.

25     Q    Did you inform Ms. Aguilar yourself that she

```
1        Q    This bottom section that says "MSC," what does
2    that stand for?
3        A    Mental status examination.
4        Q    Oh, okay.  Got it.
5             Okay.  Why don't we move on to the report.  So
6    we'll attach this as Exhibit 7.
7             (Whereupon Exhibit No. 7 was marked for
8             identification by the reporter and is
9             attached hereto.)
10   BY MR. HOPPER:
11       Q    All right.  And if you want to do it like you
12   did for the last report, you can pull it up.  Take a
13   moment to pull it up.
14       A    Yeah.  I'll do that right now.
15            Okay.  I have it up.
16       Q    Okay.  So is Exhibit 7 a true and correct copy
17   of the January 25th, 2017 report -- fitness-for-duty
18   report that you prepared for Ms. Aguilar?
19       A    Yes.
20       Q    Okay.  And just as you sit here today, do you
21   recall any differences in the condition that Ms. Aguilar
22   had compared to the first time you evaluated her?
23       A    I don't remember if this is because -- when I
24   was getting the records, I might have glanced at it, or
25   if I independently recall this.  But I do remember there
```

Atkinson-Baker, Inc.
www.depo.com

```
 1      A    No.

 2      Q    Okay.

 3      A    And I vaguely remember Mr. Carlson -- part of

 4   the reason he said that she had no insight was, I think

 5   he talked to her about -- I vaguely remember he might

 6   have mentioned medications to her before, and I think

 7   she didn't think that she was -- I forget what her

 8   language was that she used, but I don't think she

 9   thought that she needed it.

10      Q    Okay. I mean, Carlson, he wouldn't have been

11   able to prescribe medications, though; right?

12      A    No.  As kind of a therapist, I think he might

13   have mentioned it would help her.

14           And, actually -- well, again, I would defer to

15   my report, but I may have talked to her actually about

16   her medications and what she thought about them and the

17   need for them as well, and if she would take

18   medications.  But I'll defer to my report, I guess.

19      Q    Do you know which part of your report would

20   speak to that, if you usually have it under a particular

21   heading or --

22      A    Yeah.  I would typically -- like under -- in my

23   notes, I would --

24      Q    Well, what about this -- sorry.  What about

25   this here where it says "Medication updates," would you
```

Atkinson-Baker, Inc.
www.depo.com

1        MS. WASSERMAN:  The monthly records there.

2   BY MR. HOPPER:

3        Q    We don't have to go through all the background

4   of your opinion, but I just want to talk about your

5   recommendation.

6             So you said:

7             "If Expeditors International chooses to

8        have Ms. Aguilar return to work in a

9        probationary fashion, I recommend the

10       following to increase the probability that she

11       would be fit for duty."

12            This is on page 4 of 4.  And you have three

13   recommendations there.

14            My first question is were all these

15   recommendations -- are they individual recommendations

16   that could have been followed that allowed her to return

17   to work, or did they all need to -- in your opinion, did

18   they all need to be, you know, accomplished together in

19   order for her to be able to return to work?

20       A    Well, again, as you're saying this, I probably

21   could have clarified this better.  But I think I was

22   talking about each of those may improve the probability,

23   but that each one independently may not necessarily be

24   sufficient.

25            So, for example, giving a behavioral contract

```
1   may improve her chance but that alone I don't think

2   would have helped.  But, you know, if she took

3   antipsychotic medications, I think that would have a

4   very significant impact.  Even alone --

5        Q    Okay.

6        A    -- being in a different department, you know,

7   may not trigger, but then, you know, as delusional

8   thinking, will morph and ebb and flow, it would probably

9   trigger it significantly without antipsychotic

10  medication.

11            So I guess what I would say is the No. 1

12  recommendation is the strongest.  The other two are kind

13  of like adjunctive things, and probably each of these

14  would increase her probability somewhat but they may not

15  be sufficient in and of themselves.

16       Q    Okay.  So you're saying they may not be

17  sufficient in and of themselves, but did you ever

18  communicate that to Expeditors?

19       A    I don't recall if I did.

20       Q    Okay.  Do you recall ever informing Ms. Pettway

21  that all three of these recommendations needed to be

22  followed together in order for Ms. Aguilar to be able to

23  return to work?

24       A    I'm sorry.  I don't recall.

25       Q    Okay.  So the placement in a different
```

1    department or around -- this is the third

2    recommendation.

