Kaveh S. Elihu, Esq. (SBN 268249)
David C. Hopper, Esq. (SBN 306281)
**EMPLOYEE JUSTICE LEGAL GROUP, PC**
3055 Wilshire Boulevard, Suite 1120
Los Angeles, California 90010
Telephone: (213) 382-2222
Facsimile: (213) 382-2230
kelihu@ejlglaw.com; dhopper@ejlglaw.com

Attorneys for Plaintiff,
ROSA AGUILAR

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| ROSA AGUILAR, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>EXPEDITORS INTERNATIONAL OF WASHINGTON, INC., corporation; and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No. 2:19-cv-02285<br><br>Hon. Philip S. Gutierrez<br>Courtroom 6A<br><br>**PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: September 28, 2020<br>Time: 1:30 p.m.<br><br>Complaint Filed: February 14, 2019<br>Trial Date: October 20, 2020<br>Pre-Trial Conference: September 21, 2020 |

Plaintiff, Rosa Aguilar hereby submits her opposition to Defendants' Motion for Summary Judgment as follows:

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................. 2

      A.     Duties of Plaintiff and Her Managers at the Los Angeles District Office. ........................... 2

      B.     Plaintiff Began Suffering Anxiety and Stress as a Result of Perceived Mistreatment by Her Coworkers and Reported Her Disability to Her Managers. ........... 3

      C.     Plaintiff Requested That She Be Allowed to Move Her Workstation to a Different Location as an Accommodation, and Expeditors Summarily Denied Her Request .......... 3

      D.     Duties of Key Employees in the Corporate Office in Seattle. ........................ 5

      E.     As a Result of Continuing to Work in the Same Environment, Plaintiff's Mental Disabilities Were Exacerbated and Expeditors Put Plaintiff Out on Leave. ................... 6

      F.     Plaintiff was Evaluated by Dr. Praveen Kambam, M.D. on September 19, 2016, and Dr. Kambam Diagnosed Ms. Aguilar with Delusional Disorder. ............................ 7

      G.     Expeditors Failed to Advise Plaintiff What Steps She Could Take to be Fit to Return to Work. ........................................................................................... 8

      H.     Expeditors Had Plaintiff Evaluated by Dr. Kambam a Second Time On January 18, 2017 as Her Medical Leave Was About to Expire. ........................................ 9

      J.     On February 14, 2017, Expeditors Terminated Plaintiff, Falsely Claiming to Plaintiff that Kambam had Recommended Indefinite Leave. ............................ 11

III.    LEGAL STANDARD ................................................................................. 13

A.     Standard on Summary Judgment/Adjudication ................................. 13

B.     This Court Should Apply California State Law to Defendant's Motion ................... 15

IV.    LEGAL ARGUMENT ............................................................................... 15

      A.     Plaintiff's First Cause of Action for Disability Discrimination in Violation of the FEHA is Supported by Overwhelming Evidence. ............................ 15

      B.     Triable Issues Of Fact Exist Regarding Plaintiff's FEHA Retaliation Claim. ................. 20

      C.     Plaintiff Established Claims for Failure To Provide Reasonable Accommodations and Failure to Engage in the Interactive Process .................................. 20

      D.     Plaintiff's Derivative Claims Survives ................................................ 24

      E.     Summary Judgment is Improper as to Punitive Damages. ..................... 25

V.     CONCLUSION ........................................................................................ 25

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

### Cases

2 Cal. Code Regs.. § 11069(a) ........................................................................ 22

*A.M. v. Albertsons, LLC* (2009) 178 Cal.App.4th 455, 465 ............................ 21

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ......................................... 13

*Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986) ................................. 13

Cal. Civ. Code §3294(c).................................................................................. 25

Cal. Code Regs., tit. 2, § 11069(b)(1) and (2) .............................................. 22

*Claudio v. Regents of Univ. of Calif.*
    (2005) 134 CA4th 224 ............................................................................ 23

*Cloud v. Casey*, 76 Cal.App.4th 895, 912(1999) ......................................... 25

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018 (9th Cir. 2006) ..................................... 13

*Dufay v. Bank of America N.T. & S.A. of Oregon,* 94 F.3d 561 (9th Cir. 1996) ......................... 14

*Duncan v. Stuetzle,* 76 F.3d 1480 (9th Cir. 1996)....................................... 15

*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) ......................................... 15

*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 886................................ 15, 17

*Fisher v. San Pedro Hospital*, 214 Cal.App.3d 590, 621 (1989)................................................. 25

*Gasperini v. Ctr. For Humanities*, 518 U.S. 415 (1996) ............................. 15

*Gober v. Ralphs Grocery* 137 Cal.App.4th 204 (2006) ............................... 25

*Godwin v. Hunt Wesson, Inc.* (9th Cir. 1998) 150 F.3d 1217, 1221 ............ 15

Gov. Code § 12940(m)..................................................................................... 20

Gov. Code §§ 12940(*l*), (m)(2) ...................................................................... 20

Government Code § 12940(n)......................................................................... 16

*Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 361 (2000) ................................ 18

*Hanson v. Lucky Stores, Inc.*, 74 Cal.App.4th 215, 224 (1999)................................................ 17

*Hersant v. California Dept. of Social Services* (1997) 57 Cal.App.4th 997, 1002-03.................... 15, 17

*Jensen v. Wells Fargo Bank*
    (2000) 85 CA4th 245 ......................................................................... 20, 21

*Lam v. Univ. of Hawaii*, 40 F.3d 1551 (9th Cir., 1994) .............................. 14

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

*Lucchesi v. Giannini & Uniack*
    (1984) 158 Cal.App.3d 777.................................................................. 14

*Mamou v. Trendwest Resorts, Inc.*, 165 Cal.App.4th 686, 715(2008) ................................... 18

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) ........................................... 16

*Metoyer v. Chassman*, 504 F.3d 919 (9th Cir. 2007).......................................................... 15

*Nazir v. United Airlines, Inc.*
    (2009) 178 Cal.App. 4th 243 ........................................................ 14

*Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495(9th Cir. 2015) ........................................... 14

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000)...................... 13

*Oliver v. Keller*, 289 F.3d 623 (9th Cir. 2002)................................................................... 14

*Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997) ....................................... 18, 19

*Prilliman v. United Air Lines, Inc.*, 53 Cal. App. 4th 935, 947 ........................................... 21

*Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748 (9th Cir. 1979) ..................................... 14

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 147 (2000) .................................. 18

*Schnidrig v. Columbia Mach.*, 80 F.3d 1406 (9th Cir. 1996) ........................................... 14

*Slobojan v. Western Travelers Life Ins. Co.*
    (1969) 70 Cal.2d 432 ........................................................... 14

*U.S. v. Diebold, Inc.,*  369 U.S. 654 (1962) ........................................................ 14

*White v. Ultramar, Inc.,* 21 Cal.4th 563, 577 (1999) ...................................................... 25

