# EXHIBIT G

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

```
ROSA AGUILAR,                          )
                                       )
          Plaintiff,                   )
                                       )
     vs.                               )
                                       ) Case No.
EXPEDITORS INTERNATIONAL OF            ) 2:19-cv-02285-PSG-JC
WASHINGTON, INC., and DOES 1           )
through 10,                            )
                                       )
          Defendant.                   )
_____)
```

**REMOTE DEPOSITION OF PETER G. CARLSON, M.A.**

Tuesday, June 16, 2020

REPORTED BY:

JEAN KIM
CSR NO. 13555, RPR

JOB NO.
98981LMF

```
 1                    UNITED STATES DISTRICT COURT
 2                   CENTRAL DISTRICT OF CALIFORNIA
 3
 4   ROSA AGUILAR,                      )
                                        )
 5             Plaintiff,               )
                                        )
 6        vs.                           )
                                        ) Case No.
 7   EXPEDITORS INTERNATIONAL OF        ) 2:19-cv-02285-PSG-JC
     WASHINGTON, INC., and DOES 1       )
 8   through 10,                        )
                                        )
 9             Defendant.               )
     _____)
10
11        Remote deposition of PETER G. CARLSON, M.A., taken on
12   behalf of the Defendant, commencing at 9:04 a.m., on
13   Tuesday, June 16, 2020, before Jean Kim, CSR No. 13555,
14   RPR, a Certified Shorthand Reporter in and for the County
15   of Los Angeles, State of California.
16
17
18
19
20
21
22
23
24
25
```

```
 1   REMOTE APPEARANCES:

 2   FOR PLAINTIFF:
     EMPLOYEE JUSTICE LEGAL GROUP
 3   BY:  MATIAS N. CASTRO
          Attorney at Law
 4   3055 Wilshire Boulevard
     Suite 1120
 5   Los Angeles, California  90010
     213.382.2222
 6   mcastro@ejlglaw.com

 7
     FOR DEFENDANTS:
 8   LITTLER MENDELSON, PC
     BY:  HELENE WASSERMAN
 9        Attorney at Law
     2049 Century Park East
10   Fifth Floor
     Los Angeles, California  90067
11   310.772.7209
     hwasserman@littler.com
12
     BY:  KIMBERLI A. WILLIAMS
13        RAE Y. CHUNG
          Attorneys at Law
14   633 West 5th Street
     63rd Floor
15   Los Angeles, California  90071
     213.443.4300
16   kawilliams@littler.com
     rchung@littler.com
17

18   ALSO PRESENT:
     McCRAY PETTWAY, Expeditors International
19   CHANG QI, Expeditors International

20

21

22

23

24

25
```

**PETER CARLSON, M.A. - June 16, 2020**
**AGUILAR VS. EXPEDITORS INTERNATIONAL OF WASHINGTON, INC.**

1  she -- that her thought process -- that she was unable to
2  think in a new way and that her thought process precluded
3  her from being able to progress because she was so
4  reluctant to -- to accept what was going on with her?
5          Do you remember testifying about that earlier
6  today?
7          MR. CASTRO:  Objection.  Objection.  Compound.
8  BY MS. WASSERMAN:
9      Q    You can answer.
10     A    Yes.  There is a contradiction there.
11     Q    So I guess my question is -- I mean I know you
12 don't have notes.
13          Do you remember how long this conversation was
14 with her before you -- assuming you had a conversation
15 with her because I don't think we've even determined with
16 certainty that you had a conversation?
17          But if you had a conversation with her that
18 caused you to do this 180 in writing this letter, how
19 long that call was that changed your mind that you had
20 developed an opinion that you had developed over
21 three months' worth of treatment.
22     A    Yeah.  It was probably a brief conversation
23 where -- well, I put my patient in a good light so that
24 she can go back to work, and perhaps I stretched it a
25 little far.