3         "Placement in a different department or

4         around different personnel that are previous

5         departments to minimize potential triggering

6         of previous delusional thinking about being

7         harassed."

8         Why did you think that this was something that

9    may minimize the triggering of her delusional thinking?

10       A    I think she said -- that's my recollection.  I

11   think I had asked her about something, you know, "What

12   if you went back to work, do you think being in a

13   different department would help you?"  Questions like

14   that would have been some of the hypothetical questions

15   I probably would have asked.

16       Q    Okay.  And, I mean, it's true that she didn't

17   mention any delusional thinking that was nonwork

18   related, correct, that you recall?

19       A    Not that I can recall.

20       Q    So is that -- so is it fair to say that her

21   delusional thinking was isolated with respect to her

22   employment at Expeditors?

23       A    Yeah.  Based on what I could gather, it was

24   circumscribed to work.

25       Q    Okay.  And did you -- did she -- so it was --

1    sorry.  Strike that.

2         So the fact that it was isolated in her current

3    then work environment, her delusional thinking, was that

4    sort of why you thought -- or you documented that maybe

5    assigning her to a different department or working

6    around different personnel would minimize her delusional

7    thinking potentially?

8         MS. WASSERMAN:  Misstates the witness'

9    testimony.

10        THE WITNESS:  Not that the fact that she was

11   circumscribed to work.  That's more of a feature of

12   delusional disorder that's pretty common.  They --

13   versus something like schizophrenia where maybe there's

14   like a more global impairment in many domains of life.

15        But I don't know if that -- if that's what

16   you're asking, but I don't think it being circumscribed

17   to work causes this recommendation.

18   BY MR. HOPPER:

19        Q    Okay.  Do you have any opinion as to whether

20   Ms. Aguilar could have returned to work had she -- let's

21   say she didn't seek treatment or take medication, if she

22   was just able to be placed around different personnel

23   and have the behavioral contract, do you have any

24   opinion as to whether she could have then returned to

25   work?

Atkinson-Baker, Inc.
www.depo.com

1    A    Well, I think it would have -- without taking

2    medications in her case, the delusional thinking is

3    unlikely to have been addressed.  So even trying to

4    avoid triggering it, the immediate thinking, by putting

5    her in a different department, over time would not

6    necessarily (inaudible).

7         So many times delusional thinking tends to

8    morph a little bit to adapt to the situation, much like

9    anxiety does.  So you may not be -- you know, now you're

10   worried -- let's say, for example, you're worried about

11   e-mails today.  Tomorrow you may be worried about phone

12   calls; right?  It's kind of that same theme where it

13   morphs.

14        So that's why I'm saying that the most

15   significant impact is likely going to be from

16   antipsychotic treatment.

17   Q    Okay.  And does the fact that you recommended,

18   you know, the antipsychotic treatment indicate to you

19   that that's something that Ms. Aguilar may have been

20   willing to pursue?

21   A    The fact that I recommended it is that she's

22   willing to pursue?  I don't think so.  I think the fact

23   I recommended it was because that's the most likely of

24   our treatment interventions to impact her symptoms.

25   Q    Fair enough.

Atkinson-Baker, Inc.
www.depo.com

1   I guess what I'm getting at is would you have

2   even made any recommendations that Ms. Aguilar -- you

3   know, for how Ms. Aguilar could have returned to work if

4   you thought that she could not have returned to work in

5   any capacity?

6         MS. WASSERMAN:  Misstates the testimony.  And

7   Vague and ambiguous.

8         THE WITNESS:  Yeah.  I'm not a hundred percent

9   sure I understand the question.  But I -- even if

10  there's a -- even if there is not a hundred percent

11  probability that somebody will follow through on a

12  recommendation, I'm still going to include this so the

13  employer understands what may help them.

14        So, for example, yeah, I did not put this

15  recommendation in here necessarily believing that Ms.

16  Aguilar would have insight into her need for treatment

17  and believe that, "Hey, I need to take antipsychotic

18  medications because I've got these delusional symptoms."