*Wysinger v. Automobile Club of Southern Calif.*
    (2007) 157 CA4th 413 ........................................................ 23, 25

*Yanowitzv. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1043 ........................................... 20

<u>Statutes</u>

Code of Civil Procedure section 437c(e) ...................................................... 14

Fed. Rules Civ. Pro. 56(c)........................................................................... 13

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR
PARTIAL SUMMARY JUDGMENT

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Defendant Expeditors International of Washington, Inc. ("Expeditors") has inexplicably brought the instant motion for summary judgment in the face of a tidal wave of evidence that it discriminated against and wrongfully terminated Plaintiff Rosa Aguilar ("Aguilar") because of her mental disabilities, including delusional disorder, and in the process denied her an interactive process and reasonable accommodations for her disabilities. In doing so, Defendant attempts to assign blame to Plaintiff for some nonexistent refusal to seek treatment as recommended (but not communicated to Aguilar) by Defendant's psychiatrist. Defendant's baseless claim that Aguilar was unwilling to "help herself" for the purpose of returning to work when she sought treatment, participated it fitness for duty assessments with Defendant's psychiatrist, and desperately tried to find out what else she needed to do to be cleared to return to the job she had held and loved for over 23 years and caused a breakdown in the interactive process is, to put it bluntly, insulting and offensive.

Indeed, Aguilar was a long-time employee with a steady track record of good performance in Expeditors' accounting department for over two decades. Unfortunately, Aguilar began developing delusions that her co-workers were gossiping about her in March 2016. These delusions resulted in Aguilar suffering severe anxiety and becoming confrontational at times. To alleviate these symptoms, Aguilar suggested that she be allowed to work in a different department about a minute walk away from the accounting department, yet her managers summarily denied the request. Her delusions subsequently became more intense as she began to believe she was being targeted for excess monitoring and termination.

District manager Carlton Ruesch suggested that Aguilar seek mental health treatment as a result, *which Aguilar did beginning in August 2016*. In September 2016, *Aguilar also allowed herself to be evaluated by Expeditor's psychiatrist, Dr. Praveen Kambam, M.D.*, who formally diagnosed Plaintiff for the first time as having delusional disorder and informed Expeditors that she would not be fit for duty without treatment. Aguilar was not advised of her diagnosis or need for treatment. *Although Aguilar asked Ruesch what she needed to do to be*

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

*cleared to return*, she was merely placed on medical leave *without further explanation*.

After Aguilar again tried to return to work in January 2017, Ruesch sent Aguilar for another fitness for duty evaluation with Dr. Kambam. This time, Dr. Kambam provided Expeditors with three recommendations for things that could be done to make it more probable that Plaintiff would be fit to return to work. Again, this included treatment as well as a transfer to a different work area. However, Expeditors failed to engage in the interactive process with Aguilar and instead terminated her. In the process, *Ruesch falsely told Plaintiff that the reason was Dr. Kambam recommending an indefinite medical leave*, which Expeditors could not accommodate, as a pretext. *Nobody ever advised Plaintiff of Dr. Kambam's recommendations or attempted to accommodate her according to them.* Accordingly, the evidence demonstrates that Defendant's real reason for terminating her was her delusional disorder and need for accommodations, and summary judgment must therefore be denied.

## II.     <u>STATEMENT OF FACTS</u>

### A. <u>Duties of Plaintiff and Her Managers at the Los Angeles District Office.</u>

Aguilar's job duties in accounts payable included paying invoices received by trucking companies and the port, processing inter-branch payments, running accounting reports for debit and credit, inputting journal vouchers, and reporting problems with underpayment to management in order to obtain approval to pay the difference. Plaintiff's Additional Material Fact ("PAF") 1.

Ruesch is a district manager for Expeditors, and in 2016 and 2017 he was responsible for P&L, employee matters (i.e. human resources), sales, operational execution, processes, service provider management, real estate, revolving issues, accounting, and "basically everything that happens in the district." PAF 2. Although employee relations or legal may provide guidance with respect to employee matters, the ultimate decisions on such matters, including terminations, would be Ruesch's to make. In other words, Ruesch had the authority to terminate employees without approval from anyone else. PAF 3. Ruesch is the only employee who oversees the entire district and he

is able to exercise independent judgment with respect to his district's business activities, acts as a liaison between the corporate office, district office and branch offices, and has oversight over approximately 380 employees in his district between four total locations under his purview. PAF 4. Los Angeles branch administrative manager Diane Griffin reported to Ruesch and oversaw the accounting department. PAF 5.

### B. Plaintiff Began Suffering Anxiety and Stress as a Result of Perceived Mistreatment by Her Coworkers and Reported Her Disability to Her Managers.

In April 2016, Aguilar informed her supervisors, Accounting Supervisor Maria Higa, District Manager Carlton Ruesch, Branch Administrative Manager Diane Griffin, and Accounting Manager Lisa Blandi that she was experiencing severe stress and anxiety as a result of perceived mistreatment by her co-workers, including gossiping and harassment. PAF 6. Aguilar was crying and reported to Griffin and Blandi that she was very nervous and anxious, which only happened while she was at work, and that she was going to her doctor. Griffin observed that Aguilar was nervous, anxious, and more emotional than she had ever seen Aguilar before. PAF 7. Additionally, Aguilar brought in a doctor's note to Griffin and Higa after her doctor had advised that she take three days off. PAF 8. Ruesch and Griffin each understood that their duty to engage in the interactive process was triggered by Aguilar's statement that she had anxiety. PAF 9.

### C. Plaintiff Requested That She Be Allowed to Move Her Workstation to a Different Location as an Accommodation, and Expeditors Summarily Denied Her Request.

Aguilar worked at the Expeditors District Office located at 5757 Century Boulevard in Los Angeles on the second floor of the building. Expeditors occupied the entire second floor. Aguilar was stationed in the accounting department, which was on the west side of the floor, and the brokerage department was located on the east side of the floor. PAF 10. Aguilar asked Ruesch, Griffin, Blandi and Higa for a transfer to a different location in the brokerage department on the other side of the building because then she would not be around the individuals who were causing her anxiety and she could still do her job. PAF 11. Ruesch and Griffin denied Aguilar's request to transfer to

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

the other side of the building purportedly because (1) there was no room on the other side of the building and (2) it would have been detrimental to the business. PAF 12.

With respect to the purported lack of space in the brokerage department, other accounting employees had been transferred to the other side of the building in early 2016 before Aguilar made her request and worked on the other side of the building for close to a year before being moved back to the accounting department. PAF 13. Additionally, Expeditors was moving entire work groups from brokerage to accounting to free up space. PAF 14.