**PETER CARLSON, M.A. - June 16, 2020**
**AGUILAR VS. EXPEDITORS INTERNATIONAL OF WASHINGTON, INC.**

1   Q   Okay. When you say you "stretched it a little
2   far," Mr. Carlson -- and I appreciate this. And this is
3   where we all really need to figure out what's going on
4   here.
5        Was there really -- based upon the multiple
6   months of hour-long, every-week sessions that you had
7   with her about which you took very detailed and copious
8   notes detailing many situations when she said to you that
9   she feels fine and that she doesn't know what's wrong and
10  that she's ready to go back to work -- because that's all
11  reflected in these notes that we've been talking about --
12  do you remember anything that she said in that brief
13  conversation, if, in fact, there was such a brief
14  conversation before you sent out this February 27th
15  letter, that told you to basically do a complete 180 on
16  everything that you've testified to in the past few
17  hours?
18  A   Well, she seemed very confident.
19       This is not to say that she didn't have
20  problems. My whole treatment was trying to help her cope
21  with what the condition was, that she would be able to
22  continue to work regardless of whatever diagnosis that
23  she had. I believe that she was capable of continuing to
24  work.
25       It's just that she's tormented by these fears

**PETER CARLSON, M.A. - June 16, 2020
AGUILAR VS. EXPEDITORS INTERNATIONAL OF WASHINGTON, INC.**

```
 1   and these suspicions and these thoughts and yet, you
 2   know, she is excellent at her job, apparently, from her
 3   self-report of 23 years with the company.
 4       Q    Okay.
 5       A    So --
 6       Q    Did you know anything about her work
 7   environment?  Did you ever ask to see her work
 8   environment?
 9       A    No.
10       Q    Okay.  Did you ever talk to any of her
11   coworkers --
12       A    No.
13       Q    -- as part of your therapy as a way of
14   understanding her?
15            Did you ever talk to any of her managers to talk
16   about their opinions of her?
17       A    No.
18       Q    And throughout your therapy -- and it's -- she
19   told you repeatedly that she wanted to go back to work
20   and that she was ready to go back to work; right?
21       A    Yes.
22       Q    But -- okay.  But you concluded that she was
23   having an inability to think in a new way throughout
24   every time that she told you that she was ready to go
25   back to work and she wanted to go back to work; right?
```

PETER CARLSON, M.A. - June 16, 2020
AGUILAR VS. EXPEDITORS INTERNATIONAL OF WASHINGTON, INC.

```
 1    A     Yes.  Because -- yes.  I believe that her work
 2  performance was not hindered by her mental illness, if
 3  that's what you want to call it.
 4    Q     How do you know that?
 5    A     Well, that's what her self-report was when I
 6  wrote this letter for her, that she was -- she can do her
 7  job, you know.
 8    Q     Well, did you know what her job was?
 9    A     Not exactly.  Something in logistics and --
10    Q     Did you know how many people she worked with?
11    A     No.  I wasn't sure.
12    Q     Did you know what kind of -- what her work
13  environment -- the physical layout of her work
14  environment was?
15    A     Cubicles.
16    Q     Okay.  Did she ever tell you that she stormed
17  into people's offices, accusing them of trying to get her
18  fired, and they were the offices of people who didn't
19  even know who she was?  Did she ever tell you that?
20    A     I don't know anything about storming, no.
21    Q     Forget about storming.
22          Did she ever tell you that she went into
23  people's offices, the offices of people who did not even
24  know her, and started accusing them of trying to get her
25  fired?
```

**PETER CARLSON, M.A. - June 16, 2020**
**AGUILAR VS. EXPEDITORS INTERNATIONAL OF WASHINGTON, INC.**

1   A    I only have notes of her having conversations
2   with her colleagues or boss.
3   Q    Okay. So based upon what you do and don't know
4   about what it is that she was doing and the work
5   environment in which she was doing it in, what leads you
6   to conclude that there was no reason why she could not
7   return to work?
8   A    Her self-report, her confidence.
9   Q    Okay. But this was the same confidence that she
10  had been displaying with you all along about how
11  confident she was. She was right, and everybody else was
12  talking about her; right?
13  A    Yes.
14  Q    Okay. When you say "she has learned to cope
15  with pressures by thinking about things in a new way,"
16  what was it that she said to impress you so much in this
17  last conversation that you may have had with her about
18  her ability to think about things in a new way?
19  A    I barely recall, but -- but "I'm not going to
20  let it bother me what people say about me," type of
21  thing. An attitude of -- well, everything that I had
22  been trying to encourage her to do is to not care too
23  much about what other people say, what other people
24  think, and what other people do. Because, when you do
25  that, you give your power away to them to ruin your happy