19        But I think it's important -- it was important

20  for the employer to know that this a treatment that

21  would actually -- out of our treatments that we have, it

22  would be a significant treatment to help her, and if she

23  did this, then it would increase her probability to be

24  able to work.

25  ///

Atkinson-Baker, Inc.
www.depo.com

1  BY MR. HOPPER:

2      Q    Okay.  And you said it would be important for

3  the employer to know about -- about this as a treatment

4  option.

5           Why do you think that it would be important for

6  the employer to know that?

7      A    Well, I mean, if I said something like -- well,

8  like I said earlier, I think that if she did actually

9  comply with the treatment and do that -- because many

10  times employers may say -- or others may say that, you

11  know, "You need to get treatment," like -- or "You need

12  to take medications."  And, you know, there may be a

13  rare chance that somebody does that.

14          But, you know, the employer needs to be aware

15  of that, I guess as the treatment option.  So if you

16  just say they're not fit and there's nothing that's

17  going to help, you know, there's always like a .1

18  percent chance that I think they need to know about.

19      Q    Okay.  And you didn't recommend any sort of

20  indefinite medical leave for Ms. Aguilar; right?

21      A    I did not recommend a specific medical leave.

22      Q    Okay.  Did you ever tell McCray Pettway or

23  anybody else at Expeditors that Ms. Aguilar would have

24  to remain off work for an indeterminate amount of time

25  or that she would be able to return to work for an

Atkinson-Baker, Inc.
www.depo.com

1    indeterminate amount of time?

2         A    I don't recall using that kind of language.

3         Q    All right.  And in your experience when you

4    recommend psychiatric treatment for employees, do the

5    employers -- I mean, if you know, do the employers

6    advise the employee that psychiatric treatment is

7    something that could help them in returning to work?

8              MS. WASSERMAN:  Objection to the extent it

9    calls for speculation and is an incomplete hypothetical.

10             THE WITNESS:  So could you repeat the question

11   just so I understand what you're saying?

12   BY MR. HOPPER:

13        Q    Yeah.  Yeah.  Sure.

14             I just -- I'm kind of going back to how you

15   said you want to let the employers know that psychiatric

16   treatment is a possibility.  And I'm wondering if

17   that's, in part, because you've seen that employers will

18   actually let the employee know that that's a recommended

19   treatment, something that could help them come back to

20   work?

21        A    So the question is, is -- do -- what is the

22   question exactly?

23             MS. WASSERMAN:  And still, incomplete

24   hypothetical and vague and ambiguous and calls for

25   speculation on the part of this witness.

Atkinson-Baker, Inc.
www.depo.com

```
 1          MS. WASSERMAN:  Thank you very much.

 2          (A break was taken.)

 3

 4                    EXAMINATION

 5

 6  BY MS. WASSERMAN:

 7     Q    Hello, Dr. Kambam.  We were previously

 8  introduced but as you know, I'm Helene Wasserman, and my

 9  firm represents Expeditors with regards to this matter.

10  And I have hopefully not too many questions to ask, sort

11  of follow-up on some of the things that you were asked

12  earlier this morning.

13          I'm not going to be putting documents up in

14  front of you, but you've got them all in front of you so

15  I'll be referencing what they are and what the exhibit

16  number is for you to look at, if that's okay?

17     A    Okay.

18     Q    All right.  So first let's take a moment and

19  look at what was marked as Exhibit 7, which is the

20  January 25, 2017 report that you submitted to

21  Ms. Pettway at Expeditors.

22          Do you have that handy?

23     A    Yes.  I just pulled it up.

24     Q    Okay.  Terrific.

25          First off, if you could tell from that
```

1    document, what was the date of the evaluation, the date

2    of your actual interview with Ms. Aguilar?

3        A    So under the "Source of Information," if you

4    look at the No. 1, it says the interview was on

5    January 18, 2017.

6        Q    Terrific thank you.

7            Now, in this report, did you anywhere identify

8    a date certain by which you believed that Ms. Aguilar

9    would be able to return to work?

10           MR. HOPPER:  Objection.  Document speaks for

11   itself.