With respect to the claim it would have been detrimental to the business, Griffin testified it did not even get to the point of discussing whether Aguilar could have operationally been placed on the other side of the building with Blandi because of the purported lack of space. PAF 15. Although Griffin claimed there were conversations where other factors besides the lack of room were considered, she could not identify anyone who took place in such a conversation. PAF 16. In fact, Griffin testified that issues regarding supervision of Aguilar and her interaction with her co-workers *would have* played into the decision to not transfer her if they had room on the other side, but they had no room. Thus, the only reason Aguilar was not moved to the other side of the building was because it was purportedly overly impacted. PAF 17. Moreover, Ruesch testified that the decision to not transfer Aguilar to the other side of the building was made by Blandi and Griffin before they even discussed the request with him. PAF 18.

Nevertheless, Ruesch and Griffin claimed that transferring Aguilar to the other side of the building, where the customs brokerage department was located, would have been detrimental to the business because it would have taken "far too long to walk back and forth to resolve issues." PAF 19. However, it took only Aguilar approximately one to two minutes to walk between the accounting and brokerage departments, so it would not have been a problem for her to walk from the brokerage area to the accounting department to promptly discuss issues with her manager or other members of her team if necessary. PAF 20. Even Ruesch and Griffin estimated the walk to be about two to three

-4-

minutes, and Griffin testified that the distance between the two departments was only 300 feet. PAF 21. Moreover, Aguilar's job duties only required her to interact with her supervisor when issues or problems arose from underpayment of an invoice, which only occurred about one or two times a week. PAF 22. As such, Aguilar's job performance would not have been negatively impacted if her workstation was moved to the brokerage department. PAF 23. Indeed, Aguilar's supervisor, Higa, apparently saw no problem with moving Aguilar's desk as she told Aguilar that was fine and she would be happy to move her desk if it helped her feel better about being in the department. PAF 24.

Expeditors also had a location at 12200 Wilkie Avenue, Hawthorne, California. PAF 25. Aguilar could have been stationed to work at this location because she did not need to interact with the supervisors or other employees in her department in-person to complete her job duties. PAF 26. If an issue came up with underpayment of an invoice, Aguilar could communicate with her supervisor by phone or email and if they needed to sign any paperwork for approval of additional payment, Aguilar could have provided it to her supervisor via email, she could have driven to the Century Boulvard location as it took only about 20 minutes to make the drive, or she could have provided the approval paperwork to one of the runners who would hand deliver documents between locations as necessary. Expeditors had two or three full time employees that spent all of their time making such trips. PAF 27. As such, Aguilar's job performance would not have been negatively impacted if her workstation was moved to the Hawthorne office. PAF 28. Nevertheless, Expeditors denied Aguilar's request to move her physical workstation to the brokerage department or the Hawthorne location. PAF 29.

### D. <u>Duties of Key Employees in the Corporate Office in Seattle.</u>

McCray Pettway's position at Expeditors in 2016 and 2017 was Director of Global Legal Services. Her duties included traditional human resources functions, managing a team of attorneys and legal professionals, providing "global strategy" for the company's labor, employment and immigration matters, and assisting in defending the company's position "globally" in labor, employment and immigration matters. PAF 31.

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

Kelsea Danner (then Kelsea Tisdale, and hereinafter referred to as "Tisdale") testified that she worked at Expeditors' corporate office as a supervisor of employee relations and benefits in 2016 and 2017, and her duties included overseeing the leave of absence and accommodation processes, engaging in the interactive process and creating and developing training for all the U.S. branches related to accommodations and leaves of absence for all U.S. offices. PAF 32-33.

## E. **As a Result of Continuing to Work in the Same Environment, Plaintiff's Mental Disabilities Were Exacerbated and Expeditors Put Plaintiff Out on Leave.**

As a result of Expeditors failing to move her desk, Aguilar continued experiencing high levels of stress and anxiety exacerbated by perceived mistreatment by coworkers. PAF 30. Ruesch sent Aguilar for a psychiatric evaluation, and Pettway thereafter established contact with psychiatrist Dr. Praveen Kambam, M.D. via email on August 17, 2016 in which she requested a fitness for duty assessment related to "an employee who is behaving in ways thought to be consistent with paranoia/delusions." She characterized the behavior this way based on the explanation of Aguilar's behavior by Ruesch and Griffin. PAF 35. Pettway emailed Dr. Kambam on August 31, 2016 and informed him that Aguilar was no longer a concern because she had gotten care, according to Ruesch and Griffin that her behavior had tempered a bit. PAF 36.

However, on September 12, 2016, Ruesch told Aguilar that she needed to take care of her mental health and explained that Expeditors was asking that she not return to work until she could meet with a doctor provided by the company. PAF 37. Aguilar was not provided any paperwork, so she was not sure if she was put on leave or terminated. As such, on or about September 13, 2016, Aguilar returned to inquire about when she could return to work because she had not received any paperwork. Aguilar spoke with Ruesch and Griffin about her concerns, but they told Aguilar she could not be there and said they would let her know when she could come back to work. PAF 39.

Because Ruesch told Aguilar she should seek treatment for her mental health, she continued treating with a therapist named Peter Carlson. Aguilar believed that treating

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

with Mr. Carlson would help her return to work. PAF 40. Further, Ruesch was aware
Aguilar was seeing a mental health professional. PAF 41.

### F. **Plaintiff was Evaluated by Dr. Praveen Kambam, M.D. on September 19, 2016, and Dr. Kambam Diagnosed Ms. Aguilar with Delusional Disorder.**

On September 16, 2016, Ruesch instructed Aguilar to visit Dr. Kambam to
determine when she could return to work because he knew something "wasn't right" or
"wasn't normal" with Aguilar and it was causing her to be a disruption and a concern in
the office. PAF 42. Aguilar understood that in order to come back to work she needed to
see Dr. Kamabam. PAF 43.

Dr. Kambam testified that a fitness for duty evaluation is done where there is a
concern of mental state of issue that is preventing someone from working or meeting the
requirements of their job, and he estimated that 50 to 70 percent of the employees he
evaluates are not fit or need some sort of modification, but that "things can change over
time" if they get treatment. PAF 44-45. Aguilar was evaluated by Dr. Kambam on
September 19, 2016. After the evaluation, Dr. Kambam informed Aguilar he would
provide a report to Expeditors. PAF 46. Dr. Kambam prepared his first fitness for duty
evaluation report on October 13, 2016.  PAF 47. Dr. Kambam never shared this report
with Aguilar, nor did he provide her with any diagnosis or inform her that he believed
she needed treatment or medication. PAF 48.

Dr. Kambam diagnosed Aguilar with delusional disorder persecutory type.
Delusional disorder is a psychotic disorder where the individual has a break from reality,
otherwise referred to as a fixed false belief. The persecutory type means that the
individual's false beliefs are of being persecuted in some way. PAF 49. Dr. Kambam
testified that Aguilar had poor insight, but it was possible she had some insight. PAF 50.
Dr. Kambam advised Pettway that Aguilar's symptoms were circumscribed to work,
meaning it was triggered at work. PAF 51. Tisdale and Ruesch became aware of the
diagnosis and the report's findings from Pettway when the three of them had a
conversation to discuss the report during which it was discussed that Aguilar was not

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR
PARTIAL SUMMARY JUDGMENT

mentally able to return to work without treatment. PAF 52.