**PETER CARLSON, M.A. - June 16, 2020**
**AGUILAR VS. EXPEDITORS INTERNATIONAL OF WASHINGTON, INC.**

1   day.  Your whole character and personality is ruined.  I
2   explained to her the codependent nature of what it is.
3           And sometimes people, months after therapy, come
4   back to me and say that they've applied these things that
5   they hadn't done at all in homework assignments during
6   the therapy.  But it kind of sinks in later, and I
7   believe that's what happened with Ms. Aguilar.
8       Q    But you testified that you don't even recall if
9   this was a conversation you actually had with her; right?
10      A    Well, I wouldn't have written anything in here
11  like this if it didn't have some substantial confidence
12  that I had in her new attitude or a tone of communication
13  and some belief.
14      Q    Okay.  As you sit here today, you don't recall
15  whether that was a conversation you had with her or
16  somebody called you about her; right?
17      A    No.  You're right.
18      Q    Okay.  And, in fact -- and, in fact, your wife,
19  I believe you testified, in March, right after this
20  letter was written -- your wife was helping Ms. Aguilar
21  with a job search; right?  I believe you said that was --
22  that -- that there was a bill on March 13th for $40 that
23  your wife --
24      A    Yes.
25      Q    Okay.

**PETER CARLSON, M.A. - June 16, 2020**
**AGUILAR VS. EXPEDITORS INTERNATIONAL OF WASHINGTON, INC.**

1   A   Correct.
2   Q   So is it possible that you wrote this to assist
3   with Ms. Aguilar and her job search in response to your
4   wife suggesting that something like this would really
5   help her in getting a job?  Because this was the same --
6   A   No.
7   Q   And you're certain of that?
8   A   Yeah.  One thing didn't have anything to do with
9   the other.
10  Q   The fact that your wife was helping her with a
11  job search at the exact same time as you wrote this
12  February 27th letter --
13      MR. CASTRO:  Objection.  Mischaracterizes --
14  BY MS. WASSERMAN:
15  Q   -- is unrelated?
16  A   Well, the letter is about her going back to her
17  job she has now.  The seeing my wife is to seek another
18  job different from what she has now.  So they're
19  completely different things.
20  Q   Well, except for the fact that, if you look at
21  the letter, it specifically says it's referencing her
22  previous job at Expeditors.  Right?  If you're looking at
23  the second paragraph?  This is basically talking all
24  about her prior employment?
25  A   Oh, she was terminated.  I see.

Carlson Counseling & Psychotherapy
Peter G. Carlson, M.A., MFT
Parenting & Temper Management Classes

23210 Crenshaw Blvd.
Suite 100
Torrance, CA 90505
(310) 325-8787

To whom it may concern:          02/27/2017

# Individual Psychotherapy Treatment Report

This brief letter is intended to verify that **Rosa Aguilar has enrolled in individual psychotherapy as of August 22, 2016. She has completed 15 sessions.**

She has discussed personal, emotional and relationship issues and has discovering problem solving strategies by implementing effective thinking and communication skills; this was especially in order to cope with harassment at work which she believes she was a victim of, at her previous job at Expeditors International. She believes she was wrongfully terminated from her position there. The reason for her treatment at this office was because her work required it to clarify her condition.

Despite the fact that she has been terminated by her company who apparently considered her unfit, she has overcome her difficulties with stress and anxiety which she was being treated for. She was having feelings of anxiety due to apparent invasion of her privacy and feeling treated unfairly.

There is no reason, in my opinion why she cannot return to work. She has learned how to cope with pressures by thinking about things in a new way sand not letting things distract her from continuing to be an excellent employ by all accounts. She was employed 23 years at this company and reportedly has had no previous problems and complaints. She is in good mental health, not a risk to anyone or herself and is a fine person, dedicated to always doing the best job she can as an accounts payable employee.

2-5

It is sincerely hope that this very conscientious worker can be put back to work, as there is no reason why she cannot do an excellent job at her next job position as well.

Thank you for your consideration in these matters. Please contact me if I can be of further help.

Peter G. Carlson, M.A., MFT