12           THE WITNESS:  I don't think I see a date --

13   BY MS. WASSERMAN:

14       Q    Okay.

15       A    -- identify that.

16       Q    Okay.  And based upon the information contained

17   in that report, did you have any sense of a date in mind

18   that you believed that Ms. Aguilar would have been able

19   to return to work?

20       A    No.

21       Q    And how many -- if you can approximate -- and

22   I'm sure it's just going to be an approximation -- how

23   many fitness-for-duty reports have you drafted in your

24   career?

25       A    More than I can estimate.

Atkinson-Baker, Inc.
www.depo.com

1    A    Give me one -- yeah, now I do.

2    Q    Thank you.

3         First of all, if you could -- from looking at

4    exhibit -- either one of them, can you identify what the

5    date was of your actual interview with her?

6    A    Yeah.  9/19/2016.

7    Q    Thank you.

8         Now, did you -- let's go back.  Let's look at

9    the last page of Exhibit 3.

10    A    Okay.

11    Q    Now, this is the page that we talked about

12    earlier which reflects handwritten notes that you took

13    during your conversations with Dr. Laborde and

14    Mr. Carlson; correct?

15    A    Yes.

16    Q    Okay.  Let's go through the notes that you took

17    during your conversation with Dr. Laborde.  And this

18    took place on September 26th; correct?

19    A    That's correct.

20    Q    And that was after you actually had your

21    meeting with Ms. Aguilar; correct?

22    A    Yes.

23    Q    Okay.  The first -- the first -- it's not a

24    bullet point.  It's sort of like a dash indicating the

25    first item is "Long-time patient."

Atkinson-Baker, Inc.
www.depo.com

1          Is that what that says?

2     A    Yes.

3     Q    Do you recall how long term of a patient

4  Ms. Aguilar was with -- of Dr. Laborde?

5     A    I don't.  I think this is maybe something that

6  Dr. Laborde told me that she's known Ms. Aguilar for a

7  long time.  She's been a long-time patient.

8     Q    Okay.  And that she had -- and had no history

9  of medication; correct?

10    A    Psych medications, that's correct.

11    Q    Of psych medication.

12         It indicates that she was on --

13    A    Hypertension medication.

14    Q    -- medication as of April; correct?

15    A    No.  So what that is is hyper- -- she's on a

16  hyper- -- or the hypertension medication -- maybe she

17  didn't know what her hypertension medication was in the

18  report and -- or in the interview.

19         So I think what I'm writing here is her

20  hypertension medication is a medication called

21  Enalapril, not April.

22    Q    Got it.  Thank you.

23         All right.  The next -- the next notation

24  says -- tell me if I'm reading this correctly --

25  "Last" --

1      A      "Several months."

2      Q      -- "several months complains of strange and

3  peculiar re work"?

4      A      Regarding work.

5      Q      "Regarding work.  Computers.  Evaluating her,

6  employees harassing her.  Withdrew friends at work."

7            Am I reading that correctly?

8      A      Yes.

9      Q      What do you recall, if anything, about the

10  strange and peculiar behavior that Dr. Laborde reported

11  to you that she had seen in her long-time patient Ms.

12  Aguilar?

13      A      Well, I mean, that was consistent with what --

14  what I was evaluating, these delusional beliefs

15  regarding work.  And, you know, as Dr. Laborde

16  mentioned, all those different areas.

17      Q      Did it have an impact upon on you that a doctor

18  who had seen her for a -- for a long time, was a

19  long-time patient of Dr. Laborde, that Dr. Laborde had

20  noticed that there was something particularly unusual or

21  strange or peculiar going on of late?

22      A      Yes.  You know, Dr. Laborde was part of the --

23  why I was seeking collateral records because he had seen

24  the evaluee, in this case Ms. Aguilar, on a number of

25  occasions.

1     Q    And what impact did it have upon your

2   evaluation to hear that someone who had been a long-time

3   doctor of Ms. Aguilar thought there was something

4   strange and peculiar going on right now?

5     A    Well, I think it's a piece of collateral

6   information.  I look at the totality of information.