## G. **Expeditors Failed to Advise Plaintiff What Steps She Could Take to be Fit to Return to Work.**

On November 2, 2016, Ruesch emailed Aguilar to inform her that he received a report from Dr. Kambam and that it indicated she was not cleared to return to work. He offered Aguilar medical leave at that time; however, Aguilar did not believe or know that she had any medical conditions so she did not return any medical certification. Instead, the company applied Aguilar's vacation and sick time toward her leave while they would not return Aguilar to work. PAF 53.

On November 14, 2016, Aguilar emailed Ruesch and stated that she did not know why she had not been cleared to return to work and asked him to advise her what she needed to do to be able to return to work. PAF 54. However, neither Ruesch nor anyone else from Expeditors advised her why she was not cleared to return to work or what she needed to do to be cleared for work. PAF 55. Further, Aguilar was never provided with Dr. Kambam's report from the September 19, 2016 visit and nobody told Aguilar that Dr. Kambam recommended that she seek treatment or take medication. PAF 56.

On November 16, 2016, Aguilar faxed a short letter to the Employee Relations Department at the corporate office again requesting to return to work. PAF 57. Even though Aguilar believed she had no medical or mental health conditions, she participated in several therapy sessions with Mr. Carlson because she believed it would help her return to work. However, Aguilar stopped seeking treatment with him after Ruesch informed her that she needed to stay on leave and did not advise her of any steps she could take to be cleared. At that time, Aguilar felt that Expeditors would not return her to work even if she was seeking treatment given that they kept her on leave after her evaluation by Dr. Kambam. PAF 59.

On November 21, 2016, Ruesch emailed Aguilar and informed her that no further action was needed to take approved medical leave, which would expire on January 25, 2017. However, Aguilar still did not advise her why she had not been cleared to return

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

to work or what she needed to do to be fit to return to work. PAF 60.

## H. **Expeditors Had Plaintiff Evaluated by Dr. Kambam a Second Time On January 18, 2017 as Her Medical Leave Was About to Expire.**

On January 5, 2017, Aguilar emailed Ruesch to inquire what would happen after her medical leave expired as she desperately needed income since her son was still in college and she was the only person in her family who had an inflow of money. Aguilar also asked him again if it would be possible to return to Expeditors. Ruesch responded and let her know that her return to work would have to be cleared by Dr. Kambam. PAF 61. Pettway then emailed Dr. Kambam to schedule a follow-up visit to determine if she was fit for duty. PAF 62.

On January 18, 2017, Aguilar was evaluated by Dr. Kambam a second time. When Aguilar spoke with Dr. Kambam, he told her he was surprised that she was still off work. After the evaluation, Dr. Kambam informed her he would again prepare a report to provide to Expeditors. PAF 63. Dr. Kambam testified that at the time of her second evaluation, Aguilar's condition had improved since the previous evaluation as there was a reduction in how strongly she held onto her symptoms and the intensity of her delusions had decreased, which he documented in his report. PAF 64.

Dr. Kambam prepared his second fitness for duty evaluation report on January 25, 2017. PAF 65. He never shared this report with Aguilar, nor did he provide her with any diagnoses or inform her that he believed she needed treatment or medication. PAF 66. Further, Dr. Kambam testified that Aguilar had not been prescribed or taken antipsychotic medication. PAF 67. Dr. Kambam provided Pettway with his second evaluation report dated January 25, 2017, which she and Tisdale reviewed. PAF 68.

Dr. Kambam testified that his report's recommendations were meant to provide Expeditors with guidance on factors that could potentially help Aguilar return to work. PAF 69. In particular, Dr. Kambam included the recommendation that Aguilar get treatment and take medication because it was important for the employer to know that so they can understand what will help the employee and increase the probability to be able

to return to work. PAF 70. Dr. Kambam also recommended that Aguilar could be placed around different personnel or in another department to minimize triggering of previous delusional thinking because Aguilar's delusional thinking was circumscribed to work and she did not mention any delusional thinking that was non-work related. PAF 71.

I. **Following Receipt of Dr. Kambam's Report, Expeditors Failed to Engage in the Interactive Process with Plaintiff Regarding Dr. Kambam's Recommendations.**

In late January 2017, Pettway and Tisdale spoke after they each reviewed Dr. Kambam's January 2017 report to discuss Dr. Kambam's findings and recommendations, as well as whether Expeditors could accommodate Aguilar. PAF 72. Tisdale and Pettway claimed that all three recommendations needed to be done in conjunction and Aguilar was not meeting the first recommendation, which was that she was not seeking treatment and it was "unclear" if or when she would seek treatment based on Dr. Kambam's report and her communications that she did not believe she had any medical issue. Therefore they determined that there was no "definitive ability" for Aguilar to return to work. PAF 73. In reality, each of Dr. Kambam's three recommendations individually may have improved the probability of Aguilar being fit to return to work, although each one independently may not be sufficient. PAF 74. Tisdale acknowledged that Dr. Kambam's recommendation for treatment was something that could be adopted in order for her to return to work. PAF 75.

After speaking with Tisdale, Pettway talked to Ruesch and it was Ruesch's decision as to whether the company could accommodate Aguilar. PAF 76. However, Dr. Kambam's report was never provided to Ruesch as employee relations has a practice of only sharing information with the manager it deems necessary to make a decision. PAF 77. Ruesch was never advised that Dr. Kambam's recommendations or proposed solutions included transferring Aguilar to a different department where she was not working around the individuals about whom she had paranoid delusions or providing her with a behavioral contract. PAF 78.

If either Dr. Kambam or management at Expeditors informed Aguilar that she

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

could return to work as long as she was receiving treatment and taking medication, she would have done so to keep her job. Aguilar needed to work and she loved her job. She worked there for over 20 years and she loved the work because she was able to work independently and she performed well. Aguilar always received positive performance reviews and her managers and supervisors routinely complemented the quality of her work. As such, working at Expeditors gave Aguilar dignity, pride and enjoyment. Aguilar would have done anything to keep her job. PAF 79.

Pettway admitted that Dr. Kambam never concluded that the company would not be able to accommodate Aguilar, nor did he state with certainty that Aguilar would never seek treatment or take medication. PAF 80. Pettway testified that it would have been Tisdale and her team's obligation to engage in the interactive process with Aguilar by providing the information they received, and she presumed Tisdale was interacting with Aguilar and following steps to see if Expeditors could accommodate her. PAF 81. Additionally, Ruesch also knew he had an obligation to engage in the interactive process when an accommodation request had been made. PAF 82.

However, nobody at Expeditors, including Tisdale or Ruesch engaged in the interactive process with Aguilar after the company received Dr. Kambam's January 25, 2017 report, shared either of Dr. Kambam's reports with Aguilar, or inform her of any recommendations Dr. Kambam made for things she could do to improve her condition and return to work. PAF 83. Moreover, Dr. Kambam did not inform Pettway of any reasons why the report should not have been shared with Aguilar. PAF 84.