7          But, I mean, here's a situation where a

8   treating doctor notices these -- this strange and

9   peculiar behavior, reports of things and symptoms, so

10  much so that she refers her for neurological workup, to

11  see if there was something neurologically wrong with her

12  causing symptoms.  And it was normal, therefore that

13  supports my -- that supported the working assumption of

14  the delusional disorder.

15    Q    Now, in your report you indicate that you

16  actually reviewed these -- the neurological workup

17  report in the medical records regarding that, that were

18  provided to you by Dr. Laborde; correct?  I'm

19  specifically looking at page 5 of the October 13 report.

20         Do you see where I'm reading?

21    A    Yes.

22    Q    I'm sorry.  Go ahead.

23    A    That's it.  I was just saying yes.

24    Q    Okay.  So there's a comment in here about

25  Dr. Cha's opinion about -- that -- that Dr. Cha opined

Atkinson-Baker, Inc.
www.depo.com

1   that, quote, "Possible intracranial organic brain

2   syndrome is unlikely for her acute psychosis."

3          That is a direct quote from Dr. Cha's report;

4   correct?

5      A    Where are you --

6      Q    I'm reading in the middle of page 5 of 6 of

7   the -- of Exhibit 4, which is the October 13th report.

8          Do you see where I'm reading?

9      A    Yes.  That -- yeah.  That -- I would not have

10  been -- that's -- those are the records that I was

11  unable to find is what I mentioned earlier, so obviously

12  I reviewed them.

13     Q    All right.  But I'm focusing on you cite to

14  Dr. Cha's opinion, and there's a quotation about

15  Ms. Aguilar's acute psychosis.

16         Do you see where I'm reading?

17     A    Yes.

18     Q    Okay.  Would you have put that terminology in

19  quotation marks had it not been actually part of a

20  record that was provided to you that you weren't

21  actually quoting from?

22     A    I believe I was quoting from his report, the

23  language he used in his report.

24     Q    And what exactly is the SAGE report, the

25  Self-Administered Gerocognitive Examination?

Atkinson-Baker, Inc.
www.depo.com

1        A     Well, I mean, the simple thing is it's a --

2   it's a -- essentially like a screen tool for some type

3   of cognitive symptoms related to aging potentially.

4        Q     Did Ms. Aguilar ever advise you that Dr.

5   Laborde had recommended to her that she see a

6   psychiatrist and go on medications?

7        A     I don't recall.

8        Q     Do you recall that being discussed with you

9   during your communication with Dr. Laborde?

10       A     Well, I don't know.  I recall that we talked

11  about medications and no psychiatric medications.  I

12  know we talked about the referral to the neurologist

13  because of the psychotic symptoms.  But I don't recall

14  if she said that she had sent her to a psychiatrist or

15  not, or referred her or not.

16       Q     Do you view your role in conducting a fitness

17  for duty, is it your role to provide medical advice to

18  the person for whom you are conducting -- or the person

19  about whom you're conducting the evaluation?

20       A     No.  I mean, that's one of the reasons the

21  Statement of Non-Confidentiality, doctor/patient

22  relationship.

23       Q     All right.  On -- continuing on that page that

24  we were looking at where Dr. Laborde -- your notes from

25  Dr. Laborde's conversation take place, there are notes

1   regarding your conversation with Dr. Carlson.

2           Do you see where I'm reading?

3       A    Yes.

4       Q    Okay.  So the first line says "Recently seen

5   for psychotherapy"?

6       A    Yes.  "Recently" -- yeah, I guess -- I don't

7   know why I said "seen" -- but, yeah, "recently seeing

8   for psychotherapy."  He recently starts seeing her for

9   psychotherapy is probably what I meant.

10      Q    Okay.  And he had diagnosed her as being

11  delusional?

12      A    Delusional disorder.  That's --

13      Q    Delusional.

14      A    Yeah.

15      Q    Did you discuss with him that you had reached

16  the same conclusion?

17      A    I don't recall.  We probably discussed the

18  symptoms at least because I know those are listed there,

19  and, you know, we talked about it in terms of the

20  insight.  I don't recall if I had said that I believe

21  she had the same diagnosis or not.

22          And also at this point I think I was gathering

23  collateral information so I don't know if I would have

24  told him my preliminary thoughts yet.

25      Q    Okay.  And at the bottom of the notes where it

1    says from your conversation with Peter Carlson, it

2    says -- can you read that last item?