## J. On February 14, 2017, Expeditors Terminated Plaintiff, Falsely Claiming to Plaintiff that Kambam had Recommended Indefinite Leave.

Ruesch made the decision to terminate Aguilar after consulting with Expeditor's in-house counsel, McCray Pettway because they "did not believe," based on prior experience with Aguilar, that she would take seek psychiatric treatment and take medication, were things that were required for her to be able to come back to work based on Dr. Kambam's report. PAF 85. Meanwhile, Pettway and Tisdale testified that the

1    reason for Aguilar's termination was that there was no "definitive" time period when she
2    could return to work as it was "unclear" whether she would seek treatment, and it was
3    therefore it was "up in the air" whether she would ever be able to return to work. PAF 86.

4         On February 14, 2017, Ruesch sent Aguilar an email indicating that she was
5    terminated because Expeditors could not continue to accommodate her due to Dr.
6    Kambam recommending an indefinite leave of absence – language which was provided to
7    him by Tisdale. PAF 88. Tisdale testified that she told Ruesch to inform Aguilar the
8    reason for her termination was a recommendation for indefinite leave because it was
9    "unclear" if or when she would ever receive treatment so there was no "definitive" ability
10   for her to return to work, and Ruesch told her that he informed Aguilar during a phone
11   call that she was being let go and that Expeditors "could not accommodate her indefinite
12   leave of absence." PAF 89. Interestingly, Ruesch denied ever terminating an employee
13   because of an inability to accommodate their disability or medical issue. PAF 90. Ruesch
14   also claimed that he was never advised that Aguilar required an indefinite leave. PAF 91.

15        This may be because Dr. Kambam did not recommend a specific medical leave and
16   he did not recall telling Pettway that Aguilar would need to remain off work for an
17   indeterminate amount of time. PAF 92. In fact, Dr. Kambam testified Aguilar's return to
18   fitness for duty was unforeseeable only if she did not treatment. PAF 93. If she had been
19   advised that she needed treatment and followed through with it, Dr. Kambam opined that
20   it would have been more probable that Aguilar would be fit to return to work within two
21   to four weeks after starting on his recommended treatment path, as patients generally start
22   experiencing a significant response from antipsychotic medication two to four weeks
23   after starting the medication. PAF 94.

24        On February 28, 2017, Aguilar emailed Dr. Kambam to request his report and
25   inquire as to the reasons why he recommended indefinite leave. However, Dr. Kambam
26   never responded to her email. PAF 95. Instead, Dr. Kambam forwarded this email to
27   Pettway, but did not recall Pettway responding to the email. PAF 96.

28        Incredibly, Ruesch testified that their experience with Aguilar was that she "was

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR
PARTIAL SUMMARY JUDGMENT

1    not willing to take steps to return to work to help herself" and therefore they "just didn't

2    feel that she would be able to come back and not continue to be erratic and create issues

3    in the office." PAF 97. Nevertheless, Ruesch admitted he was aware that Aguilar had

4    seen her own mental health professional and she had gone to see the company's

5    psychiatrist, Dr. Kambam. PAF 98. Additionally, at no time after being evaluated by Dr.

6    Kambam did anyone at Expeditors advise Aguilar that she needed to seek treatment, take

7    medication, or enter into a behavioral contract in order to return to work. PAF 99.

8    Further, nobody at Expeditors ever offered to transfer Aguilar to another work station

9    where she could work around different personnel who were not aggravating her stress

10   and anxiety. PAF 100. Aguilar also never told Dr. Kambam or anyone at Expeditors that

11   she would refuse to seek psychiatric treatment or take medication if it was a condition of

12   returning to work, and she never refused any transfer or behavioral contract. PAF 101.

## III.   LEGAL STANDARD

### A. Standard on Summary Judgment/Adjudication

15   At summary judgment, the burden is squarely on the moving party to show that *no*

16   genuine issue as to *any* material fact still remains, such that the moving party is entitled

17   to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247

18   (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir.

19   2000); Fed. Rules Civ. Pro. 56(c). If a jury could reasonably find for either party as to an

20   issue, it is genuinely disputed and summary judgment is not proper. *Anderson*, 477 U.S.

21   at 248. The function of the trial court on a motion for summary judgment is merely to

22   determine whether material issues of fact exist, and not to decide the merits of the issues

23   themselves. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1027 (9th Cir.

24   2006). If there is a single such issue of fact, a motion for summary

25   judgment/adjudication must be denied.

26   In determining whether there is any triable issue as to any material fact, courts

27   strictly construe the moving defendant's evidence, and liberally construe opposing

28   declarations and evidence: all evidence and all inferences thereupon must be viewed in

-13-

the light most favorable to the nonmoving party and any doubt as to the propriety of granting a motion for summary judgment should be resolved in favor of the party opposing the motion. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962) ; *Dufay v. Bank of America N.T. & S.A. of Oregon,* 94 F.3d 561, 564 (9th Cir. 1996); *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir. 2002); *Slobojan v. Western Travelers Life Ins. Co.*(1969) 70 Cal.2d 432.

The Ninth Circuit has set an exceptionally high standard for parties moving for summary judgment on claims of employment discrimination. *Schnidrig v. Columbia Mach.*, 80 F.3d 1406, 1410 (9th Cir. 1996). The Ninth Circuit has explained that "very little" evidence is required for a plaintiff to survive summary judgment in an employment discrimination case, because the ultimate question of an employer's motives can only be resolved through a "searching inquiry" that must be conducted by the factfinder upon a full record. *Id*. (quoting *Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1563 (9th Cir., 1994)); *c.f. Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 499 (9th Cir. 2015) ("It should not take a whole lot of evidence to establish a genuine issue of material fact in a disability discrimination case…").

Summary judgment is an extreme remedy and should be not be entered unless the movant has "established its right to judgment with such clarity as to leave no room for controversy, and the other party is not entitled to recover under any discernable circumstances." *Real v. Driscoll Strawberry Assocs., Inc.,* 603 F.2d 748, 753 (9th Cir. 1979) (citations omitted). Employment discrimination cases present issues of intent and motive, and are therefore "rarely appropriate for disposition on summary judgment, however liberalized it be." *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App. 4th 243, 286; *Lucchesi v. Giannini &Uniack* (1984) 158 Cal.App.3d 777 (the question of defendant's state of mind was one of fact for the jury to determine). Even if the employer can articulate a non-discriminatory reason for the termination and support it with evidence, summary judgment is not appropriate if the employee can proffer evidence to the contrary. *Nigro*, 784 F.3d at 499 (citing *Metoyer v. Chassman*, 504 F.3d 919, 939

-14-

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

(9th Cir. 2007)).