3        A    "Not owning it, poor insight."

4        Q    Now, at the time that you had the conversation

5    with Mr. Carlson, did you have any sense in terms of how

6    many visits he had had with her?

7        A    Not that I can recall, unless it's listed

8    somewhere else.

9        Q    Based upon your evaluation of Ms. Aguilar, did

10   you concur with Mr. Carlson's interpretation that she

11   was not owning it and had poor insight?

12       A    Yes.  I would agree with the lack of insight.

13       Q    Just a moment.

14            And just to confirm, do you remember anything

15   else about your conversation with Dr. Laborde, other

16   than that she was -- she wanted to have a brain scan

17   done of Ms. Aguilar to rule out anything organic due to

18   her sudden psychosis?

19       A    Do you mean in addition to the other things we

20   talked about --

21       Q    Yes.  That's correct.

22       A    No, not that I recall.

23            Just as a small point of clarification, I think

24   she -- we discussed that she referred for a full

25   neurological evaluation, not just a brain scan.

Atkinson-Baker, Inc.
www.depo.com

```
 1        Q     Okay.  And --
 2        A     Potentially that may not show in a brain scan.
 3        Q     Thank you for that clarification.
 4              So just so that it's clear, has Dr. Laborde
 5    made it clear to you that the reason why she was sending
 6    Rosa out for this neurological workup, which could
 7    include any number of different types of tests, was
 8    because of the sudden psychosis and the sudden change in
 9    her that she'd seen in this long-time patient, and she
10    wanted to rule out anything organic going on; is that
11    correct?
12        A     Yes.  I mean, I think how we phrased it in
13    medical terminology is like acute psychotic symptoms or
14    acute psychosis, but that means the same thing, you
15    know, more recent or on -- or sudden onset symptoms.
16        Q     Thank you.
17              And do you recall -- do you recall how it is
18    that you found out from Ms. Pettway that Expeditors
19    wanted to have a follow-up evaluation of Ms. Aguilar?
20              MR. HOPPER:  I'll object to the extent it's
21    been asked and answered.
22              THE WITNESS:  I don't recall.  I don't recall
23    the details.
24    BY MS. WASSERMAN:
25        Q     Do you recall Ms. Pettway explaining that the
```

Atkinson-Baker, Inc.
www.depo.com

1   certain number of weeks that -- or a certain number of

2   visits that Ms. Aguilar would have to follow up with a

3   psychiatrist before she could return to work?

4       A    I don't recall specifically having that kind of

5   detail in mind at the time.

6       Q    So is this something where -- you know, is this

7   a situation where she -- if she would have initiated the

8   treatment and, you know, maybe these other

9   recommendations would have been adopted, that she could

10  have returned to work right away?

11      A    If she had initiated medication treatment, you

12  mean?

13      Q    Yeah.  I mean, you know -- yeah.  Like you say

14  "Follow up with a psychiatrist to include taking

15  antipsychotic medication."

16          So if she had, you know, taken those steps

17  right away, would she have been able to return to work

18  immediately or would there have been some delay?

19      A    I mean, my read of the report, because of how I

20  phrased it, was if Expeditors chose to have her return

21  in a probationary fashion.  I don't think I was saying

22  that I believe that she was fit at that time.

23          I think, you know, maybe this was our

24  conversation, I don't recall, but just looking at the

25  phrasing of that, I think that's a chosen phrasing on my

Atkinson-Baker, Inc.
www.depo.com

1    part.

2         So I think what I'm saying was if they decided

3    to have her return in a probationary fashion, here are

4    some things that will be helpful for her.

5         So to answer your question more directly, I --

6    A, I didn't think she was fit at the time.  But, B, if I

7    did think she was fit at the time, and that -- you know,

8    with the -- what would be the purpose of the

9    antipsychotic medication at that point?

10        Q    I don't think that's really the question I'm

11   asking.

12        I understand that you didn't think she was fit

13   at the time you made the report, and I'm not trying to

14   put words in your mouth there.

15        I'm just asking -- you know, you're giving

16   steps -- you're giving recommendations to increase the

17   probability that she would be fit to return to duty.