### B. This Court Should Apply California State Law to Defendant's Motion

Although Federal courts may hear state claims in diversity, they must apply state substantive law to decide state-law claims. *Gasperini v. Ctr. For Humanities*, 518 U.S. 415, 426-27 (1996) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 74 (1938)). If the complaint does not specify whether a claim is based on federal or state law, it is a claim "arising under" federal law only if it is clear that it raises a federal question. *Duncan v. Stuetzle,* 76 F.3d 1480, 1485 (9th Cir. 1996). Here, Plaintiff's causes of actions are brought under a state statute, the California Fair Employment and Housing Act (the "FEHA"). Even his claims that do not specifically reference the FEHA, such as his wrongful termination claim, are brought for violations of California public policy as embodied in the FEHA. Therefore, California state case law should apply.

## IV.    LEGAL ARGUMENT

### A. Plaintiff's First Cause of Action for Disability Discrimination in Violation of the FEHA is Supported by Overwhelming Evidence.

#### 1. Plaintiff has Established Defendant's Discrimination with Direct Evidence.

To establish a prima facie case of disability discrimination under the FEHA, the plaintiff is required to show: "(1) he suffers from a disability; (2) he is otherwise qualified to do his job; and, (3) he was subjected to adverse employment action because of his disability." *Faust v. California Portland Cement Co.*, 150 Cal.App.4th 864, 886 (2007) .

The plaintiff's burden of proof depends upon whether there is direct evidence of discriminatory motive, or whether circumstantial evidence must be relied upon, in which case courts follow a burden-shifting approach. *Hersant v. California Dept. of Social Services*, 57 Cal.App.4th 997, 1002-03 (1997). Where there is direct evidence of discrimination, the burden-shifting approach need not be utilized. "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).  Defendant does not dispute that Plaintiff established a prima facie case of disability discrimination. Moreover, there is abundant direct evidence of discriminatory animus. Indeed, it is undisputed that

Plaintiff was not terminated for a reason related to her conduct or performance at work. Rather, the admissions from Defendant's witnesses demonstrate clearly that Plaintiff was terminated because she had a disability – delusional disorder – and required mental health treatment. On this basis alone, the Court should deny Defendant's Motion.

### 2. Defendant's Failure to Engage in an Interactive Process Was Not a Legitimate Reason for Termination.

Assuming, *arguendo*, Plaintiff's case was based on circumstantial evidence rather than direct evidence, Plaintiff nevertheless prevails under the burden-shifting analysis. In cases involving circumstantial evidence, once a plaintiff has demonstrated her prima facie case of discrimination, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's [termination]." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Here, Expeditors' articulated reason for terminating Aguilar is that it could not accommodate Plaintiff because one of Dr. Kambam's three separate recommendations for ways Aguilar could become fit for duty in his January 25, 2017 report was that Aguilar seek psychiatric treatment and take antipsychotic medication. Defendant unilaterally assumed, without engaging in any interactive process with Aguilar despite full awareness of its obligation to do so, that Aguilar would not seek treatment or take medication as recommended. Therefore, Defendant determined that it was "up in the air," "unclear," and/or "indeterminate" whether Aguilar would ever be fit to return to work. Significantly, word that were not used by Defendant were that it was "certain," "clear," and/or "determinate" that Plaintiff would *not* seek treatment and therefore not be fit to return to work. This is because Plaintiff never refused to get treatment or take medication. Practically speaking, Defendant terminated Plaintiff because it did not know what she would do if advised of Dr. Kambam's recommendations, and it did not want to find out.

Simply put, in addition to *not* being a legitimate reason for termination, this is a patently unlawful reason for termination. As set forth below in greater detail, Government Code § 12940(n) imposes a mandatory obligation on employers to engage in

-16-

a good faith dialogue with a disabled employee to determine whether and how an employee's disabilities can be accommodated. Although it was the responsibility of Ruesch or Tisdale to engage in this process with Aguilar, they never did. Moreover, nobody at the company shared Dr. Kambam's report with Aguilar, advised her of Dr. Kambam's recommendations, or informed her that she needed to seek treatment and take medication in order to return to work. This is a textbook failure to engage in the interactive process.

Under the law, Defendant cannot bury its head in the sand and make assumptions about what can be done to accommodate an employee. Because Defendant's purported assumptions that Aguilar would refuse treatment arose from its failure to communicate with her as part of legally-mandatory interactive process, it was unlawful and not legitimate. Thus, Expeditors has not articulated a legitimate, non-discriminatory reason for terminating Aguilar.

### 3. Expeditors' Purported "Legitimate" Reason was a Pretext for Discrimination.

Assuming, *arguendo*, the articulated justification for Plaintiff's termination was legitimate, which it was most certainly not, Plaintiff has nevertheless established that Defendant's justification was pretext for discrimination. "Once the employer has [offered a legitimate, nondiscriminatory reason for the adverse employment action] the plaintiff must offer evidence that the employer's stated reason is either false or pretextual, or evidence that the employer acted with discriminatory animus, or evidence of each which would permit a reasonable trier of fact to conclude the employer intentionally discriminated." *Faust v. California Portland Cement Co.*, 150 Cal.App.4th 864, 886 (2007).

Generally in FEHA discrimination cases, pretext may be demonstrated by showing that "the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate discharge." *Hanson v. Lucky Stores, Inc.*, 74 Cal.App.4th 215, 224 (1999); *Hersant v. Department of Social Services*, 57 Cal.App.4th 997, 1005 (1997) (pretext may be shown by "such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons'"); *Mamou v. Trendwest Resorts, Inc.*, 165 Cal.App.4th 686, 715(2008) (holding that the court may "take into account . . . manifest weaknesses in the cited reasons [for termination] in considering whether those reasons constituted the real motive for the employer's actions, or have instead been asserted to mask a more sinister reality.").

Where certain evidence supports an inference of discriminatory motive, proof that the employer's reasons are illogical and inconsistent may "considerably assist" plaintiff's case because it suggests the employer had cause to hide its true reasons. *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 361 (2000). "[T]he plaintiff need produce very little evidence of discriminatory motive to raise a genuine issue of fact as to pretext." *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997). Here, in addition to the evidence of discriminatory animus set forth above, there is abundant additional evidence demonstrating that Defendant's proffered justifications for the termination are pretext for discrimination.

The plaintiff may establish pretext by proving that the legitimate reasons offered by defendant were false, creating an inference that those reasons were merely a pretext for discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is . . . probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."); *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 356 (2000). Here, at the time of the termination, Ruesch informed Aguilar that she was being terminated because Dr. Kambam had recommended an indefinite medical leave, which Defendant could not accommodate. Ruesch clearly lied to Plaintiff when he told her Dr. Kambam recommended indefinite leave because Dr. Kambam never made such a recommendation.