18        That's your language; correct?

19        A    Yes.

20        Q    Okay.  And so to increase the probability that

21   she would be fit to return to duty, would there be a

22   certain number of visits, a certain duration, you know,

23   under which she would have to take psychiatric

24   medication in order for her to be able to return to

25   work, or was it just initiating the treatment was kind

Atkinson-Baker, Inc.
www.depo.com

1    I meant by that recommendation.

2         I think I was looking at what factors may

3    increase the probability.  But as I mentioned earlier,

4    the response to -- you know, for delusional disorder,

5    antipsychotic medications, is not as good as some other

6    psychotic conditions.  So you kind of have to see over

7    some time to reassess.

8    BY MR. HOPPER:

9         Q    Okay.  And --

10        Okay.  So is it fair to say at the time you

11   prepared this report -- actually, strike that.

12        MR. HOPPER:  I don't have anything further.

13        MS. WASSERMAN:  I've got a couple.

14

15                   FURTHER EXAMINATION

16

17   BY MS. WASSERMAN:

18        Q    So thank you for clarifying, Dr. Kambam, that

19   at the time that you prepared the January 25th, 2017

20   report, which is Exhibit 7, you did not believe that as

21   of that point in time she was fit to return -- Ms.

22   Aguilar was fit to return to duty.

23        My one question is, based upon what you knew

24   from evaluating Ms. Aguilar, reviewing her doctors'

25   reports, and having evaluated her prior to preparing the

Atkinson-Baker, Inc.
www.depo.com

1    January 25th, 2017 report, did you have any

2    approximation as to when she might be prepared and fit

3    to return to work, based upon what you knew of Ms.

4    Aguilar?

5            MR. HOPPER:  I'm going to object based on it's

6    been asked and answered.

7            THE WITNESS:  I didn't have a specific time

8    frame that I can recall, other than the concept of the

9    lack of insight and the natural ebb and flow of the

10    delusional disorder.  So I didn't expect, without

11    treatment, that there would be any -- and without

12    further insight, that there be would any, at least

13    foreseeable return to fitness for duty.

14    BY MS. WASSERMAN:

15    Q    Okay.  So just so I understand what you just

16    said because being a lay person and speaking with you as

17    expert, Doctor.

18            So based upon your expert opinion and your

19    evaluation of Ms. Aguilar, you could not foresee a date

20    certain by which Ms. Aguilar would have been able to

21    return to work and be fit to return to work; is that

22    correct?

23            MR. HOPPER:  Objection to the extent it

24    mischaracterizes the evidence, and it's been asked and

25    answered.

Atkinson-Baker, Inc.
www.depo.com

1        THE WITNESS:  If I'm understanding the question

2    correctly, then that's correct.  I did not have kind of

3    a foreseeable date in mind.

4        MS. WASSERMAN:  Thank you.

5        I have no further questions.

6        MR. HOPPER:  I don't have anything else.

7        I don't -- I guess, I don't know if we just go

8    by Code or -- I've actually never taken a doctor

9    deposition before, so I don't know how that -- how we

10    usually handle the transcripts.

11        MS. WASSERMAN:  Well, I would propose that the

12    transcript be prepared and provided to Dr. Kambam for

13    his review.  He may be a doctor but he's also a

14    third-party witness.  So he can review the transcript to

15    make any edits that he deems necessary, and communicate

16    those edits to both your office and my office, as well

17    as to the court reporter.  Or actually, if you

18    communicate them to our office, we can communicate them

19    to the court reporter.

20        Does that make sense to everyone?

21        MR. HOPPER:  Yeah.

22        MS. WASSERMAN:  All right.  And -- and --

23    otherwise, and that we would also propose that Dr.

24    Kambam be afforded the opportunity to sign this

25    transcript under penalty of perjury;

1   employee or attorney or counsel of any of the

2   parties, nor am I a relative or employee of such

3   attorney or counsel, nor am I financially interested

4   in the outcome of this action.

5

6           IN WITNESS WHEREOF, I have subscribed my name

7   this _8th_ day of _____July_____, ~~2020~~.

8

9

10  _____

11  DAMARIS MARTINEZ, CSR No. 12925

12

13

14

15

16

17

18

19

20

21

22

23

24

25