At his deposition, Ruesch then stated that he had never been informed Plaintiff

-18-

required an indefinite medical leave, and instead stated that the reason for termination was Defendant's belief that Plaintiff would never seek treatment or take medication. Pettway and Tisdale then attempted to merge these two explanations by claiming that because they believed Plaintiff would not seek treatment or take medication (again, without even communicating with her on this matter), it was "up in the air," "unclear," and/or "indeterminate" whether Plaintiff would ever be fit to return to work. The new defense advanced by Expeditors in this litigation is flatly illogical. First, Aguilar never told anybody at Expeditors or Dr. Kambam that she would refuse treatment or medication. Second, Aguilar's actions demonstrated just the opposite – when Ruesch informed Plaintiff that she needed to take care of her mental health in September 2016, Plaintiff voluntarily participated in psychotherapy treatment with Peter Carlson (of which Ruesch was aware) because she thought it would help her return to work. Plaintiff also voluntarily participated in two fitness for duty assessments with the company's psychiatrist, Dr. Kambam, because she understood that she needed to do so in order to return to work. Consequently, Plaintiff did everything Defendant asked of her in connection with her effort to return to work and it is beyond implausible that Defendant had any good faith belief that Plaintiff would refuse to seek additional mental health treatment to get her job back.

Furthermore, the fact that Defendant has changed its story about the reasons for termination in and of itself can demonstrate pretext. The fact pattern here is analogous to that of *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997), a case in which the employer offered several different justifications for the employee's termination at different stages. By the time the decision makers' depositions had been taken, the employer's justification had morphed from a single incident to a pattern of insubordinate acts. (*Ibid.*) Here, Defendant shifted its justification for the termination to one that it certainly perceived as a stronger defense in litigation. The reasonable inference is that Expeditors initially told Plaintiff a lie as to the reason for the termination, which it knew could not be supported by the evidence once this suit was filed given that Dr. Kambam never recommended an indefinite medical leave. Thus, Defendant has now realized that it could advance a different narrative

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

based upon statements in Dr. Kambam's report that Plaintiff did not understand that she had a mental health condition. "A rational trier of fact could find these varying reasons show that the stated reason was pretextual, for one who tells the truth need not recite different versions of the supposedly same event. (*Payne,* 113 F.3d at 1080.) Accordingly, summary judgment must be denied as to Plaintiff's discrimination claim.

### B.  Triable Issues Of Fact Exist Regarding Plaintiff's FEHA Retaliation Claim.

To establish a prima facie case for relation plaintiff must show that (1) plaintiff engaged in protected activity; (2) that the employer subjected plaintiff to an adverse action; (3) and that a causal link exists between the protected activity and the employer's action. *Yanowitzv. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1043 (2005). A person's request to an employer for an accommodation of a disability is a protected activity sufficient to support a claim for discrimination or retaliation in violation of the FEHA, regardless of whether the accommodation was granted. See Gov. Code §§ 12940(*l*), (m)(2).

Here, Plaintiff engaged in protected activity by requesting reasonable accommodations in April 2016, including a transfer of her workstation to either the other side of the building or the Hawthorne office to minimize triggering of her anxiety and symptoms of her then-undiagnosed delusional disorder. Additionally, accommodations were requested on Plaintiff's behalf in the form of recommendations made by Dr. Kambam, which included a recommendation that she be transferred to a different work area to minimize triggering of her symptoms. Moreover, Defendant terminated Plaintiff in retaliation for these accommodation requests, particularly those in Dr. Kambam's report, as set forth above. As such, summary judgment should be denied as to Plaintiff's FEHA retaliation claim.

### C.  Plaintiff Established Claims for Failure To Provide Reasonable Accommodations and Failure to Engage in the Interactive Process.

To establish a failure to accommodate claim, Plaintiff must show (1) she suffered from a disability covered by the FEHA; and (2) Defendant failed reasonably to accommodate plaintiff's disability. Gov. Code § 12940(m); *Jensen v. Wells Fargo Bank*, 85 Cal.App.4th 245, 256 (2000). Summary judgment as to a failure to accommodate claim must be denied

unless it is undisputed that a reasonable accommodation was offered and refused, there no vacant position within the employee's organization for which the disabled employee was qualified and capable of performing with or without accommodation, or" the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussion in good faith."*Ibid.*

Defendant alludes to the fact that it accommodated a medical leave for Aguilar, yet that is not dispositive of Plaintiff's claim that Defendant failed to reasonably accommodate her disabilities. Indeed, even where an employer has a history of accommodating an employee, a single failure to accommodate is in itself actionable. See *A.M. v. Albertsons, LLC*, 178 Cal.App.4th 455, 465 (2009). Therefore, the fact that Defendant placed Plaintiff on a medical leave related to her disabilities is irrelevant for the purposes of this summary judgment if it failed to provide accommodations in any other instances.

### 1. Defendant Failed to Accommodate Plaintiff's April 2016 Transfer Request.

On April 29, 2016, Plaintiff requested to move her workspace to the brokerage department on the other side of her floor or the Hawthorne location as an accommodation for her anxiety and then-undiagnosed delusional disorder. "Employers must make reasonable accommodations to the disability of an individual unless the employer can demonstrate that doing so would impose an 'undue hardship.'" *Prilliman v. United Air Lines, Inc.*, 53 Cal. App. 4th 935, 947 (citing Cal. Code Regs., tit. 2, § 7293.9). Defendant's claim that moving Plaintiff's workstation was not "feasible" certainly does not constitute an undue hardship. Expeditors is a global company with hundreds of employees in Los Angeles alone, so moving one employee cannot be said to a hardship.

Nevertheless, Griffin summarily denied Plaintiff's request for a transfer because there was purportedly not enough space in the brokerage department. However, the evidence shows that accounting and brokerage employees were moved back and forth between the two sides of the floor with some regularity. Therefore, Defendant could have moved one more brokerage employee in order to make room for Aguilar without any undue hardship.

As a post hoc rationale for the denial, Defendant also claimed that working on the

other side of the building would have meant there would have been too long of a walk for Aguilar to be able to interact with her supervisor and team members when necessary. Aguilar rarely needed to interact with these employees, but even if she did, the distance between brokerage and accounting was only 300 feet. Aguilar estimated that it took her about one or two minutes to make this walk. Even Ruesch and Griffin believed the walk was only two or three minutes.[1] This can hardly be considered an undue hardship that would justify denial of a reasonable accommodation. Further, Hawthorne would have been workable as well, as Aguilar could stay in touch with her supervisor via phone and email, and documents could have been sent via runner or email as necessary. Thus, Defendant failed to reasonably accommodate Plaintiff's request for transfer.

### 2. Defendant Failed to Engage in the Interactive Process with Respect to Dr. Kambam's Recommendations.

It is unlawful for an employer to "fail to engage in a timely, good faith interactive process" with a disabled employee to determine effective reasonable accommodations. Gov. Code § 12940(n); 2 Cal. Code Regs. § 11069(a). An employer must initiate an interactive process when it becomes aware of the need of an accommodation through observation, or when an employee with a known physical disability requests an accommodation. 2 Cal. Code Regs., tit. 2, § 11069(b)(1), (2).

Here, Dr. Kambam made three separate recommendations for ways to increase the probability to return to work in his January 25, 2017 report. This included a transfer to a different work area, which would have been a reasonable accommodation as set forth above. Additionally, Dr. Kambam recommended treatment, medication, and a behavioral contract. It is undisputed that Defendant failed to engage in the interactive process with respect to these recommendations. Defendant and Dr. Kambam never (1) provided Aguilar with the fitness for duty report, (2) advised Aguilar of Dr. Kambam's recommendations set forth in the report, (3) advised Aguilar that seeking treatment and taking medication was a requirement

---

[1] An individual would have to be walking at a snail's pace of one mile per hour to take three minutes to travel 300 feet.

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

for her to be cleared to return to work, or (4) communicated with Aguilar regarding Dr. Kambam's recommendations that she enter into a behavioral contract and/or be transferred to a different area so she could work around personnel who did not trigger her symptoms. In fact, Expeditors failed to communicate with Aguilar at all following the January 18, 2017 fitness for duty examination except to inform her she was terminated. It is therefore undisputed that Expeditors failed to engage in the interactive process.

Defendant absurdly blames Aguilar for the breakdown in the interactive process. In reality, Aguilar was the *only* party engaging. She voluntarily appeared for fitness for duty assessments with Defendant's psychiatrist and sought treatment on her own after Ruesch suggested to her that she needed to take care of her mental health. After Ruesch informed her in November 2016 that Dr. Kambam had not cleared her to return to work, Aguilar specifically informed Ruesch that she did not know why she had not been cleared and asked him what she needed to do. This was followed by silence from Ruesch, who merely extended Aguilar's medical leave without telling her any reason why Kambam had not cleared her. Aguilar reached out at least two additional times between November 2016 and January 2017 to try to return to work, but she was kept in the dark by Expeditors. Consequently, it is abundantly clear that Aguilar was not responsible for the breakdown in the interactive process – that failure falls 100 percent on Expeditors.

### 3. Defendant Failed to Reasonably Accommodate Aguilar According to Dr. Kambam's Recommendations.

Defendant's last ditch effort to squirm out of trouble is its claim that the interactive process would have been futile because of Aguilar's belief that she did not need any treatment. First, employer liability for failing to engage in the interactive process does *not* depend on showing a reasonable accommodation was possible. *Wysinger v. Automobile Club of Southern Calif.*, 157 Cal.App.4th 413, 425 (2007); see also *Claudio v. Regents of Univ. of Calif.*, 134 Cal.App.4th 224, 245 (2005) (based on employer's failure to engage in interactive process, "it cannot be known whether an alternate job would have been found".) Consequently, Expeditors is liable for disregarding its interactive process obligations

-23-

1  regardless of whether it could have accommodated Aguilar.

2     In any event, the interactive process would not have been futile and Expeditors could

3  have accommodated Plaintiff. In spite of her belief that she had no mental health conditions,

4  Aguilar continuously saw mental health professionals when she thought doing so would give

5  her a chance at continuing her work for Expeditors. Again, she had treated with Carlson and

6  visited Dr. Kambam based on her belief that this would help her continue working. She only

7  stopped treating with Carlson when it seemed that it was not helping her return to work, as

8  Dr. Kambam did not clear Aguilar to return to work and Ruesch was not answering her when

9  she asked why. Aguilar had no way of knowing that she needed to treat to return to work

10  when Expeditors and Aguilar were not communicating with her and were ignoring her

11  attempts to figure out why she had not been cleared.

12     Even after she was terminated, Aguilar saw multiple mental health professionals in the

13  context of her workers' compensation case. Moreover, Defendant presents no evidence that

14  treatment itself would not have enabled Plaintiff to return to work. As such, Defendant failed

15  to demonstrate any inability to accommodate Aguilar according to Dr. Kambam's

16  recommendations.

17     Significantly, Dr. Kambam testified that Aguilar was likely to see results from his

18  recommended treatment within two to four weeks, which would have made it more probable

19  that she would be fit to return to work. Defendant cannot demonstrate any undue hardship

20  would have been suffered by allowing Plaintiff a few weeks to seek recommended treatment.

21  Moreover, had Defendant engaged following the October 2016 report, Plaintiff may have

22  seen results during the medical leave that Defendant originally provided Plaintiff, which did

23  not expire until January 25, 2017. Thus, Defendant failed to reasonably accommodate

24  Plaintiff based on Dr. Kambam's recommendations.

25  **D.  Plaintiff's Derivative Claims Survives.**

26     Because Plaintiff has demonstrated genuine disputes of material fact as to her FEHA

27  claims, Plaintiff's derivative claims for failure to prevent discrimination, wrongful

28  termination, and declaratory relief all survive.

### E. **Summary Judgment is Improper as to Punitive Damages.**

A claim for punitive damages may be successful where the plaintiff proves that the defendant acted with oppression, fraud or malice. Cal. Civ. Code §3294(c). Defendant contends that Plaintiff cannot obtain punitive damages because Ruesch was not a managing agent. "[S]upervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents." *White v. Ultramar, Inc.,* 21 Cal.4th 563, 577 (1999). Here, Ruesch was a district manager who admittedly acted as a liaison between the branches and corporate office, (see, e.g., *Gober v. Ralphs Grocery* 137 Cal.App.4th 204 (2006), was the sole employee who oversaw all of the activities in his district, (see e.g., *Wysinger v. Automobile Club of Southern Calif.* 157 Cal.App.4th 413, 428-429 (2007)), and had 380 employees under his purview.

Further, as set forth above, the failure to engage with Plaintiff was done in conscious disregard of Defendant's responsibilities, as all the relevant actors knew their duties under the law. In addition, the fact that Ruesch gave Plaintiff a false reason for termination also demonstrates. Moreover, Ruesch's act of giving Plaintiff a false explanation for her termination will support an award of punitive damages. See *Cloud v. Casey*, 76 Cal.App.4th 895, 912(1999). Finally, the actions of Ruesch and Tisdale were ratified by Pettway, who undoubtedly was a managing agent as she worked in Defendant's corporate office as the Director of Global Legal Services. Indeed, ratification may be inferred if the employer is "*informed* of the employee's actions" but "does not fully investigate and fails to repudiate the employee's conduct." *Fisher v. San Pedro Hospital*, 214 Cal.App.3d 590, 621 (1989) (emphasis added). Accordingly, summary adjudication as to punitive damages must be denied.

### V.    **CONCLUSION**

For the reasons stated above and in light of the stark factual disputes in the record, Defendant's motion for summary judgment must be denied, and this matter allowed to proceed in due course to trial, together with such other relief as this Court deems proper.

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DATED: September 4, 2020 | **EMPLOYEE JUSTICE LEGAL GROUP, PC**

By: _/s/ David C. Hopper_
Kaveh S. Elihu, Esq.
David C. Hopper, Esq.
Attorneys for Plaintiff
ROSA AGUILAR

PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT